Mark S. Cohen
mcohen@CohenGresser.com
Sandra C. McCallion
smccallion@cohengresser.com
**COHEN & GRESSER LLP**
800 Third Avenue
New York, New York 10022
Telephone: (212) 957-7600
Fax: (212) 957-4514

J. Michael Huget (MI P39150)
mhuget@honigman.com
Jeffrey K. Lamb (MI P76738)
jlamb@honigman.com
Roger P. Meyers (MI P73255)
rmeyers@honigman.com
**HONIGMAN MILLER SCHWARTZ
AND COHN LLP**
130 S. First Street, 4th Floor
Ann Arbor, MI 48104
Telephone: (734) 418-4200
Fax: (734) 418-4257
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

LIVEPERSON, INC.,                          :

        *Plaintiff,*                          :   Index No. 14-cv-01559-RWS

                               :

        - against -                          :   **ECF CASE**

                               :   **JURY TRIAL DEMANDED**

24/7 CUSTOMER, INC.,                        :

                               :   **SECOND AMENDED**

        *Defendant.*                          :   **COMPLAINT**

------------------------------------------------------------------ x

## <u>SECOND AMENDED COMPLAINT</u>

Plaintiff LivePerson, Inc. ("LivePerson" or "Plaintiff") complains against Defendant 24/7 Customer, Inc. ("24/7" or "Defendant") as follows:

### I.  INTRODUCTION

1.     Plaintiff LivePerson is a pioneer and industry leader in live-interaction and customer engagement technology for e-commerce websites.   Live-interaction or "online engagement" technology enables businesses to interact in real-time with their website visitors through instant messaging (aka "chat"), voice, and content delivery.   LivePerson's online engagement technology is "intelligent," in that it analyzes in real-time the activities of website visitors individually and in the aggregate across hundreds of thousands of website visits using highly sophisticated predictive algorithms and proprietary methodologies.   This real-time analysis enables LivePerson's business clients to achieve desired results on their websites. LivePerson's intelligent live-engagement technology automatically determines what a website visitor needs in real-time, by, for example, determining when a website visitor is in need of human assistance from a customer service agent via an instant messaging session or phone call, or when a consumer will be most receptive to a sales offer or other content and information.

2.     LivePerson's customers enjoy proven benefits from LivePerson's technology, including measurable and significant increases in online sales, as well as increased customer satisfaction scores.   In addition, LivePerson's technology allows business clients to maximize the efficiency and effectiveness of human customer service agents in their call centers.   LivePerson's proprietary behavioral analysis methods and algorithms are the result of many years' of research undertaken at great expense. LivePerson's intelligent live-engagement and predictive analytics technologies are secured by patents, copyrights, trademarks, trade dress, and other trade secret protections.

3.     Defendant 24/7 historically has been a provider of outsourced human call-center operators to businesses in need of auxiliary manpower to answer phones in the company's call center.   24/7's operators in this scenario would communicate directly with consumers that contact a company's call center, *e.g.*, for customer support.

4.     In 2006, LivePerson entered into a contractual relationship with 24/7 which introduced 24/7 to LivePerson's intelligent engagement technology. In 2007 LivePerson entered into an additional contract with 24/7.   Both contracts concern the parties' provision of joint solutions to customers using LivePerson's technology and 24/7's call-center personnel.

5.     LivePerson believes that 24/7 had never before utilized or adopted website-based live-interaction technology in its business.   Pursuant to the parties' contracts, which contain confidentiality and non-competition clauses, LivePerson introduced 24/7 to LivePerson's technology, and educated 24/7 labor agents regarding use of live-interaction technology as well as LivePerson's proprietary methodologies and best practices for website-based customer service, customer support, and sales.   Further, LivePerson also facilitated relationships by which LivePerson's business clients engaged 24/7 labor agents to provide customer service via LivePerson's live-interaction technology.

6.     Since 2006, 24/7 has provided call-center agents to numerous LivePerson clients, sometimes originating due to introductions made by LivePerson through one of the parties' contractual relationships, and also in circumstances where a customer engaged LivePerson to provide live-interactive technology, and separately engaged 24/7 to provide outsourced customer service agents.   In both types of engagements, 24/7 gains access to and uses LivePerson's copyrighted and proprietary intelligent engagement technology on the customer's behalf (and subject to the confidentiality terms of the customer's contract with LivePerson).

7.     LivePerson recently has uncovered evidence that 24/7 has abused this access and misappropriated and infringed LivePerson's copyrighted technology and confidential information in order to create and refine 24/7's own competing live-interaction technology, as well as intentionally to interfere with LivePerson's technology and its client relationships. LivePerson believes that 24/7's infringement and other improper conduct began no later than 2012 and continued through the filing of this action.

