Michael W. De Vries (S.B.N. 211001)
Sharre Lotfollahi (S.B.N. 258913)
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, CA  90071
Telephone:  (213) 680-8400
Facsimile:  (213) 680-8500
Email:  michael.devries@kirkland.com
Email:  sharre.lotfollahi@kirkland.com

Adam R. Alper (S.B.N. 196834)
Robert Kang (S.B.N. 274389)
James W. Beard (S.B.N. 267242)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA  94104
Telephone:  (415) 439-1400
Facsimile:  (415) 439-1500
Email:  adam.alper@kirkland.com
Email:  robert.kang@kirkland.com
Email:  james.beard@kirkland.com

Joshua L. Simmons (admitted pro hac vice)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:  joshua.simmons@kirkland.com

*Attorneys for Plaintiff LivePerson, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| LIVEPERSON, INC., <br><br> Plaintiff, <br><br> v. <br><br> [24]7.AI, INC. (F/K/A 24/7 CUSTOMER, INC.), <br><br> Defendant. | Case No. 3:17-CV-01268 <br><br> **PLAINTIFF LIVEPERSON, INC.'S OPPOSITION TO [24]7'S MOTION TO REDUCE THE NUMBER OF TRADE SECRETS** <br><br> Date:   March 29, 2018 <br> Time:   2:00 PM <br> Place:  Courtroom 9, 19th Floor <br> Judge:  Hon. Jon S. Tigar |

REDACTED DOCUMENT SOUGHT TO BE FILED

UNDER SEAL

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 3

    I.     [24]7'S MISAPPROPRIATION .......................................................... 3

    II.     LIVEPERSON'S TRADE SECRETS ................................................. 5

ARGUMENT ...................................................................................................... 9

    I.     LIVEPERSON VOLUNTARILY REDUCED ITS NUMBER OF TRADE SECRETS TO MATERIALLY BELOW THE 70-SECRET LIMIT PROPOSED BY [24]7, WHICH SHOULD PRECLUDE [24]7'S INSISTENCE ON A NEW, LOWER LIMIT ................................................. 10

    II.     THE REMAINING NUMBER OF ASSERTED TRADE SECRETS IS REASONABLE AND LIVEPERSON WOULD BE SEVERELY PREJUDICED BY IMPOSITION OF [24]7'S NEW, ARBITRARY LIMIT 11

        A.     LivePerson's Four Categories of Trade Secrets Can Be Manageably Tried ........................................................................ 12

        B.     Courts Routinely Permit Far More Trade Secrets to Be Presented to the Jury ........................................................................... 14

        C.     Imposing [24]7's Arbitrary 10-Secret Limit On LivePerson Would Severely Prejudice LivePerson, In Contravention Of The Law ...................................................................................... 15

    III.     [24]7'S ARGUMENTS ABOUT THE SUFFICIENCY OF LIVEPERSON'S INTERROGATORY RESPONSES ARE WRONG, AND IN ANY EVENT DO NOT SUPPORT REDUCING THE NUMBER OF LIVEPERSON'S TRADE SECRETS ............................................................................. 19

CONCLUSION ................................................................................................ 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Brescia v. Angelin*,
 172 Cal. App. 4th 133, 90 Cal. Rptr. 3d 842 (2009)........................................................14

*Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*,
 15 F.3d 1573 (Fed. Cir. 1993)..........................................................................................16

*DVD Copy Control Ass'n, Inc. v. Bunner*,
 31 Cal. 4th 864 (2003) ......................................................................................................18

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
 No. 09 Civ. 58, 2014 WL 792137 (E.D. Va. Feb. 25, 2014).............................................14

*Gentherm Canada, Ltd v. IGB Auto., Ltd*,
 No. 13 Civ. 11536, 2016 WL 1170801 (E.D. Mich. Mar. 25, 2016)..................................19

*Intermedics, Inc. v. Ventritex, Inc.*,
 804 F. Supp. 35 (N.D. Cal. 1992) .....................................................................................15

*In re Katz Interactive Call Processing Patent Litig.*,
 639 F.3d 1303 (Fed. Cir. 2011).........................................................................................19

*MAI Sys. Corp. v. Peak Computer, Inc.*,
 991 F.2d 511 (9th Cir. 1993) ............................................................................................16

*Mathews v. Eldridge*,
 424 U.S. 319 (1976)....................................................................................................17, 18

*Mattel, Inc. v. MGA Entm't, Inc.*,
 782 F. Supp. 2d 911 (C.D. Cal. 2011) ..............................................................................14

*N. Atl. Instruments, Inc. v. Haber*,
 188 F.3d 38 (2d Cir. 1999)................................................................................................16

*Picker Int'l Corp. v. Imaging Equip. Servs., Inc.*,
 931 F. Supp. 18 (D. Mass. July 5, 1995) ..........................................................................14

*Ruckelshaus v. Monsanto Co.*,
 467 U.S. 986 (1984)....................................................................................................16, 18

*ScentSational Techs., LLC v. PepsiCo, Inc.*,
 No. 13 Civ. 8645, 2017 WL 4403308 (S.D.N.Y. Oct. 2, 2017) ........................................14

*Speech Tech. Assocs. v. Adaptive Commc'n Sys.*,
 No. 88 Civ. 2392, 1994 WL 449032 (N.D. Cal. 1994).....................................................16

ii

*Spring Design, Inc v. Barnesandnoble.com, LLC*,
   No. 09 Civ. 05185, 2010 WL 5422556 (N.D. Cal. Dec. 27, 2010) ............................................17

*Tech. Licensing Corp. v. Blackmagic Design Pty Ltd.*,
   No. 13 Civ. 05184, 2015 WL 307256 (N.D. Cal. Jan. 22, 2015) ..................................................17

*Think Village-Kiwi, LLC v. Adobe Sys., Inc.*,
   No. 08 Civ. 04166, 2009 WL 3837270 (N.D. Cal. Nov. 16, 2009)..............................................17

*TNS Media Research, LLC v. Tivo Research & Analytics, Inc.*,
   No. 11 Civ. 4039 (S.D.N.Y. May 31, 2013) ................................................................................15

*Verigy US, Inc. v. Mayder*,
   No. 07 Civ. 04330, 2008 WL 564634 (N.D. Cal. Feb. 29, 2008)................................................17