8.     By misappropriating and infringing LivePerson's proprietary technology and trade secrets, 24/7 unjustly has saved millions of dollars in research and development costs, and many years' worth of effort and investment that would have been required to bring its own competing technology to market.   LivePerson is one of only a few companies capable of delivering this type of high quality, intelligent live-engagement functionality to global, enterprise-grade clients, including major financial institutions, telecommunications providers, and retailers.   LivePerson's ability to do so was made possible through LivePerson's intensive investment for more than a decade in selling to and supporting such major global enterprises, and refining its technology to meet the needs of such clients.   Through its wrongful actions, 24/7 improperly has gained access to proprietary information, intellectual property and premium business data that would be impossible for it to develop independently without similar years of investment and effort. LivePerson also has uncovered evidence that 24/7 has further abused its access to LivePerson's technology and systems to: (1) maliciously disrupt the operation of LivePerson's technology on the websites of its customers; (2) misrepresent data regarding LivePerson's technology, services and system performance; and (3) inject spyware into LivePerson's databases, through unauthorized use of LivePerson's copyrighted code, in order to

gather information regarding the operation of LivePerson technology—presumably to reverse engineer LivePerson's technology.

9.      24/7 deliberately and unfairly has interfered and continues to interfere with LivePerson's business relationships through various deceptive and illegal tactics to market its competing live-interaction technology to LivePerson's existing and prospective customers, including by misusing and misappropriating LivePerson's confidential business and proprietary information and by misrepresenting important LivePerson business data.  24/7 has undertaken these acts in order to obtain an unfair and illegitimate competitive advantage in the marketplace.

10.     As a result of 24/7's numerous copyright infringements and other violations of LivePerson's intellectual property rights, breaches of contract, and various tortious acts, LivePerson has been grievously harmed and now brings this action against 24/7.

## II.  PARTIES, JURISDICTION, AND VENUE

11.     LivePerson is a Delaware corporation with its principal place of business at 482 Seventh Avenue, 3rd Floor, New York, New York.

12.     24/7 is a California corporation with its principal place of business at 910 E. Hamilton Avenue, Suite 240, Campbell, California.

13.     This Court has exclusive subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338 in that this case arises under various federal statutes, including the Copyright Act, 17 U.S.C. § 101 *et seq.*, and the Lanham Act, 15 U.S.C. § 1051, *et seq.*  The Court also has subject-matter jurisdiction under 28 U.S.C. § 1338 over LivePerson's unfair-competition based claims because they are joined with substantial and related claims under the copyright and trademark laws.  The Court has supplemental jurisdiction over LivePerson's remaining common-law claims under 28 U.S.C. § 1367.

14.     This Court also has subject-matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs exceeds $75,000.

15.     This Court has personal jurisdiction over 24/7 because 24/7 conducts business in New York and is committing acts of copyright infringement, trade secret misappropriation and other torts in the State of New York and in this district.  In addition, some of the causes of action asserted by this Complaint arise out of 24/7's breaches of contracts made in New York, to be performed in New York, and which are governed by New York law.

16.     Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts, omissions, and injuries giving rise to the claims occurred in this judicial district and because 24/7 is subject to personal jurisdiction in this judicial district at the time this action has commenced.

## III.  GENERAL ALLEGATIONS

### A.     <u>Live-Interaction Technology and the Parties' Roles</u>

17.     Since 1996, LivePerson has been committed to helping its clients achieve "intelligent engagement" with visitors to their websites.  LivePerson's live-interaction and behavioral analysis technologies help LivePerson's clients to proactively engage and connect with and efficiently assist visitors to their websites.  Such assistance can be delivered with live help via instant messaging (aka "live chat" or "chat"), and/or voice connections, and through targeted content delivery (*e.g.*, instructions, FAQs, video, discount coupons). In each case, engagement is delivered "intelligently," based on LivePerson's sophisticated analytic software and proprietary methodologies that allow LivePerson to understand when a website visitor needs help, and what type of help or content will benefit that visitor at any given moment.  LivePerson delivers value to its business clients and their website visitors alike by allowing businesses to

engage their online customers at the right time, with the right type of engagement, and through the right channels, including websites, social media and mobile devices.

18.     LivePerson's technology relies in large part on sophisticated analysis of website visitors' actions and behaviors online, both individually and in the aggregate.   Using a combination of highly sophisticated behavioral analysis and predictive capabilities—which consist of proprietary algorithms and other functionality developed through extensive research and investment, as well as know-how gained through over a decade of hands-on experience— LivePerson's technology is able to make insightful, personalized, and up-to-the-minute assessments of what types of interactions will be valued by a website visitor.   Moreover, LivePerson's intelligent technology can segment and prioritize visitors based on the business client's priorities, to enable the business client to attend to high-priority needs of its website visitors, and allocate human customer service resources in the most efficient and profitable way.