*Via Techs., Inc. v. Asus Computer Int'l*,
   No. 14 Civ. 3586, 2016 WL 5930280 (N.D. Cal. Oct. 12, 2016) ................................................14

*Waymo LLC v. Uber Techs., Inc.*,
   No. 17 Civ. 00939 (N.D. Cal. June 14, 2017)..................................................................14, 15, 16

*Youth Justice Coal. v. City of Los Angeles*,
   264 F. Supp. 3d 1057 (C.D. Cal. 2017) ......................................................................................18

**Statutes**

18 U.S.C. § 1836................................................................................................................................16

18 U.S.C. § 1839(3) ..........................................................................................................................16

35 U.S.C. § 112..................................................................................................................................15

35 U.S.C. § 121..........................................................................................................................15, 16

**INTRODUCTION**

[24]7's request to limit the number of misappropriated trade secrets for which LivePerson can seek relief in this action to no more than ten (10) is a thinly-veiled attempt to minimize [24]7's liability for its years-long ████████ scheme, in which it brazenly used numerous LivePerson trade secrets to develop a competing chat platform and take LivePerson's customers. As explained by [24]7's Senior Business Development Manager:

█████████████████████████████████████████████████████████

Ex. A.[1]  [24]7's request to arbitrarily restrict its liability for the large-scale theft of LivePerson's trade secrets it perpetrated—by shielding the jury from the full extent of that theft—is not proper or necessary. At [24]7's request, LivePerson already has materially reduced the number of trade secrets at issue in this case to a number that is eminently manageable for expert discovery and trial— and well below the limit that [24]7 previously proposed—and neither the law nor case management principals supports [24]7's request to limit LivePerson's ability to obtain full recourse for [24]7's trade secret misappropriation.

[24]7's motion to limit LivePerson to ten trade secrets should be denied for several reasons. *First*, LivePerson already has materially reduced the number of trade secrets at issue in this proceeding to a reasonable number, and [24]7's complaints about LivePerson's trade secret disclosures have been an unjustifiably moving target. As part of its good faith effort to cooperatively resolve issues, LivePerson voluntarily amended its trade secret disclosure *three times* to satisfy [24]7's various demands:

- When [24]7 demanded more detail beyond what the New York District Court already had ruled sufficient, LivePerson voluntarily amended its trade secrets disclosure to include a

---

[1]  Unless otherwise noted, all cited exhibits are to the supporting declaration of Michael W. De Vries ("De Vries Decl."), filed concurrently herewith.

more detailed narrative of the facts concerning the LivePerson trade secrets misappropriated by [24]7.

- After [24]7 subsequently complained that the narrative format should be changed to a list of enumerated trade secrets, LivePerson again voluntarily complied, supplementing its disclosure to provide a detailed enumerated list of 182 LivePerson trade secrets that the evidence establishes were misappropriated by [24]7.

- After [24]7 complained again, this time arguing that there were *too many* trade secrets in LivePerson's response, LivePerson asked [24]7 what a reasonable number would be and [24]7 indicated that 70 trade secrets would be an appropriate limit.  LivePerson thereafter again voluntarily amended its trade secrets disclosure to reduce the total number of asserted trade secrets to 61—a nearly seventy percent reduction in the number of asserted trade secrets and well below the 70 trade secrets that [24]7 had indicated would be reasonable.

After obtaining LivePerson's voluntary reduction—made in an effort to finally put [24]7's complaints about LivePerson's trade secrets disclosure to rest—[24]7 improperly shifted positions again: suggesting as recently as last month that a limit of 30 would be appropriate, then ultimately suggesting in this motion that a limit of 10 should be imposed.  Neither of [24]7's new arbitrary limits is tied to the facts of this case, or the specifics of LivePerson's trade secrets disclosure, and there is no justification for allowing [24]7 to further restrict LivePerson's disclosure.

*Second*, it will be eminently reasonable for the parties to try the already-reduced number of trade secrets in LivePerson's current disclosure, and the law does not support [24]7's request to further restrict the number of trade secrets for which LivePerson may obtain recourse.  The trade secrets enumerated in LivePerson's current disclosure consist of only *four categories* of trade secrets that the evidence unequivocally establishes were misappropriated by [24]7:

- [24]7 stole LivePerson's **rules and associated variables** (the predictive analytics behind LivePerson's chat platform) that LivePerson had deployed for multiple different customers.  These rules and variables will be addressed as a category, which covers 26 of the 61 trade secrets.

2

- [24]7 used LivePerson's **data and data reporting** to build its competing platform, which will be presented together as a category, covering 28 of the 61 trade secrets.

- [24]7 misappropriated LivePerson's **tag-related trade secrets**, which are grouped together as five of the 61 instances of misappropriation.

- Finally, [24]7 misappropriated LivePerson's **business information**, consisting of two of the 61 trade secrets.

As a result each party will have no difficulty presenting their cases to the jury during the ten court days the Court has allocated for trial. Indeed, other courts routinely have permitted trade secret plaintiffs to present far more trade secrets to the jury than those included in LivePerson's already-reduced list.

*Finally,* LivePerson would be severely prejudiced if [24]7's proposal is adopted. Limiting LivePerson to [24]7's arbitrary ten-secret limit would preclude ████████████████████ ████████████████████ e liability—for large parts of [24]7's misconduct. Such a result would be inconsistent with due process and fundamental principles of fairness. Because trade secrets law does not support the outcome it seeks, [24]7 attempts to analogize to patent cases, in which patentees have at times been limited in the number of claims they can assert from a single patent. But patents and trade secrets are fundamentally different legal rights, and the justification for requiring reduction in asserted patent claims from a single patent—that multiple claims in a patent are directed to different ways of describing *the same invention*—does not apply to trade secrets. As a result, prohibiting LivePerson from seeking recourse for each of the trade secrets that were misappropriated by [24]7 would deprive LivePerson of its rights, and lead to an unjustified windfall for [24]7. And such a draconian outcome is unnecessary given LivePerson's voluntary, material reduction in the number of asserted trade secrets to a number that can reasonably be tried.

For these reasons, LivePerson respectfully requests that [24]7's motion be denied.