19.     LivePerson's technology works by analyzing website visitors' behavior, identifying key actions or "events" that take place during one or more web browsing sessions, and applying artificial intelligence to determine whether, when, and how to initiate a personalized interactive experience to assist that web visitor.  That artificial intelligence is fueled by many years of research and development undertaken at great expense by LivePerson to develop proprietary algorithms, technology, and methodologies capable of predicting and meeting website visitors' needs in order to achieve the specific business objectives of LivePerson's clients.

20.     Based on its ability to analyze web browsing behavior and engage visitors, LivePerson helps its clients deliver a superior customer experience by intuitively engaging website visitors when they need assistance, and providing the most appropriate or relevant type

of assistance. For example, a visitor to a financial institution's website can be intuitively routed to an operator specializing in mortgages, investments, or technical support depending on the web browsing activity exhibited by the visitor.

21. In addition, because an enterprise-grade website may have hundreds of thousands of simultaneous visitors at any given moment, but proportionally far fewer call-center operators available, LivePerson's technology prioritizes the call-center agents' time and attention in accordance with the business client's desired priorities.

22. More than 8,500 businesses, including dozens of Fortune 500 companies, rely on LivePerson's intelligent live-engagement technology as a means of enhancing the online visitor experience and improving their online sales and other "conversions" or desired results. LivePerson is particularly well established as an industry leader for enterprise-grade clients, like global financial institutions, airlines, major national retailers, and telecommunications carriers, which interact with millions of customers via the web and whose robust live-interaction needs cannot be met by most competing technologies.

23. Although LivePerson provides live-engagement technology systems for its clients, LivePerson does not supply call-center operators or human customer service agents. While some businesses provide their own employee-customer service agents, many larger companies engage labor outsourcing vendors who maintain call centers in various lower-cost locations around the world to supply customer service and sales agents. Many of LivePerson's larger clients use such outsourced personnel in their call centers. Accordingly those outsourced call-center personnel need and receive access to LivePerson's technology to provide call-center services to the business client.

24.     24/7 was founded in 2000 primarily as a labor outsourcer for call-center personnel.  24/7 supplies outsourced call-center personnel through contact centers located, for example, in India, the Philippines, and Guatemala.  Recently, after years of providing call-center personnel to business clients using LivePerson technology, 24/7 became a late entrant into the live-interaction technology space.

### B.     The Parties' Contractual and Co-Located Relationships

25.     LivePerson and 24/7 entered into a Co-Marketing and Referral Agreement ("the Co-Marketing Agreement") in 2006.  (*See* Exhibit A.)  The Co-Marketing Agreement established a framework under which LivePerson and 24/7 would co-market LivePerson's technology and 24/7's outsourced labor agents to prospective clients as a combined solution.

26.     In recognition that the co-marketing contemplated by the Co-Marketing Agreement would require LivePerson to provide 24/7 with non-public access to and training regarding LivePerson's proprietary and protected intellectual property, the parties agreed to confidentiality and non-competition provisions and limitations on 24/7's ability to use LivePerson's proprietary technology and information.

27.     In early 2007, LivePerson and 24/7 entered into a second contract, a Master Service Agreement ("MSA").  (*See* Exhibit B.)  The MSA set forth the terms and conditions under which LivePerson was able to offer a combined solution to its clients using LivePerson's live-engagement technology and 24/7's call-center personnel.

28.     Both the MSA and the Co-Marketing Agreement provided that LivePerson would grant a limited, non-transferable, revocable, royalty-free right for 24/7 to access and use proprietary LivePerson technology subject to confidentiality obligations, and solely for the

purposes set forth in those agreements, which was to provide a joint solution to clients using LivePerson's live-engagement technology and 24/7 call-center personnel.

29.     Both the MSA and the Co-Marketing Agreement also recognized that LivePerson would provide 24/7 access to confidential information regarding its technology, as well as training and certification, again, solely for the purposes set forth in those agreements.  Each agreement includes extensive prohibitions against 24/7's reverse engineering, infringing, or disrupting LivePerson's technology.

30.     As contemplated by the MSA and the Co-Marketing Agreement, LivePerson did provide 24/7 with valuable and proprietary non-public information about, and access to, its technology, know-how, methodologies, business data, business strategy, and client relationships. Under their contractual relationships, LivePerson and 24/7 successfully provided a combined solution to several clients.

31.     The parties also remained free to, and did, market their respective services separately.  Further, the parties each had pre-existing relationships with certain business clients. As a result, a LivePerson client might use 24/7 for call-center operators under either a co-marketed arrangement, or under separate arrangements with each of LivePerson and 24/7, or a LivePerson client might use its own employee call-center personnel or another call-center outsourcer entirely.