## BACKGROUND

## I.    [24]7'S MISAPPROPRIATION

In 2006, [24]7 began providing chat agent labor to companies using LivePerson's software technologies ("Joint Customers"). *See* 2d Am. Compl. (Dkt. 50) Exs. A, B. Through the course of,

3

1  and in connection with, those relationships, which were subject to confidentiality agreements, [24]7

2  employees had non-public access to valuable and proprietary non-public information about

3  LivePerson technology, know-how, methodologies, business data (including XML data, chat

4  transcripts, and reports), business strategy, and client relationships.  *See id.*  Sometimes [24]7

5  obtained the information directly from LivePerson or LivePerson's platform and sometimes [24]7

6  employees would request the information directly from the Joint Customers.

7    After working side-by-side for years, LivePerson ultimately discovered that [24]7 had abused

8  its access to siphon LivePerson's confidential information and use it to develop a competing chat

9  platform.  *See id.*  In March 2014, LivePerson filed suit for trade secret misappropriation among

10  other claims arising from [24]7's misconduct (the "Trade Secrets Action").  Compl. (Dkt. 2).

11    Through discovery, it is now clear that [24]7 acknowledged that ████████████

12  ████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████

14  ████████.  By way of mere example:

15   &bull; [24]7's plan was to ████████████████████████████

16    ████████████████████████████████████████████

17    ████████████████████████████████████████████

18    ████████████  Ex A.

19   &bull; [24]7 ████████████████████████████████████

20    ████████████████  Ex. B.

21   &bull; [24]7 ████████████████████████████████

22    ████████████████████████████████████████

23    ████████████████████.  Exs. C ████████████████

24    ████████████████████████████████████████████

25    ████████████████████████████████████████

26    ████████████████),  D (noting that ████████████████

27    ████████████████████████████████████████████

28    ████████████████████),  E (noting that ████████

1 ████████████████████████████████████████████

2 ████████████████████████████████████).

3 • [24]7 ████████████████████████████████████

4 ████████████████████████. Ex. G.

5 • [24]7 created a ████████████████████████████████

6 ████████████████████████████████████████

7 ████████████████████. Ex. H (████████████████

8 ████████████████████████████

9 ████████████████████████████████████

10 ████████████████████████).

## II.   LIVEPERSON'S TRADE SECRETS

Despite [24]7's widespread copying of LivePerson's confidential technology, LivePerson voluntarily has narrowed the number of trade secrets for which it seeks redress in this case to 61 trade secrets grouped into four categories:

- **Rules and Variables:** LivePerson's predictive analytics for its chat platform, specifically rules, including LivePerson's conditions and variable inputs, as well as the manner and information tracked by the variables.  (Trade Secret Nos. 1–23 and 56–58.)

- **Data:**  LivePerson's data, data reporting, and data metrics output from LivePerson's platform.[2]  (Trade Secret Nos. 24–40, 48–55, and 59–61.)

- **Tag:**  The operation of LivePerson's tag with LivePerson's systems to track certain information and to collect data to determine whether and when to send a chat invitation.  (Trade Secrets Nos. 43–47.)

- **Business Information:**  LivePerson's competitive business information, such as LivePerson's "competitive financial and pricing information," as well as LivePerson's marketing strategy.  (Trade Secrets Nos. 41–42.)

---

[2]   [24]7 improperly has subdivided this trade secret category into four additional categories: (1) data, (2) reports, (3) canned chat responses, and (4) chat transcripts.  [24]7's Br. 3–4.

Dkt. 333 ("Snyder Decl.") at Ex. A (LivePerson's 3d. Suppl. Resp. to [24]7's 2d Interrog. (No. 9)).

This is a streamlined version of the trade secrets identification that LivePerson originally

provided to [24]7 on April 22, 2016, which identified:

> LivePerson's tag; the way in which LivePerson's tag and LivePerson's application server communicate; the data transmitted to and from LivePerson's tag; LivePerson's customized designs for its clients' engagement objectives; the way in which LivePerson's applications process website visitor behavior; the way in which LivePerson's applications determine whether to initiate an engagement; the outputs from LivePerson's applications; and the outputs contained in LivePerson's reports, transcripts, data extracts, or other forms.

*Id.* Ex. A (LivePerson's Resp. to [24]7's 2d Interrog. (No. 9)).  At that time, [24]7 moved the New

York court to compel a further identification of LivePerson's trade secrets, arguing LivePerson's

identification was deficient.  But the New York court denied [24]7's motion, holding that

LivePerson's existing response provided [24]7 with all of the notice to which it was entitled during

the discovery period.  Sept. 6, 2016 Op. (Dkt. 197) 7–8.

Despite the New York court's ruling in its favor, in a good faith effort to cooperate in

discovery and resolve disputes without judicial intervention, LivePerson agreed to supplement its

trade secrets identification on three separate occasions. De Vries Decl. ¶¶ 2, 3, 7, 15.  At [24]7's

request, those identifications were far more detailed than required by the New York court, including

by describing specific instances of LivePerson confidential material misappropriated by [24]7.  *Id.*

¶ 2. And LivePerson also voluntarily made an extremely substantial reduction in the number of

asserted trade secrets to put [24]7's complaints about the number of trade secrets to rest.  *Id.* ¶ 7, 15.

LivePerson's first enumerated list of trade secrets included **182 trade secrets**

misappropriated by [24]7.  *Id.* ¶ 3.  Despite requesting the enumerated list, [24]7 continued to insist

that LivePerson further modify and limit its trade secret identification, while simultaneously refusing

to provide any substantive answer to LivePerson's interrogatory seeking [24]7's responsive

contentions regarding its LivePerson's trade secrets claims.  *Id.*  The parties continued to negotiate

about LivePerson's trade secrets disclosure and [24]7's failure to provide any responsive contentions

until, during a lead counsel meet-and-confer on November 20, 2018, LivePerson asked [24]7

whether it had in mind a particular number of trade secrets that [24]7 believed was appropriate.  *Id.* ¶

5.  On that call, [24]7 indicated that it believed a list of **70 secrets** would be appropriate.  *Id.*  The

6

following day, on November 21, 2018, LivePerson again met and conferred with [24]7.  *Id.* ¶ 6.

During that call, [24]7 proposed that LivePerson reduce the number of asserted secrets to seventy.

*Id.*; *see* Joint Case Mgmt. Statement (Dkt. 325) ("Jnt. Statement"), at 42.  To finally obtain [24]7's

responsive contentions, LivePerson substantially narrowed its trade secrets identification from 182

secrets to **55 secrets**, *a reduction of nearly 70 percent* and 15 fewer than the limit proposed by

[24]7.  *Id.* ¶ 7.  At the time of this reduction, LivePerson expressly reserved the right to amend or

supplement the list based on further discovery.  Snyder Decl. Ex. A.