32.     For business clients that engage 24/7 to provide outsourced call-center personnel and LivePerson to provide live-engagement technology, whether separately or through a co-marketed solution, 24/7 necessarily is afforded non-public access to certain aspects of LivePerson's technology, such as its agent console and reporting interface, in order to perform its call-center duties as a contractor of the business client.  In this sense, 24/7 is afforded the same

access as LivePerson's business clients—and under the same confidentiality and limited-use license restrictions.  That access includes exposure to and use of LivePerson's "back-end" systems and data, such as the features used by call-center agents to assist website visitors as well as the control features and data access afforded to system administrators to operate and use LivePerson technology on behalf of the business client.  These features provide, among other things, on-demand access to a wealth of business and technical data, as well as control over certain functions of LivePerson's technology that determine how LivePerson's technology interprets and responds to various behaviors exhibited by visitors to the client's website.  In each case, such features and access are provided solely for the business client's licensed use and operation of LivePerson's technology.

33.     Outside of the Co-Marketing Agreement and MSA, 24/7's access and permission to use LivePerson technology and information are governed and restricted by the terms of LivePerson's license agreement with each business client, as 24/7 is afforded access solely as a subcontractor of the business client and solely in 24/7's capacity as a call-center labor provider. LivePerson's client license agreements routinely include confidentiality provisions and limited-use licenses, and require that access by third-party service providers be subject to the same restrictions.

34.     By virtue of the access and information made available under the Co-Marketing Agreement and the MSA, as well as the numerous situations where 24/7 separately has been engaged by clients who use LivePerson technology in their call centers, 24/7 has had access to a wealth of non-public information about LivePerson's proprietary technology and methodologies, confidential business data, intellectual property and trade secrets.  All such access was restricted by contracts limiting use of such information to licensed and legitimate business purposes

authorized by the relevant agreements and imposing confidentiality and noncompetition obligations on 24/7.

### C.   24/7 Misappropriates LivePerson's Technology, Misuses Its Access To LivePerson's Confidential Information Unfairly To Compete, And Actively Sabotages LivePerson's Services

35.    At some point, 24/7 apparently decided to develop its own competing live-interaction technology and to compete with LivePerson.  Rather than incur the millions of dollars and many years' worth of research and development costs, as well as years of sales efforts and intensive client service needed legitimately to create and refine its technology and gain necessary industry information and experience, 24/7 instead chose to misappropriate that valuable proprietary information and intellectual property from LivePerson.

*24/7 exploits its access to LivePerson's technology for improper purposes*

36.    As set forth above, 24/7 obtained non-public access to certain aspects of LivePerson's technology, such as its agent console and reporting interface, and business information in connection with the Co-Marketing Agreement and the MSA, as well as through its services as a labor outsourcer to LivePerson's business clients.

37.    In its capacity as call-center labor provider to LivePerson clients, 24/7 enjoys the client's access to certain aspects of LivePerson's back-end systems for the purpose of using the technology and managing the call-center operators on behalf of the client.  LivePerson believes, however, that 24/7 has abused its access to LivePerson's back-end systems to observe, penetrate, and manipulate the operation of LivePerson's technology and download extensive data from LivePerson's servers in order to both interfere with LivePerson's client relationships and to reverse engineer and copy LivePerson's technology.

38.     For example, 24/7's limited authorization to access certain aspects of LivePerson's technology, such as its agent console and its reporting interface, did not include authorization to write its own tracking markers to the servers upon which LivePerson stores visitor monitoring data, as more fully detailed below.  Nor did 24/7 have any authorization to access—and disable—the software code by which LivePerson's interactive chat functionality is triggered, thereby interrupting the LivePerson service.

39.     LivePerson also has learned that 24/7 repeatedly has provided inaccurate business performance data regarding LivePerson to LivePerson's clients, which (a) could not be produced without accessing LivePerson's confidential system data; and (b) differs significantly from LivePerson's business performance data shown when LivePerson technology is used by any of a dozen or so other outsourced call-center labor providers and/or client call-center employees. LivePerson believes that 24/7 intentionally has manipulated LivePerson's technology in client deployments, fabricated metrics regarding LivePerson's performance, or both, in order to create a false and misleading perception that, among other things, 24/7's technology is equivalent or superior to LivePerson's technology, and to create an artificial and inaccurate cost disparity between the two.

**24/7 injects spyware into LivePerson's technology**

40.     LivePerson also has discovered evidence that 24/7 inappropriately has gained unauthorized access to LivePerson technology and systems by abusing 24/7's access to client websites.  Now that 24/7 offers competing "live-interactive" technology, 24/7 is able to install its competing technology on client websites where LivePerson's technology already is installed. Once 24/7's live-interaction software has been installed on a website that also contains LivePerson's technology, it appears that 24/7 improperly injects "spyware" into LivePerson's systems.  24/7's spyware appears expressly designed to capture confidential and proprietary

information and data regarding LivePerson's technology and client relationships.  LivePerson believes that 24/7 uses this spyware to reverse engineer LivePerson's proprietary methods and technology and potentially copy them, as well as to interfere with LivePerson's client relationships.