By the time of that December 13 reduction, several key discovery-related issues had not yet

been resolved:

1.  [24]7 still had not served its responses to LivePerson's Interrogatory Nos. 1 and 4
    identifying its defenses (if any) to LivePerson's trade secret misappropriation claims,
    despite the Court's Order setting October 12, 2017 as the deadline for serving those
    contentions (which LivePerson subsequently agreed to extend to November 13, 2017, but
    no further);

2.  [24]7 had not agreed to designate any 30(b)(6) witnesses for deposition;

3.  [24]7 had not agreed to make its rules-related .SQL files available for inspection; and

4.  [24]7 had not agreed to produce XML data for particular customers.

De Vries Decl. ¶¶ 9, 10, 11, 12, 14 and Exs. L, M, N, and O.  Thus, while LivePerson was making

diligent efforts to present and narrow the substance of its claims through written discovery, [24]7

still had not provided a substantial amount of the discovery sought by LivePerson.  For example, as

referenced above, [24]7 still had not provided any substantive response to LivePerson's

interrogatories seeking [24]7's contentions regarding the claimed trade secrets, which were served in

June 2017.  *Id.* ¶ 10.  Notably, [24]7 was obligated by the Court's scheduling order to serve

supplemental responses to LivePerson's contention interrogatories by October 12, 2017.  Ord. (Dkt.

157), at 2.  LivePerson later agreed to a one-month extension, to November 13, 2017, for [24]7 to

provide those responses.  Ex. J (Dec. 27, 2017 Lotfollahi to Parker).   But that date came and went

with no supplement.  *Id.*; *see also* Ex. K (Nov. 14, 2017 Lotfollahi to Miller).  In an effort to avoid

motion practice, LivePerson later requested that [24]7 serve its responses no later than December 18,

7

in response to which [24]7 instead committed to providing the long-overdue responses on December

22, 2017.  De Vries Decl. ¶ 8 & Ex. J.  Once again, however, [24]7 failed to serve its responses by

the promised date.  *Id*.  Ultimately, it was not until January 5, 2018 that [24]7 provided it responsive

contentions. De Vries Decl. ¶ 10 & Ex. N.  As another example, [24]7 did not agree to make .SQL

data files for particular customers available for inspection until late December, and even then,

provision of additional tools that were needed to analyze and view those data were not resolved until

later in January.  *Id.* ¶ 9 & Ex L.  And although LivePerson served its first Rule 30(b)(6) notice to

[24]7 on April 11, 2017, it was not until nearly nine months later, on January 10, 2018, that [24]7

finally served its responses to that notice and agreed to designate a witness for most topics.  *Id.* ¶ 11.

LivePerson did not depose [24]7's first designated Rule 30(b)(6) witness until January 16, 2018.  *Id.*

¶ 12.[3]

Once LivePerson had the discovery it required, it promptly supplemented its trade secrets

disclosure (before the close of non-deposition fact discovery) to add six (6) newly-discovered

instances of misappropriated LivePerson material, bringing the total number of asserted trade secrets

to 61, which was still nearly 10% less than the limit of 70 secrets suggested by [24]7.  Snyder Decl.

Ex. A.

These six additional secrets relate primarily to misappropriation of certain specific data that

LivePerson discovered through the deposition of [24]7's first 30(b)(6) witness, Danielle Newton,

which occurred on January 16, 2018.  For example, LivePerson added Trade Secret No. 59 after

discovering through the deposition of [24]7's first 30(b)(6) witness that ███████████████████

███████████████████████████████████████████████████████.  Ex. R (Newton

Tr. at 258:20–259:1 ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████).  LivePerson had

not previously identified this report in its list, because ████████████████████████████

---

[3]    And on February 8, 2018, [24]7 agreed to produce XML data for particular customers over
particular time periods after LivePerson sent a draft letter brief regarding LivePerson's motion to
compel production of that data.  *Id.* ¶ 14 and Ex. O.

1  ████████████████████████████████████████████████████████████████

2  ████████████████████████████████.  Similarly, through the same 30(b)(6) deposition,

3  LivePerson discovered ██████████████████████████████████████████

4  ██████████████████.  *Id.* (Newton Tr. at 196:14–24; 232:11–23) ████████████████

5  ████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████

14 ████████████████████████████████████████████)).  Thus, after learning about

15 ████████████████████████████████████████████, LivePerson added Trade Secret

16 Nos. 60 and 61 ████████████████████████████████████████.  Snyder Decl.

17 Ex. A.[4]

## ARGUMENT

19         Due to its voluntarily reduction in the number of asserted trade secrets by nearly 70 percent,

20 LivePerson currently asserts only four categories of trade secrets based on 61 specific instances of

21 confidential LivePerson material misappropriated by [24]7.  Forcing LivePerson to further reduce

22 the number of trade secrets would severely prejudice LivePerson—by precluding it from obtaining

23 recourse for [24]7's taking of numerous trade secrets developed and carefully guarded by

24 LivePerson—and unjustly reward [24]7, which would unfairly escape liability for large aspects of its

25 scheme to misappropriate LivePerson's trade secrets.  The law does not support—and in fact

---

[4]   To the extent the supplemental instances referenced earlier-produced material, additional
documents and depositions of [24]7 employees were necessary to illustrate how the information
had been used by [24]7.

prohibits—[24]7's attempt to avoid liability through the procedural gambit it proposes.  The four categories of trade secrets that remain asserted in the action can be fully and fairly tried during the upcoming trial that begins November 26, 2018, and [24]7's request seeking additional narrowing should be denied.

## I.    LIVEPERSON VOLUNTARILY REDUCED ITS NUMBER OF TRADE SECRETS TO MATERIALLY BELOW THE 70-SECRET LIMIT PROPOSED BY [24]7, WHICH SHOULD PRECLUDE [24]7'S INSISTENCE ON A NEW, LOWER LIMIT

In November 2017, during the meet and confer process, [24]7 told LivePerson that it believed 70 trade secrets is an appropriate number of trade secrets.  Jnt. Statement, at 42; De Vries Decl. ¶¶ 5, 6.   In response, LivePerson agreed to [24]7's proposal and voluntarily reduced the number of its asserted trade secrets by nearly 70 percent—from the 182 trade secrets asserted at the time down to just 55 secrets, which was subsequently increased to 61 secrets as described above.  De Vries Decl. ¶¶ 7, 15.  Having obtained that material reduction in the number of trade secrets asserted by LivePerson, [24]7 now argues that LivePerson should be further restricted from obtaining recourse for [24]7's misappropriation of an additional 60 secrets—down to just 10 trade secrets.  [24]7's new position is inconsistent with its prior statements and the parties' agreement, and should be rejected.