41.     24/7's illicit conduct and spying tactics have involved deep penetration of LivePerson's technology platform.  For example, LivePerson has found 24/7 programming code embedded on client websites that is clearly designed to siphon data regarding the operation and activity of LivePerson's proprietary behavioral analytics and predictive targeting functionalities—and then stream this information back to 24/7's servers.

42.     24/7's insidious tactics work by infringing LivePerson's copyrighted software code and using LivePerson's own proprietary programming to make calls to LivePerson's servers.  Those tactics, which depend on inside access to the business client's secured website environment, allow 24/7 to mimic LivePerson itself.  By hijacking LivePerson's programming, 24/7 has been able secretly to inject millions of tracking and indexing markers into LivePerson's systems in a completely unauthorized and unlawful manner, illegitimately creating an ability to mine LivePerson's confidential and proprietary system data.  LivePerson believes that 24/7 uses this confidential and proprietary system data to reverse engineer LivePerson's products and to interfere with LivePerson's client relationships.

43.     24/7 has no legitimate business purpose for copying and making unauthorized use of LivePerson's software code, or spying on LivePerson's technology systems or the confidential data those systems collect and produce.  Rather, LivePerson believes that 24/7 has done so in an effort to reverse engineer and misappropriate the proprietary technology and methodologies that

14

LivePerson pioneered, and to save itself years of time and expense in research and development, industry experience and client service in bringing a competing technology to market.

*24/7 deliberately sabotages LivePerson's technology*

44.   LivePerson also has discovered evidence that 24/7 has abused its access to client websites and to LivePerson systems to engage in specific acts of sabotage designed to disrupt the functionality of LivePerson's technology and interfere with its client relationships.

45.   For example, where 24/7's competing technology is installed on LivePerson's client's websites, LivePerson has discovered 24/7 programming code expressly designed to suppress the proper operation of LivePerson's technology, such as preventing live-chat sessions from being initiated, and/or eliminating LivePerson's "chat" button from appearing altogether.

*24/7 engages in other improper conduct*

46.   In addition to the rampant misconduct detailed above, 24/7 has prepared and published marketing materials and advertisements containing demonstrably false and misleading claims about LivePerson's and 24/7's technologies.

47.   In particular, 24/7 repeatedly has advertised itself as creating the "first" predictive or smart chat platform.  24/7 knows these statements to be untrue because it copied and learned of this technology from LivePerson, which pioneered the technology years earlier.

48.   For example, in a blog post purportedly authored by 24/7's founder, PV Kannan on January 22, 2013—which was still accessible on 24/7's website as of the filing of this complaint—24/7 purports to announce that it "finally" has brought to market "the industry's first smart chat."  (*See* Exhibit C.)  The post goes on to condemn the "antiquated chat platforms" available in 2012 and 2013, to herald Kannan's alleged legacy of being the "first" as a chat pioneer in the 1990s and to state, "we've come a long way since the 90s."  (*Id.*)

49.     In addition, 24/7 authored and made available on its website in 2014 a four-page, highly produced white paper entitled "[24]7 Assist: Chat, Made Smarter." (*See* Exhibit D)  The white paper included an executive summary section criticizing so-called "traditional chat software solutions and asserting that the "need for a more intuitive, predictive real-time customer service solution has now reached a critical point for today's enterprises." (*Id.*)  To solve that problem, 24/7 purports to offer "the first predictive, real-time customer assistance solution for chat." (*Id.*)  It reiterates a page later, "[24]7 Assist, the industry's first smart chat platform, empowers agents with predictive models, intelligence and rich content." (*Id.*)

50.     24/7's false advertisements were patently designed to, and did, help it capture market share and contracts with clients who respond to the claim of being "first" as a point of differentiation; and LivePerson has been damaged as a result.

51.     The MSA and Co-Marketing Agreement also put strict protections in place to prevent 24/7 from using its access to LivePerson's intellectual property for any purpose other than the mutually beneficial activities of the parties.   Certainly, access to LivePerson's technology was never provided for the purpose of allowing or assisting 24/7 to create competing technology.

52.     In addition, where 24/7 provides labor agent services to LivePerson's clients, 24/7 is precluded by LivePerson's client license agreements from using its access for any purpose other than the licensed use of LivePerson technology by the client, which certainly does not include the ability to create competitive products.

53.     Finally, 24/7 has no conceivable right to spy on, reverse engineer, copy, manipulate, sabotage, or make unauthorized use of LivePerson's technology in an effort to misappropriate its intellectual property or interfere with and steal its client relationships.

54.     LivePerson already has lost or been notified of cancellation by major clients expressly due to 24/7's improper conduct.  LivePerson also has been informed by several clients that 24/7 actively is disparaging LivePerson's technology and services based on misrepresentation and misuse of LivePerson's confidential data, which 24/7 is not authorized to use for competitive purposes.