As described above, LivePerson agreed to narrow its trade secrets disclosure to fewer than 70, a limit proposed by [24]7, and its current disclosure currently includes only 61 secrets in four categories—still well below the 70-secret limit proposed by [24]7.  *See supra* 6.  Despite that agreement and receiving a materially reduced trade secrets disclosure from LivePerson, [24]7 subsequently insisted that LivePerson further limit its disclosure to meet arbitrary, ever-shifting numerical limits on the number of trade secrets that LivePerson may assert in this case.  On January 3, 2018, having proposed a limit of 70 secrets just a few weeks earlier and already having received LivePerson's substantially narrowed disclosure pursuant to that proposal, [24]7 suggested a new limit: proposing that LivePerson should be further limited to no more than **30 secrets**.  *See* Dkt. 325, at 42.  And now, in a motion filed just a few weeks after suggesting a 30-secret limit, [24]7 proposes that LivePerson be restricted to seeking recourse for only **10 secrets** that the evidence clearly establishes were misappropriated by [24]7.  [24]7's constantly shifting proposed limits are arbitrary,

10

1   untethered to the facts of the case, and inconsistent with its earlier proposals. [24]7 should not be

2   permitted to constantly move the target, but should be held to its earlier statements—on which

3   LivePerson relied in voluntarily limiting the number of its asserted trade secrets—that 70 secrets

4   would be reasonable.

5           [24]7 attempts to justify its newest proposed limit by suggesting it has been deprived of "the

6   ability to take meaningful discovery" on 6 of the 61 trade secrets that were added to LivePerson's

7   disclosures. [24]7's Br. 1. As described above, that supplement was reasonable and [24]7 has been

8   permitted a full opportunity to conduct discovery about those issues—indeed, the parties have

9   continued to take depositions for several weeks after that supplement and currently contemplate

10  continuing depositions through mid-March with the Court's permission. *See supra* 8. Regardless,

11  this issue does not bear on whether another, now-lower limit should be imposed on LivePerson's

12  trade secrets disclosure. As an initial matter, this argument does not relate to 55 of the 61 trade

13  secrets on LivePerson's voluntarily-narrowed disclosure. And in any case, it does not provide any

14  basis for restricting LivePerson to being able to obtain recourse for only ten of the trade secrets

15  misappropriated by [24]7.

16  **II.    THE REMAINING NUMBER OF ASSERTED TRADE SECRETS IS REASONABLE**

17  **AND LIVEPERSON WOULD BE SEVERELY PREJUDICED BY IMPOSITION OF**
    **[24]7'S NEW, ARBITRARY LIMIT**

18          When LivePerson voluntarily limited the number of its asserted trade secrets from 182 to 55

19  in December of last year (ultimately increased to 61), it did so with a view towards ensuring efficient

20  expert discovery and a manageable trial. As a result, LivePerson's remaining trade secrets—which

21  break down into just four categories—can be reasonably addressed through the expert discovery

22  process and effectively presented (by both parties) at the upcoming trial. By contrast, [24]7's newest

23  proposed limit—just 10 trade secrets—is arbitrary and would severely prejudice LivePerson by

24  allowing [24]7 to escape any liability for a number of the LivePerson trade secrets the evidence

25  unequivocally establishes were misappropriated by [24]7. Not surprisingly, the law does not

26  countenance such a result.

27

28

### A.   LivePerson's Four Categories of Trade Secrets Can Be Manageably Tried

As described above, LivePerson's four remaining trade secret categories were specifically designed to ensure that trial will proceed in a straightforward, reasonable manner.  Within each category, the misappropriation analysis largely will involve the same underlying facts, because [24]7's scheme was so clear and consistent.  *See supra* 3.  As a result, LivePerson's remaining trade secrets can be fully and fairly tried in the time currently allotted for trial:

- With respect to LivePerson's rules and variables trade secrets, [24]7 would ███████ ██████████████████████████████████████████████ ██████.  Exs. A, C.

- With respect to LivePerson's data trade secrets, [24]7 would █████████ ████████████████████ Ex. E.

- With respect to LivePerson's tag trade secrets, [24]7 was ███████████ █████████████████████████████████████ ███████.  Ex. G.

- With respect to LivePerson's business information trade secrets, [24]7 considered such information to be █████████████████████████ Ex. I.

The presentation of misappropriation-related evidence will be focused on these four categories, and the jury will not be confused by introduction of consistent evidence showing [24]7's misappropriation of the same types of trade secrets (rules, generated data) over and over again, in connection with various of the parties' joint customers.  The Court has set aside ten court days for trial (Dkt. 337), which will be more than sufficient for the parties to present their respective cases concerning LivePerson's four remaining categories of asserted trade secrets.

Moreover, large quantities of the testimony to be presented to the jury will apply equally to all of LivePerson's trade secrets.  For example, Lynn Gibson, LivePerson's Global Director of Human Resources, testified at her deposition about many of the ways that LivePerson protects its trade secrets, subject matter that applies to each of LivePerson's remaining trade secrets.  *See* Ex. S

(Gibson Dep. Tr. 35:25–36:10; 37:3–22; 38:11–20; 51:18-52:5; 60:3–19; 155:13–25; 171:20–172:2; 180:12–18; 198:6–12; 256:17–257:24).  For example, Ms. Gibson testified regarding:

1.   How LivePerson █████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████

2.   The confidentiality clauses contained within LivePerson's customer contracts, which discuss LivePerson and the customer's obligations with respect to the handling of confidential information belonging to the other;

3.   LivePerson's numerous security policies, which discuss access permissions, passwords, and the levels of treatment for handling certain types of confidential information, including the heightened level of treatment for trade secrets;

4.   LivePerson's code of conduct covering the handling of LivePerson confidential information and limiting access to those with a "need to know," which all employees must annually review and sign;

5.   LivePerson's employee handbook, which also discusses confidentiality;

6.   Non-disclosure agreements both with LivePerson employees and customers regarding their obligations with respect to LivePerson confidential information; and

7.   Separation agreements and exit interviews with departing employees reminding the employee of their obligation to maintain the confidentiality of LivePerson proprietary and trade secret information after leaving LivePerson.