55.     24/7's wrongful conduct has damaged and continues to endanger LivePerson's relationships with several major clients, representing potentially millions of dollars of revenue, and has harmed LivePerson financially in an amount well in excess of the diversity jurisdictional threshold of $75,000 excluding interests and costs.

### COUNT I

### Copyright Infringement, 17 U.S.C. § 101 *et seq.*

56.     LivePerson incorporates and re-alleges the allegations of paragraphs 1-55, inclusive.

57.     LivePerson's innovative and proprietary intelligent live-interaction and customer engagement technology is a work of original creative expression fixed in software programming. LivePerson is the rightful owner of this copyrighted material and is empowered to enforce the rights inherent in its copyrights.  LivePerson has registered its copyrighted LivePerson Visitor Monitoring Module with the United States Copyright Office.  (*See* Exhibit E.)

58.     As detailed above, 24/7, without LivePerson's authorization or consent, and in express violation of the limitations on the access to which 24/7 had any right of access, has reproduced and copied, caused to be reproduced and copied, used, and/or prepared derivative works of LivePerson's copyrighted technology.  In particular, 24/7 has copied and made unauthorized use of LivePerson's own copyrighted software code to make calls to LivePerson's

servers, for the apparent purpose of injecting millions of tracking and indexing markers into LivePerson's systems, mining the resulting data, and reverse engineering and copying LivePerson's copyrighted technology.

59.     24/7's conduct, which began occurring no later than 2012 and continued through the filing of this action, constitutes direct and intentional infringement of LivePerson's exclusive rights under the Copyright Act to control the reproduction, publication, use and display of LivePerson's live-interaction technology, including the LivePerson Visitor Monitoring Module.

60.     24/7's conduct constitutes repeated infringement under the Copyright Act, 17 U.S.C. § 101 *et seq.*

61.     As a direct and proximate result of 24/7's conduct, LivePerson has suffered and continues to suffer the disruption of its business relationships and the loss of clients and potential clients, dilution of good will, injury to its reputation, misappropriation of its intellectual property, and devaluation of its live-interaction and analytic technology and its trade secrets.

## COUNT II

### Misappropriation of Trade Secrets

62.     LivePerson incorporates and re-alleges the allegations of paragraphs 1-61, inclusive.

63.     Many aspects of LivePerson's live-interaction technology are not generally known outside of LivePerson.  Because this information is valuable, is subject to reasonable measures to guard its secrecy, and is difficult for others properly to acquire or independently duplicate, it constitutes protected trade secret information under New York common law.

64.     24/7 acquired knowledge of these trade secrets under circumstances giving rise to a duty to maintain their secrecy and not use them except for the purposes for which disclosure

was made.   These circumstances include access and information made available under confidentiality obligations in connection with the MSA and the Co-Marketing Agreement, or where 24/7 provides outsourced call-center labor to LivePerson clients subject to the confidentiality provisions and other restrictions in the client's license agreement with LivePerson.

65.     24/7 also acquired knowledge of these trade secrets through entirely improper means including intentionally exceeding its authorized access and use permissions, copying and making unauthorized use of LivePerson's software, as well as the outright and malicious introduction of spyware into LivePerson's technology.

66.     24/7 thereafter misappropriated and continues to misappropriate LivePerson's trade secrets for its own benefit by using them to develop and improve technology directly to compete with LivePerson's technology.   24/7 further misused and continues to misuse its knowledge of LivePerson's trade secrets in order to sabotage LivePerson's technology and create false perceptions of the cost and performance of LivePerson's technology.

67.     As a direct and proximate result of 24/7's conduct, LivePerson has suffered and continues to suffer the disruption of its business relationships and the loss of clients and potential clients, dilution of good will, injury to its reputation, misappropriation of its intellectual property, and devaluation of its live-interaction and analytic technology and its trade secrets.

## COUNT III

### Breach of Contract

68.     LivePerson incorporates and re-alleges the allegations of paragraphs 1-67, inclusive.

69.     The MSA and the Co-Marketing Agreement are binding contracts between LivePerson and 24/7.

70.     By its conduct as set forth above, 24/7 has breached at least paragraphs 2.1, 2.2, 2.3, 5.2 and 5.4 of the Co-Marketing Agreement.  (*See* Ex. A.)  In particular, 24/7 has breached its obligations to access LivePerson's technology only for permitted purposes and to refrain from misusing, copying, and reverse engineering LivePerson's technology and other confidential information.

71.     By its conduct as set forth above, 24/7 has breached at least paragraphs 5(b), 6(b), 7(a), 7(b), 7(f), 7(g), 9(d)(2), and 17(a) of the MSA.  (*See* Ex. B.)  In particular, 24/7 has breached its obligations to access LivePerson's technology only for permitted purposes and to refrain from misusing LivePerson's technology and other confidential information and from introducing Trojan horses, malicious computer instructions, or other intentional devices to infect, assault, disrupt, or disable LivePerson's systems.