*See id.*  This testimony obviously applies equally to ***all*** of LivePerson's trade secrets and will not be repeated individually for each secret.  Large portions of the other testimony to be presented at the trial (*e.g.*, concerning LivePerson and [24]7 as companies, their relationships, their joint customer relationships, etc.) similarly will not need to be repeated for each secret that LivePerson misappropriated.

**B.      Courts Routinely Permit Far More Trade Secrets to Be Presented to the Jury**

Not surprisingly, courts regularly permit trade secret plaintiffs to present far more than the *four categories* of trade secrets (including 61 specific trade secrets) that remain in LivePerson's disclosure.  In *ScentSational Techs., LLC v. PepsiCo, Inc.*, for example, the court permitted the plaintiff to prosecute "the disclosure of 11 *combination* trade secrets."  No. 13 Civ. 8645, 2017 WL 4403308, at *2 (S.D.N.Y. Oct. 2, 2017) (emphasis added).  Similarly, in *Mattel, Inc. v. MGA Entm't, Inc.*, the court considered *seven categories* of trade secrets on summary judgment.  782 F. Supp. 2d 911, 967 (C.D. Cal. 2011) (denying the defendant's summary judgment motion and permitting the case to go to the jury).  And in *Picker International Corp. v. Imaging Equipment Services, Inc.*, the trial involved *six categories* of trade secrets, with *numerous examples* of misappropriated information within each category.  931 F. Supp. 18 (D. Mass. July 5, 1995) (finding trade secret misappropriation and entering a permanent injunction).

LivePerson's list of 61 items of misappropriated material should not be considered as individual trade secrets, as they are rightly characterized as specific instances of misappropriation of trade secrets falling into four categories.  *See supra* 5.  But even if they were considered separately, the law still does not support [24]7's arbitrary, 10-secret limit.  In *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, for instance, the jury found that the defendant had "willfully and maliciously misappropriated and used *149 DuPont trade secrets*."  No. 09 Civ. 58, 2014 WL 792137, at *1 (E.D. Va. Feb. 25, 2014) (emphasis added), *vacated on other grounds*, No. 13-1054, Dkt. 59 (4th Cir. June 12, 2014).  Likewise, in *Brescia v. Angelin*, the court permitted the plaintiff to proceed with four categories of trade secrets that referred to *305 documents* that "specifically detail[ed] each and every trade secret misappropriated."  172 Cal. App. 4th 133, 140, 90 Cal. Rptr. 3d 842, 845 (2009).  [24]7's motion plainly is out-of-step with each of these cases, which demonstrate that the far fewer number of trade secrets included in LivePerson's current disclosure can be fully and fairly tried.[5]

---

[5]   [24]7's cited cases do not support its 10-secret limit.  *First*, the plaintiff in those cases asserted far more trade secrets than those at issue here.  *See Waymo LLC v. Uber Techs., Inc.*, Case Mgmt. Conf. Tr. (Dkt. 625) at 51, No. 17 Civ. 939 (N.D. Cal. June 14, 2017) (Snyder Decl. Ex. D) (*135* trade secrets); *Via Techs., Inc. v. Asus Computer Int'l*, No. 14 Civ. 3586, 2016 WL 5930280, at *3 (N.D. Cal. Oct. 12, 2016) (*one thousand* schematics).  *Second*, [24]7's cited

### C.   Imposing [24]7's Arbitrary 10-Secret Limit On LivePerson Would Severely Prejudice LivePerson, In Contravention Of The Law

There is no question that imposing the 10-secret limit proposed by [24]7, under the mantle of "case management," would cause LivePerson to suffer severe, detrimental prejudice.  As described above, substantial evidence leaves no doubt that [24]7 intentionally took numerous LivePerson trade secrets and then used those trade secrets without permission to build a competing platform and take LivePerson's customers.  *See supra* 3.  [24]7 does not suggest that LivePerson be permitted to try ten trade secrets in a first trial, then ten more in a next trial, and so on until all of the trade secrets that [24]7 misappropriated are addressed.  Rather, [24]7 appears to suggest that LivePerson be precluded from ever addressing its misappropriation of LivePerson's trade secrets beyond ten secrets.  That proposal would deprive LivePerson of the value of its hard-earned intellectual property rights, while giving [24]7 a "free pass" for much of its intentional misappropriation.  The arbitrary numerical limit that [24]7 proposes further compounds that prejudice because it is not tied in any meaningful way to the facts of the case or the specifics of LivePerson's trade secrets disclosure, and also because [24]7 seeks to impose that limit before summary judgment motions have been decided.  The law does not condone the outcome that [24]7 seeks.

Indeed, [24]7's attempt to analogize a reduction in the number of **trade secrets** to a reduction in the number of **patent claims** both misunderstands the manifest differences in those legal rights and confirms the prejudice LivePerson would unquestionably suffer if [24]7's proposal is adopted. Under patent law, every claim in a particular patent must be directed to **the same invention**. Specifically, the claims of a patent must "point[] out and distinctly claim[] the subject matter which the inventor . . . regards as **the invention**."  35 U.S.C. § 112 (emphasis added).  As a result, if two or more inventions are claimed in a single patent application, the Patent & Trademark Office will require the "application to be restricted to one of the inventions."  *Id.* § 121.  The other invention(s)

---

cases were in a different procedural posture not applicable to [24]7's request to force LivePerson to further reduce its disclosure in the middle of expert discovery, prior to summary judgment rulings.  *See Waymo*, Case Mgmt. Tr. at 51 (reducing trade secrets due to fast-approaching trial date); Status Conf. Tr. (Dkt. 120) at 3, *TNS Media Research, LLC v. Tivo Research & Analytics, Inc.*, No. 11 Civ. 4039 (S.D.N.Y. May 31, 2013) (Snyder Decl. Ex. F) (reducing trade secrets after the close of expert discovery); *Intermedics, Inc. v. Ventritex, Inc.*, 804 F. Supp. 35, 37 (N.D. Cal. 1992) (reducing trade secrets after summary judgment).