72.     LivePerson has satisfied all conditions precedent to bringing this action.

73.     As a direct and proximate result of 24/7's conduct, LivePerson has suffered and continues to suffer the loss of clients and potential clients, dilution of good will, injury to its reputation, misappropriation of its intellectual property, and devaluation of its live-interaction and analytics technology and its trade secrets.

### COUNT IV

**Intentional Interference With Advantageous
Existing Economic Relationships**

74.     LivePerson incorporates and re-alleges the allegations of paragraphs 1-73, inclusive.

75.     LivePerson has or had existing economic relationships with certain major clients in the financial services, telecommunications, retail, high technology, and other sectors.  24/7 was aware of LivePerson's economic relationships with these clients because those relationships were disclosed in writing in the parties' agreements and/or because 24/7 was engaged to provide call-center labor agents to the LivePerson client.  (*See* Ex. A, at Sch. 1.)

76.     24/7 intentionally, wrongfully, and with actual malice has interfered with and continues to interfere with LivePerson's economic relationships with these clients and others by developing its own technology through the misappropriation and misuse of LivePerson's proprietary technology and confidential information, and by then specifically marketing its new technology to these known LivePerson clients.

77.     24/7 intentionally, wrongfully, and with actual malice has interfered with and continues to interfere with LivePerson's economic relationships with these clients by copying and hijacking LivePerson's software code through those clients' websites, by injecting unauthorized spyware into LivePerson's servers through those websites, by developing and publishing software code designed to suppress LivePerson's chat functionality on those websites, by manipulating the functionality on those websites to degrade LivePerson's performance, and by submitting falsified or manipulated reports purporting to show inferior performance and excessive costs associated with LivePerson's technology.  24/7 did so and continues to do so in order to create a false appearance that LivePerson's technology is inferior to and costlier than 24/7's derivative, misappropriated technology and to otherwise unfairly compete with LivePerson.

78.     24/7's conduct was unprivileged, unethical, unlawful and unjustified.

79.     There was no legitimate reason for 24/7's conduct and its conduct exceeded and breached all legitimate and authorized access, permissions, and contractual limitations.

80.     As a direct and proximate result of 24/7's interference, several of LivePerson's major clients have cancelled or notified LivePerson they intend to cancel their relationship with LivePerson and replace LivePerson's technology with 24/7's misappropriated competitive technology.

81.     As a direct and proximate result of 24/7's conduct, LivePerson has suffered and continues to suffer the loss and potential loss of clients, dilution of good will, injury to its reputation, misappropriation of its intellectual property, and devaluation of its live-interaction and analytics technology and its trade secrets.

## COUNT V

### Intentional Interference with Prospective Advantageous Economic Relationships

82.     LivePerson incorporates and re-alleges the allegations of paragraphs 1-81, inclusive.

83.     Because of its preeminent reputation in live-interaction and predictive analytics technology, LivePerson has continually grown its business through contracts with new clients.

84.     24/7 specifically was aware of LivePerson's prospective economic relationships with multiple clients because the parties' agreements contained a list of prospective clients to whom LivePerson was seeking to market its products and services.  (*See* Ex. A, at Sch. 1.)  In addition, 24/7 generally is aware of LivePerson's market position as one of only a few companies in the world capable of delivering intelligent live-interaction functionality to enterprise-grade clients, and specifically is aware of LivePerson's client relationships in all

accounts where 24/7 provides outsourced call-center labor to LivePerson's clients using LivePerson's technology.

85.     24/7 intentionally, wrongfully, and with actual malice has interfered with and continues to interfere with LivePerson's existing and prospective economic relationships with clients by developing its own technology through the copying, misappropriation, and misuse of LivePerson's proprietary technology and by seeking to damage LivePerson's reputation in the marketplace through the acts of sabotage and misinformation described above.  24/7 did so in order create a false and misleading impression that LivePerson's technology was inferior to 24/7's misappropriated technology.

86.     24/7's conduct was unprivileged, unethical, unlawful, and unjustified.

87.     There was no legitimate reason for 24/7's conduct and its conduct exceeded and breached all legitimate and authorized access, permissions, and contractual limitations.

88.     LivePerson asserts on information and belief that it has lost existing and prospective clients to 24/7 as a result of 24/7's wrongful interference.

89.     As a direct and proximate result of 24/7's conduct, LivePerson has suffered and continues to suffer the loss of clients and potential clients, dilution of good will, injury to its reputation, misappropriation of its intellectual property, and devaluation of its live-interaction and analytics technology and its trade secrets.

## COUNT VI

### Lanham Act Unfair Competition, 28 U.S.C. § 1125(a)

90.     LivePerson incorporates and re-alleges the allegations of paragraphs 1-89, inclusive.

91.     24/7 has, in commercial advertising and promotion, misrepresented the true nature, characteristics, and qualities of its own and LivePerson's goods and services, including by falsely claiming to have developed the "first" predictive or smart chat platform.