15

may become part of divisional applications, resulting in separate patents.  *Id.*  Because of these rules, although patents often contain numerous, duplicative claims, they must all be focused on the same, singular invention.  By contrast, each trade secret carries with it a stand-alone legal right that is protected "by the extent to which the owner of ***the secret*** protects his interest from disclosure to others."  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984); *see also* 18 U.S.C. § 1839(3) (defining "trade secret").  Therefore, patent rules requiring a patentee to elect which of its multiple attempts to describe a single invention in a particular patent to present at trial do not support a conclusion that trade secrets holders can (or should) be forced to abandon trade secrets that they developed and protected, and which were misappropriated by a defendant.

Moreover, proving patent infringement is fundamentally different than proving trade secret misappropriation.  To prove patent infringement, a claim must cover "an accused device" such that "the device embodies every limitation of the claim."  *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993).  As a result, patent cases require claim-by-claim specific testimony, comparing each limitation of each asserted patent claim to the accused device.  Trade secret misappropriation, by contrast, requires the plaintiff to show only (i) possession of a trade secret and (ii) that the defendant has misappropriated that secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means.  *See, e.g., N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999); *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 520 (9th Cir. 1993) ("To establish a violation under the UTSA, it must be shown that a defendant has been unjustly enriched by the improper appropriation, use or disclosure of a 'trade secret.'"); *see also* 18 U.S.C. § 1836 ("An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.").  In fact, trade secret misappropriation may occur in a variety of ways, including where a defendant uses some, but not all, aspects of a secret, or merely studies or otherwise consults the plaintiff's trade secrets.  *See Speech Tech. Assocs. v. Adaptive Commc'n Sys.*, No. 88 Civ. 2392, 1994 WL 449032 at *10 (N.D. Cal. 1994); Penultimate Jury Instructions on Trade Secret Misappropriation (Dkt. 2449) at 8, *Waymo LLC v. Uber Techs., Inc.*, No. 17 Civ. 00939 (N.D. Cal. Jan. 3, 2018) (instructing that "use is not limited to direct copying but includes studying and

16

consulting").[6]   The wholly different standards that apply to proving patent infringement makes

[24]7's attempt to analogize them to trade secrets misappropriation inapt.

Thus, the fact that this Court required [24]7 to reduce the number of asserted claims in the

Patent Actions[7] at a time when it was asserting numerous duplicative patent claims from a single

patent does not suggest that a new, arbitrary limit on the number of trade secrets that LivePerson can

present at trial is justified.  [24]7's cited patent cases do not suggest a different result.  They stand

for the proposition that, even in a patent case, the goal of reducing the number of claims is to get to a

"manageable number."  *Tech. Licensing Corp. v. Blackmagic Design Pty Ltd.*, No. 13 Civ. 05184,

2015 WL 307256, at *4 (N.D. Cal. Jan. 22, 2015).  As discussed above, LivePerson's four categories

of trade secrets can be readily addressed in expert discovery and ultimately at trial, including due to

the overlapping witnesses and testimony required.  *See supra* 11.  Accordingly, even putting aside

the manifest differences between patents and trade secrets, the ultimate goal of the patent cases on

which [24]7 relies—manageability—is fully satisfied here.

The more appropriate legal framework for analyzing [24]7's proposal to restrict LivePerson's

ability to obtain recourse for the full extent of [24]7's misappropriation is the law of procedural due

process.  As the Supreme Court explained in *Mathews v. Eldridge*, "[p]rocedural due process

imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property'

interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."  424

U.S. 319, 332 (1976).  Courts analyze procedural due process in two steps.  First, they ask "whether

---

[6]   *See also Spring Design, Inc v. Barnesandnoble.com, LLC*, No. 09 Civ. 05185, 2010 WL
5422556, at *7 (N.D. Cal. Dec. 27, 2010) (denying defendant's summary judgment motion,
because there was a factual dispute about whether the plaintiff's information had a substantial
influence on the defendant's product design); *Think Village-Kiwi, LLC v. Adobe Sys., Inc.*, No.
08 Civ. 04166, 2009 WL 3837270, at *3–5 (N.D. Cal. Nov. 16, 2009) (denying defendant's
summary judgment motion, because the plaintiff does not have to show that its trade secret was
the sole influence on the defendant's product design, only that it had a substantial influence);
*Verigy US, Inc. v. Mayder*, No. 07 Civ. 04330, 2008 WL 564634, at *7–11 (N.D. Cal. Feb. 29,
2008) (granting preliminary relief to the plaintiff, because the defendant gained lead time on the
development of a product by using information gained from a plaintiff's trade secret).

[7]   *[24]7.ai, Inc. v. LivePerson, Inc.*, Case Nos. 15 Civ. 02897 (lead); 15 Civ. 05585 ("Patent
Actions").

---

17

there exists a liberty or property interest which has been interfered with by the State." *Youth Justice*

*Coal. v. City of Los Angeles*, 264 F. Supp. 3d 1057, 1065–66 (C.D. Cal. 2017). Second, they address

"whether the procedures attendant upon that deprivation were constitutionally sufficient," *id.*, by

considering:

> [F]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 334–45.

Turning to the first step of the analysis, there is no question that a trade secret is a property

interest protected by the federal and California constitutions. *See, e.g., Ruckelshaus*, 467 U.S. at

1004 (recognizing that a trade secret is a property right protected by the Fifth Amendment); *DVD*

*Copy Control Ass'n, Inc. v. Bunner*, 31 Cal. 4th 864, 877 (2003) (finding that trade secret claim

involves misappropriation of property interest).

And as to the second step, each of the *Mathews* factors reveals the due process problems with

[24]7's suggestion that it should be exonerated from liability for its misappropriation of

LivePerson's trade secrets. Reducing the number of trade secrets that LivePerson may assert—in

any proceeding—could limit the relief LivePerson will be able to seek at trial. For example,

LivePerson seeks entry of a permanent injunction that prohibits [24]7 from any further disclosure or

use of each of the LivePerson trade secrets on its current disclosure. If LivePerson's ability to

present the jury with evidence with respect to each of those trade secrets is restricted, it is not clear

how a permanent injunction coming out of that trial could fully address [24]7's misappropriation.