92.     Taken in context, 24/7's false claims of having the "first" smart chat platform were designed to, and did, help it capture market share and contracts with clients who responded to being "first" as a point of differentiation, thus damaging LivePerson.

93.     24/7's false advertising violates the Lanham Act, 28 U.S.C. § 1125(a).

94.     As a direct and proximate result of 24/7's conduct, LivePerson has suffered and continues to suffer the loss of clients and potential clients, dilution of good will, injury to its reputation, misappropriation of its intellectual property, and devaluation of its live-interaction and predictive analytics technology and its trade secrets.

## COUNT VII

## Common Law Unfair Competition

95.     LivePerson incorporates and re-alleges the allegations of paragraphs 1-94, inclusive.

96.     24/7 has copied, misappropriated, and sabotaged LivePerson's proprietary technology and improperly accessed LivePerson's confidential and proprietary information in order to gain an unfair advantage in developing and marketing its own competing technology.

97.     24/7 has passed off that competing technology as its own and has marketed it to known existing LivePerson clients and prospective clients without informing those clients that its technology is based on the intellectual property it stole from LivePerson.  It also has falsely and maliciously interfered with and misreported the functionality of LivePerson's technology so as to make that technology appear to be inferior to and costlier than 24/7's new, stolen technology.

98.     As a direct and proximate result of 24/7's conduct, LivePerson has suffered and continues to suffer the loss of clients and potential clients, dilution of good will, injury to its reputation, misappropriation of its intellectual property, and devaluation of its live-interaction and analytics technology and its trade secrets.

## COUNT VIII

## Unjust Enrichment

99.     LivePerson incorporates and re-alleges the allegations of paragraphs 1-98, inclusive.

100.    As detailed above, 24/7 used and continues to use its access to LivePerson's proprietary information and technology to save millions of dollars of research and development, marketing, sales and client support effort and costs, and many years' worth of intensive work and experience in developing a competing technology.  24/7 used and continues to use its knowledge of and access to LivePerson technology, clients, and prospective clients to sabotage and undercut LivePerson's technology and to interfere with and usurp LivePerson's client relationships.

101.    Through this conduct, 24/7 obtained, without compensation, a substantial benefit from and at the expense of LivePerson, under circumstances in which it would be inequitable to allow 24/7 to retain that benefit.

## PRAYER FOR RELIEF

WHEREFORE, LivePerson respectfully asks that this Court:

1.     Find 24/7 liable for copyright infringement;

2.     Find 24/7 liable for trade secret misappropriation;

3.     Find 24/7 liable for breach of contract;

4.     Find 24/7 liable for tortiously interfering with LivePerson's existing and prospective economic relations;

5.      Find 24/7 liable for violating the Lanham Act;

6.      Find 24/7 liable for unfair competition in violation of the common law;

7.      Find 24/7 liable for unjustly enriching itself at LivePerson's expense;

8.      Award LivePerson its actual damages in an amount to be determined at trial, including but not limited to the disgorgement of 24/7's ill-gotten revenue and proceeds;

9.      Award LivePerson punitive damages in an amount to be determined at trial for 24/7's knowing, willful, and malicious conduct;

10.     Enjoin 24/7 from copying or making unauthorized use of LivePerson's copyrighted technology, and from using, distributing, or developing a derivative work based in any part on LivePerson's copyrighted technology;

11.     Enjoin 24/7 from obtaining unauthorized access to LivePerson's copyrighted technology and from obtaining or attempting to obtain unauthorized access to or information from LivePerson's protected computers;

12.     Enjoin 24/7 from interfering with LivePerson's existing and prospective economic relationships and from unfairly competing with LivePerson and misappropriating its trade secrets;

13.     Award LivePerson pre- and post-judgment interest;

14.     Award LivePerson its costs in bringing this action and its attorneys' fees;

15.     Provide such other relief as the Court may deem just and proper.

LivePerson demands a trial by jury of its claims against 24/7.

Dated:  February 4, 2015                    Respectfully submitted,

*Mark S. Cohen /SGD)*

Mark S. Cohen
mcohen@CohenGresser.com
Sandra C. McCallion
smccallion@cohengresser.com
**COHEN & GRESSER LLP**
800 Third Avenue
New York, New York 10022
Telephone: (212) 957-7600
Fax: (212) 957-4514

J. Michael Huget (MI P39150)
mhuget@honigman.com
Jeffrey K. Lamb (MI P76738)
jlamb@honigman.com
Roger P. Meyers (MI P73255)
rmeyers@honigman.com
**HONIGMAN MILLER SCHWARTZ**
**AND COHN LLP**
130 S. First Street, 4th Floor
Ann Arbor, MI 48104
Telephone: (734) 418-4200
Fax: (734) 418-4257
*Attorneys for Plaintiff*

16510070.5