Moreover, as discussed extensively above, LivePerson already has materially (and

voluntarily) streamlined the number of trade secrets it plans to present at trial. *See supra* 12. Unlike

in patent cases, where courts have approved forced claim reduction because of the duplicative nature

of the claims in a single patent (such that infringement of any claim in a patent equates to

infringement of the entire patent), forcing LivePerson to further reduce the number of its trade

secrets would be akin to forcing LivePerson to abandon any protection for entire secrets that the

18

1    evidence shows [24]7 misappropriated.  *See, e.g., In re Katz Interactive Call Processing Patent*

2    *Litig.*, 639 F.3d 1303, 1311 (Fed. Cir. 2011) (approving of reduction of patent claims on the basis

3    that the claims were duplicative).  Unlike patent law, finding that one trade secret was

4    misappropriated does not necessarily mean that another trade secret was misappropriated.  Hence,

5    adopting [24]7's proposal would deprive LivePerson of due process.  *Cf. Gentherm Canada, Ltd v.*

6    *IGB Auto., Ltd*, No. 13 Civ. 11536, 2016 WL 1170801, at *2 (E.D. Mich. Mar. 25, 2016) (patent

7    reduction "violates due process if a non-selected claim presents a unique legal issue and the patentee

8    object").  And as noted above, it is unnecessary: LivePerson has materially, voluntarily reduced the

9    number of its asserted trade secrets by nearly 70 percent and no further.[8]

10   **III.    [24]7'S ARGUMENTS ABOUT THE SUFFICIENCY OF LIVEPERSON'S**
     **INTERROGATORY RESPONSES ARE WRONG, AND IN ANY EVENT DO NOT**
11   **SUPPORT REDUCING THE NUMBER OF LIVEPERSON'S TRADE SECRETS**

12          [24]7's remaining arguments simply are not directed to the issue of a reduction in trade

13   secrets.  For example, [24]7 asserts that LivePerson "has not explained how [24]7 misappropriated"

14   LivePerson's trade secrets.  [24]7 Br. 9.  That claim is plainly wrong, as evidenced at least by

15   [24]7's decision not to move to compel any further response before the deadline for doing so

16   passed.[9]  Regardless, that issue provides absolutely no justification for imposing an arbitrary

17   ─────────────────

18   [8]   It also bears noting that [24]7's proposal is contrary to the decision of the New York court.
           [24]7 already sought to modify LivePerson's identification of its trade secrets.  The New York
19        court held that LivePerson's first identification (which was far less detailed than the
           identifications that LivePerson has made to date) was sufficient and that [24]7's request for more
20        particularity should be left to the "summary judgment stage" of the case.  Sept. 6, 2016 Op. (Dkt.
           197) 7–8.  While LivePerson has nevertheless repeatedly revised its disclosure in an apparently-
21        futile attempt to satisfy [24]7's ever-shifting complaints, [24]7 should not be permitted to revisit
           that decision, which is now law of the case.

22   [9]   By way of example, [24]7 claims that "LivePerson has not explained how [24]7 misappropriated
           any of these compilations of rules, let alone identified any portion of the list of the approximately
23        2,300 rules that [24]7 allegedly misappropriated."  [24]7 Br. 9.  This is incorrect for multiple
           reasons.  First, [24]7's own corporate designees have admitted tha███████████████████
24        ███████████████████████████████████████████████████████████. Ex. T (Dwivedi
           R. Tr. v.] at 137:16-138:5███████████████
25        ██████████████████████████████████████████████████████████████████████████
26        ██████████████████████████████████████████████████████████████████████████
27        ██████████████████████████████████████████████████████████████████████████
           ██████████. Second, despite the avalanche of emails and other documents produced by [24]7
28

─────────────────
19

numerical limit on the number of trade secrets that LivePerson may assert.  [24]7's claims that complications allegedly arise from the "parties' overlapping relationships with many of the relevant customers," [24]7 Br. 9, similarly is wrong: [24]7 has not identified any permission that extended to, or even contemplated, use of LivePerson's trade secrets to create a competing platform.  And again, nothing about that issue supports [24]7's request to impose a 10-secret limit on LivePerson.

**CONCLUSION**

For the foregoing reasons, LivePerson respectfully requests that this Court deny [24]7's motion to reduce the number of trade secrets at this stage of the action.[10]

---

describing in detail [24]7's use of ████████████████████████████████████████████, [24]7's corporate witnesses designated for Topics 17 and 18 covering "[24]7's use, access, or copying" of LivePerson information in connection with particular customers (*e.g.* Grainger and Capital One) were unprepared to testify regarding the ways in which [24]7 used LivePerson's trade secrets.   LivePerson has raised this issue separately with [24]7 and requested that [24]7 designate alternative witnesses who are prepared to speak on behalf of the company for Topics 17 and 18 as those topics pertain to Grainger and Capital One.  *See* De Vries Decl. ¶¶ 13, 16 & Exs. P, Q.  [24]7 also took months to produce (and has still not completed producing) the .SQL files that contain further records of [24]7's encoding of LivePerson's rules in its system.  De Vries Decl. ¶ 9 & Exs. L, M.

[10]    At best, this issue is premature and should be deferred until after summary judgment rulings are issued (*i.e.*, after [24]7 is required to disclose its positions during expert discovery and summary judgment briefing).

1    DATED:  February 26, 2018                    Respectfully submitted,

2
                                                   _/s/ Michael W. De Vries_____
3
                                                  Michael W. De Vries
4                                                 Sharre Lotfollahi
                                                  KIRKLAND & ELLIS LLP
5                                                 333 South Hope Street
                                                  Los Angeles, CA  90071
6                                                 Telephone:  (213) 680-8400
                                                  Facsimile:  (213) 680-8500
7                                                 Email:  michael.devries@kirkland.com
                                                  Email:  sharre.lotfollahi@kirkland.com
8
                                                  Adam R. Alper
9                                                 Robert Kang
                                                  James Beard
10                                                KIRKLAND & ELLIS LLP
                                                  555 California Street
11                                                San Francisco, CA  94104
                                                  Telephone:  (415) 439-1400
12                                                Facsimile:  (415) 439-1500
                                                  Email:  adam.alper@kirkland.com
13                                                Email:  robert.kang@kirkland.com
                                                  Email:  james.beard@kirkland.com
14
                                                  Joshua L. Simmons
15                                                KIRKLAND & ELLIS LLP
                                                  601 Lexington Avenue
16                                                New York, New York 10022-4611
                                                  Telephone:  (212) 446-4800
17                                                Facsimile:  (212) 446-4900
                                                  Email:  joshua.simmons@kirkland.com
18
                                                  *Attorneys for Plaintiff LivePerson, Inc.*
19

20

21

22

23

24

25

26

27

28