1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Darin W. Snyder (State Bar No. 136003)
dsnyder@omm.com
Mark E. Miller (State Bar No. 130200)
markmiller@omm.com
Geoffrey H. Yost (State Bar No. 159687)
gyost@omm.com
Alexander B. Parker (State Bar No. 264705)
aparker@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA  94111-3823
Telephone: (415) 984-8700
Facsimile: (415) 984-8701

*Attorneys for [24]7.ai, INC.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| LIVEPERSON, INC.,<br><br>                      Plaintiff,<br><br>          v.<br><br>[24]7.ai, INC.<br><br>                      Defendant. | Case No. 3:17-CV-01268-JST<br><br>**DEFENDANT [24]7.AI, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**[DECLARATION OF ALEXANDER PARKER AND [PROPOSED] JUDGMENT** filed and or lodged concurrently herewith]<br><br>Hearing:  August 30, 2018<br>Time:  2:00 p.m.<br>Place:  Courtroom 9, 19th Floor<br>Judge:  Hon. Jon S. Tigar |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2      **PLEASE TAKE NOTICE** that, on August 30, 2018 at 2:00 p.m., or as soon thereafter as

3  the matter may be heard, in Courtroom 9, 19th Floor, of the above-captioned Court, located at

4  450 Golden Gate Avenue, San Francisco, California 94102, defendant [24]7.ai, Inc. ("[24]7")

5  hereby moves for an order pursuant to Federal Rules of Civil Procedure 12 and 56 and Local Rule

6  56-1 for summary judgment on plaintiff LivePerson, Inc.'s ("LivePerson's") (i) claim for breach

7  of contract, (ii) claim for misappropriation of trade secrets, (iii) claim for unfair competition

8  under the Lanham Act, and (iv) claim for unjust enrichment; and (v) for a ruling on summary

9  judgment that LivePerson cannot seek (a) disgorgement of [24]7's profits under New York trade

10  secret and unfair competition law or (b) disgorgement of [24]7's profits or other damages related

11  to [24]7's digital chat agents.

12      LivePerson's claim for breach of contract fails because the contract between the parties

13  has expired and LivePerson has presented no evidence that [24]7 breached the contract.

14      LivePerson's claim for misappropriation of trade secrets fails as to all 15 of the alleged

15  trade secrets LivePerson selected for the first trial because [24]7's third party customers or

16  LivePerson provided the alleged trade secrets to [24]7 so that [24]7 could perform services for

17  those customers.  [24]7 thus did not use any of the 15 alleged trade secrets in breach of a contract

18  or confidential duty, or as a result of discovery by improper means.  Further, LivePerson has no

19  standing to assert 12 of the alleged trade secrets because the alleged trade secret information is

20  owned by LivePerson's customers, not LivePerson.  And 3 alleged trade secrets cannot qualify as

21  trade secrets because they are insufficiently defined and relate only to ephemeral events.

22      LivePerson's claim under the Lanham Act fails because it is based only on one marketing

23  phrase constituting mere puffery, and—independently—the phrase was not material to any

24  customer's decision to switch from LivePerson to [24]7.

25      LivePerson's claim for common law unjust enrichment is based entirely on LivePerson's

26  other claims, which is impermissible under New York law and requires that claim be dismissed

27  on summary judgment.

28      Finally, New York law prohibits LivePerson from seeking disgorgement of [24]7's profits

1    as trade secret misappropriation damages.  And [24]7 is entitled to summary judgment on

2    LivePerson's request for damages based on digital chat agent services because no evidence

3    connects those services to any conduct on which LivePerson bases its claims.

4         This motion is based on this Notice, the Memorandum of Points and Authorities that

5    follows, the declaration of Alexander Parker and exhibits thereto, the pleadings and other

6    materials on file in this action, and on such other and further evidence or argument as the Court

7    may consider at or before the hearing on this motion.

8

9         Dated:  July 13, 2018                    O'MELVENY & MYERS LLP

10

11                                                By:    */s/ Darin W. Snyder*
                                                         Darin W. Snyder

12
                                                 *Attorneys for Defendant [24]7.ai, Inc.*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ......................................................................................... 1

II.   FACTUAL BACKGROUND ......................................................................... 2

      A.   [24]7 and LivePerson's Past Relationship and Competition....................... 2

      B.   [24]7's Customers Sent the Alleged Trade Secrets to [24]7 so [24]7 Could
           Provide Services to Those Customers ......................................................... 4

           1.    Optus ................................................................................................ 5

           2.    Sears ................................................................................................. 7

           3.    Capital One ...................................................................................... 8

III.  LIVEPERSON'S CLAIMS ............................................................................ 9

IV.   SUMMARY JUDGMENT STANDARD ...................................................... 9

V.    LIVEPERSON'S BREACH OF CONTRACT CLAIM FAILS ...................... 10

VI.   LIVEPERSON'S TRADE SECRET MISAPPROPRIATION CLAIM FAILS ............... 11

      A.   [24]7's Customers Provided the Alleged Trade Secrets to [24]7, and Thus
           They Were Not Discovered Through Improper Means ......................... 11

      B.   [24]7 Did Not Use the Alleged Trade Secrets in Breach of an Agreement ........... 12

      C.   [24]7 Did Not Use the Alleged Trade Secrets in Breach of a Confidential
           Relationship or Duty ............................................................................... 13

VII.  LIVEPERSON LACKS STANDING TO ASSERT THE OPTUS AND CAPITAL
      ONE RELATED TRADE SECRETS. ............................................................ 14

VIII. THE DATA-RELATED ALLEGED TRADE SECRETS ARE NOT TRADE
      SECRETS ...................................................................................................... 16

      A.   Alleged Trade Secrets 48, 49, and 51 Are Not Sufficiently Specific ................. 16

      B.   Alleged Trade Secrets 48, 49, and 51 Are Not Trade Secrets Because They
           Are Information About Ephemeral Events .............................................. 18

IX.   LIVEPERSON'S LANHAM ACT CLAIM FAILS ....................................... 18

      A.   The [24]7 Marketing Statements Are Puffery .......................................... 19

      B.   The [24]7 Marketing Statements Are Not Material ................................. 20

X.    UNJUST ENRICHMENT SHOULD BE DISMISSED AS DUPLICATIVE ................ 21

XI.   LIVEPERSON CLAIMS DAMAGES NOT AVAILABLE UNDER THE LAW ........... 21

      A.   LivePerson May Not Seek Disgorgement Damages for Trade Secret
           Misappropriation or Unfair Competition as a Matter Of Law ............... 21

      B.   No Alleged Misconduct Caused [24]7's Digital Chat Agent Profits ............... 23

XII.  CONCLUSION ............................................................................................. 25

[24]7.AI'S MOTION FOR
SUMMARY JUDGMENT
3:17-CV-01268-JST

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen Organ Co. v. Galanti Organ Builders, Inc.*,
   798 F. Supp. 1162 (E.D. Pa. 1992) ..................................................................20

*Alpha Pro Tech, Inc. v. VWR International, LLC*,
   2016 WL (E.D. Pa. Oct. 12, 2016)....................................................................25

*Am. Seating Co. v. USSC Grp., Inc.*,
   514 F.3d 1262 (Fed. Cir. 2008)........................................................................25

*Am. Student Fin. Grp. v. Aequitas Capital Mgmt.*,
   2015 WL 11237638 (S.D. Cal. Feb. 12, 2015) ................................................23

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
   823 F.3d 51 (2d Cir. 2016)..........................................................................18, 20

*Ayyadurai v. Floor64, Inc.*,
   270 F. Supp. 3d 343 (D. Mass. 2017) ..............................................................19

*Banas v. Volcano Corp.*,
   47 F. Supp. 3d 941 (N.D. Cal. 2014) ................................................................9

*Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*,
   1 F. Supp. 3d 224 (S.D.N.Y. 2014)........................................................... *passim*

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...........................................................................................9

*Corsello v. Verizon N.Y. Inc.*,
   967 N.E.2d 1177 (N.Y. 2012) ..........................................................................21

*Data Cash Sys., Inc. v. JS&A Grp., Inc.*,
   1984 WL 63623 (N.D. Mar. 20, Ill. 1984)........................................................20

*E.J. Brooks Co. v. Cambridge Sec. Seals*,
   2018 WL 2048724 (N.Y. May 3, 2018).......................................................22, 23

*Friedman v. Live Nation Merch., Inc.*,
   833 F.3d 1180 (9th Cir. 2016)............................................................................9

*Grange Ins. Ass'n v. Lintott*,
   77 F. Supp. 3d 926 (N.D. Cal. 2015) ..............................................................10

*Groupion, LLC v. Groupon, Inc.*,
   859 F. Supp. 2d 1067 (N.D. Cal. 2012) ........................................................9, 10

*Hertz Corp. v. Avis Inc.*,
   485 N.Y.S. 51 (N.Y. App. Div. 1985) ..............................................................22

*In re Iphone 4S Consumer Litig.*,
   2014 WL 589388 (N.D. Cal. Feb. 14, 2014).....................................................19

**TABLE OF AUTHORITIES**
(continued)

Page

*Keenan v. Allan,*
    91 F.3d 1275 (9th Cir. 1996)........................................................................10

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,*
    191 F.3d 229 (2d Cir. 1999)........................................................................23

*Lehman v. Dow Jones & Co.,*
    783 F.2d 285 (2d Cir. 1986)........................................................................18

*Liberty Power Corp., LLC v. Katz,*
    2011 WL 256216 (E.D.N.Y. Jan. 26, 2011) ...............................................11

*Lipton v. Nature Co.,*
    71 F.3d 464 (2d Cir. 1995)..........................................................................18

*Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.,*
    210 F.3d 1099 (9th Cir. 2000).....................................................................10

*PaySys Int'l, Inc. v. Atos Se,*
    2016 WL 7116132 (S.D.N.Y. Dec. 5, 2016) ........................................16, 17

*Pullman Group, LLC v. Prudential Insurance Co.,*
    733 N.Y.S.2d 1 (N.Y. App. Div. 2001) ......................................................15

*Rite–Hite Corp. v. Kelley Co.,*
    56 F.3d 1538 (Fed. Cir. 1998).....................................................................25

*Schroeder v. Pinterest Inc.,*
    17 N.Y.S.3d 678 (N.Y. App. Div. 2015) ....................................................12

*Sci. Components Corp. v. Sirenza Microdevices, Inc.,*
    2006 WL 6937123 (E.D.N.Y. July 11, 2006) ........................................13, 14

*Sit-Up Ltd. v. IAC/InterActiveCorp.,*
    2008 WL 463884 (S.D.N.Y. Feb. 20, 2008) ..........................................16, 17

*SourceOne Dental, Inc. v. Patterson Cos.,*
    2018 WL 3038503 (E.D.N.Y. June 19, 2018) .............................................20

*Stewart v. World Wrestling Fed'n Entm't, Inc.,*
    2005 WL 66890 (S.D.N.Y. Jan. 11, 2005)..................................................13

*Suburban Graphics Supply Corp. v. Nagle,*
    774 N.Y.S.2d 160 (N.Y. App. Div. 2004) ..................................................22

*Sullivan v. Aventis, Inc.,*
    2015 WL 4879112 (S.D.N.Y. Aug. 13, 2015) ...........................................21

*US Bank Nat'l. Ass'n v. Lieberman,*
    950 N.Y.S.2d 127 (N.Y. App. Div. 2012) ..................................................10

**Statutes**

15 U.S.C. § 1125 (a)(1)....................................................................................18

iii

1

**TABLE OF AUTHORITIES**
(continued)

2
                                                                                    **Page**

3   **Rules**

4   Fed. R. Civ. P. 56(a)........................................................................................9

5   **Treatises**

6   Restatement of Torts § 757, cmt. b (1939) ....................................................18

    Restatement (Third) of Unfair Competition § 43 cmt. c (1995) ....................11

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[24]7.AI'S MOTION FOR
SUMMARY JUDGMENT
3:17-CV-01268-JST

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

I.    **INTRODUCTION**

This multi-year litigation should end now in summary judgment for defendant [24]7. LivePerson brought this case based on frustration over losing customers to [24]7 and a belief that the only reason for those losses was [24]7 cheating.  But the true reason LivePerson lost customers was [24]7's more advanced technology, superior service, and lower prices.  Now that discovery has closed, the undisputed facts show that each of LivePerson's remaining claims for relief is based only on legitimate business activity, including [24]7's limited, authorized use of material that was voluntarily provided to [24]7 by [24]7's customers or by LivePerson.

LivePerson's claim for breach of contract fails because the contract on which the claim is based expired over a decade ago, and no evidence indicates that [24]7 breached that agreement.

[24]7 is entitled to summary judgment on LivePerson's claim for misappropriation of trade secrets as to all 15 of the alleged trade secrets ("Alleged Trade Secrets" or "ATS") that LivePerson selected for the November 26, 2018 trial.  [24]7 received all of those Alleged Trade Secrets directly and voluntarily from the three relevant customers (Optus, Capital One, and Sears) or from LivePerson to assist [24]7 in performing services for those customers.  LivePerson thus cannot demonstrate that [24]7 "used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 257 (S.D.N.Y. 2014) (citation omitted).  Moreover, LivePerson has no standing to assert 12 of the Alleged Trade Secrets because LivePerson's contracts with Optus and Capital One specify that those customers own those Alleged Trade Secrets.  And 3 Alleged Trade Secrets do not qualify as trade secrets because they are insufficiently defined and relate only to ephemeral events.

LivePerson's claim under the Lanham Act fails.  It is based exclusively on [24]7's statement in three promotional materials that [24]7 was the first provider of "smart" or "predictive" chat.  Those statements were mere puffery, and there is no evidence that they were material to any customer's buying decision.

LivePerson's claim for common law unjust enrichment fails because LivePerson has

failed to identify any separate basis for that claim.  As a matter of New York law, common law unjust enrichment is a limited claim that cannot duplicate LivePerson's other claims.

LivePerson is not entitled as matter of law to seek disgorgement of [24]7's profits under New York law for its trade secret misappropriation or unfair competition claims.  And because there is no credible evidence of a causal relationship between [24]7's digital chat agent revenue and any alleged tortious conduct, [24]7 is entitled to summary judgment on LivePerson's request to recover [24]7's profits or other damages from [24]7's digital chat agent services.

## II.      FACTUAL BACKGROUND

### A.      [24]7 and LivePerson's Past Relationship and Competition

[24]7 and LivePerson currently compete in the online engagement industry.  Both companies offer customers (typically, companies with websites) chat software—sometimes called a "chat platform"—that enables customer service agents to have text-based communications, "chats," with website visitors directly on the customer's website.

 [24]7 was founded in 2000 to provide customer service agents for other companies, allowing those companies to outsource customer service.  [24]7 offers both telephone agents and "digital chat agents."  Digital chat agents are customer service agents that participate in chats with website visitors using chat software.  Beginning in 2006, [24]7 expanded its offerings to include predictive analytics.  Using predictive analytics, [24]7 began to offer consulting services, assisting its customers with optimizing and managing their chat programs.  LivePerson has never offered digital chat agent services, but it is a long-time provider of chat software.

In 2006 and 2007, [24]7 and LivePerson entered into two contracts to coordinate their offerings.  A Co-Marketing and Referral Agreement ("CMA"), effective July 10, 2006, allowed either party to market the combined services of both parties: chat software from LivePerson and digital chat agents and consulting services from [24]7.  Ex. 1 at 698-700.[1]  At the time, [24]7 did not offer its own chat software.  A Master Service Agreement ("MSA"), effective January 26, 2007, was intended to cover those situations where, under the CMA, LivePerson "provide[s] a

---

[1] "Ex." refers to the exhibits attached to the declaration of Alexander Parker, filed with this motion.

[24]7.AI'S MOTION FOR
SUMMARY JUDGMENT
3:17-CV-01268-JST

1  solution to its clients . . . which include[s] the use of [[24]7's customer service representatives,"

2  *i.e.* digital chat agents.  Ex. 2.  The MSA expressly applied only to work provided by [24]7 "set

3  forth in one or more Statements of Work" or "SOWs."  *Id.*  Both the CMA and the MSA reflect

4  that [24]7 already offered predictive technology.  The CMA acknowledges "24/7's use of its own

5  data analytics algorithms."  Ex. 1 at 697.  The MSA similarly acknowledges "24/7 Customer's

6  analytics algorithms and statistical models (the 'Models')."  Ex. 2 at 341.

7       [24]7 and LivePerson entered into only two SOWs under the MSA.  On January 26, 2007,

8  [24]7 and LivePerson entered into an SOW through which [24]7 would provide services to Adobe

9  through May of 2007.  Ex. 2 at 357; Ex. 3.  In August and September 2007, the parties signed an

10  SOW with an April 1, 2007 effective date, through which [24]7 would provide services to

11  Hoover's through March of 2008.  Ex. 4.

12       Shortly after the parties signed the Hoover's SOW, their collaborative relationship ended.

13  On October 3, 2007, [24]7 notified LivePerson that it was terminating the CMA.  Ex. 5.  [247]

14  and LivePerson did not further extend the SOWs for Adobe or Hoover's, and they never entered

15  into any additional SOWs under the MSA.  [24]7 continued, however, to provide digital chat

16  agents and other chat-related services to customers that separately contracted with LivePerson for

17  use of the LivePerson chat software.  In such circumstances, [24]7 would necessarily work with

18  the LivePerson chat software.

19       In Spring 2012, [24]7 released and began marketing its own chat software to "enterprise"

20  customers, large businesses that have significant online footprints.  Dkt. 50-3; Ex. 6 at 68:1-2,

21  73:8-17.  [24]7 licenses its chat software independently of its digital chat agents.  Some customers

22  use both.  But some of [24]7's customers use its chat software but not its digital chat agents.  Ex.

23  7 at 78:18-20.  And other customers use [24]7's digital chat agents but not its chat software. Ex. 8

24  at 165:1-18.

25       [24]7 combined its predictive and other advanced technology with its chat software to

26  create a client "solution" or platform, and it advertised its chat solution in a blogpost, a marketing

27  video, and a white paper as the "first" chat platform that was "smart" or "predictive."  Ex. 9 at 54-

28  55; Dkt. 50-3; Ex. 10. ████████████████

[24]7.AI'S MOTION FOR
SUMMARY JUDGMENT
3:17-CV-01268-JST

██████████████████████████████████████████████

██████████████████████████████████████

██████  *Id.* at slide 54.  There is no evidence that anyone who saw the blogpost or video purchased [24]7's chat platform.  And there is no evidence that any customer or potential customer found these marketing statements to be material or even relevant to the purchasing decision.

**B.      [24]7's Customers Sent the Alleged Trade Secrets to [24]7 so [24]7 Could Provide Services to Those Customers**

[24]7 released its chat software just as LivePerson found it increasingly difficult to keep customers satisfied.  Dissatisfaction with LivePerson caused enterprise customers Optus, Sears, and Capital One to replace LivePerson's chat software with [24]7's chat software.  Each of these customers provided information to [24]7, usually with LivePerson's knowledge, so [24]7 could use that information in providing services to that customer.  All 15 Alleged Trade Secrets relate to these three third-party customers.

[24]7 received each of the Alleged Trade Secrets voluntarily from one of these three customers or from LivePerson.  LivePerson has identified no Alleged Trade Secret that came to [24]7 any other way.  And [24]7 only used each Alleged Trade Secret to provide services to the customer that provided it.  LivePerson has identified no evidence that [24]7 used any Alleged Trade Secret for any other purpose. ███████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████

██████  Ex. 12 at 79:3-81:17.

The 15 Alleged Trade Secrets are limited to two categories of information.  Twelve of the Alleged Trade Secrets (ATS 1, 3-9, 10, 13, 62, and 63[2]) are rules used with chat software, primarily for determining whether to invite a website visitor to chat.  These rules are logical statements, customized for each customer, that specify a condition and an action. Ex. 12 at 9:4-17; Ex. 14 at 56:14-56:19.  For example, a rule might state: if the visitor stays on the checkout

---

[2] These numbers follow the numbers assigned in LivePerson's interrogatory response.  Ex. 13.

1    page for at least 45 seconds, then trigger a chat invitation.  These rules-related trade secrets are

2    found in 12 specific documents.  ████████████████████████████████████████████

3    ███████████████████████████████████████████████████████████████████████████

4    ██████████████████████████████████████████████████  Ex. 13 at 36.

5    Many of these documents are in the form of a DRD or Design Requirements Document.  A DRD

6    is a format used by LivePerson to describe the requirements, including rules, for a chat program

7    for a specific customer, although the description is not a format that could be directly used by the

8    chat software.

9           Three of the Alleged Trade Secrets (**ATS 48**, **49**, and **51**) broadly encompass data

10   collected by the LivePerson chat platform.  Chat software, including both LivePerson's chat

11   software and [24]7's chat software, collects information about each website visitor, including

12   information about the visitor's activities on the customer website and a transcript of the visitor's

13   chat with a digital chat agent.  This information can later be exported and used, for example, to

14   optimize the rules or manage the digital chat agents for that customer.  The three data-related

15   Alleged Trade Secrets purport to cover all data and reports that were available for certain

16   customers over a period of many years.  ████████████████████████████████████

17   ███████████████████████████████████████████████████████████████████████████

18   ██████████████████████████████████████████████████████████████████████████

19   ██████████████████████████████████████████  Ex. 13 at 41.

20          The undisputed facts confirm that Optus, Sears, or Capital One voluntarily sent each of

21   the 15 Alleged Trade Secrets to [24]7, usually with LivePerson's knowledge or even

22   participation, for legitimate business purposes:

23                 1.      **Optus**

24          Optus is a large Australian telecom provider.  [24]7 has provided services to Optus since

25   at least 2006, when [24]7 started providing phone agents to Optus pursuant to a Call Centre

26   Services Agreement between Optus and [24]7.  Ex. 15.  LivePerson began providing its chat

27

28

[24]7.AI'S MOTION FOR
SUMMARY JUDGMENT
3:17-CV-01268-JST

1   software to Optus years later, in 2010. ████████████████████████ Ex. 16.[3]  That

2   same year, [24]7 began providing digital chat agents and chat optimization services to Optus for

3   use with the LivePerson chat software.  Ex. 19 at 622.  ████████████████████████

4   ████████████████████████ Ex. 20 at 161:17-162:4.  Yet, LivePerson alleges

5   misappropriation by [24]7 of 9 Alleged Trade Secrets related to customer Optus: **ATS 3-8**, **10** and

6   **13** (rules), and **51** (XML data).

7           Beginning in 2010, at Optus's instruction, LivePerson allowed [24]7 to access the data

8   and reports broadly described by **ATS 51** so [24]7 could manage the digital chat agents it

9   provided to Optus.  *See* Ex. 21 at 623-24.  ████████████████████████

10  ████████████████████████                                  *Id.*

11          That same year, but long before [24]7 provided its chat software to Optus, Optus began

12  sending DRDs (now claimed as LivePerson trade secrets) to [24]7 so [24]7 could help develop

13  rules for Optus's websites.  Optus, [24]7, and LivePerson jointly collaborated to create **ATS 3**

14  and **10** for Optus.  ████████████████████████

15  ████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████

18  ████████████████████     *Id.*  The contemporaneous communications between the companies

19  relating to **ATS 3** and **ATS 10** make clear that LivePerson was aware that [24]7 had received and

20  was working to optimize these rules for the Optus SMB (small and medium business) website,

21  and that LivePerson raised no objection.  For example, [24]7 and LivePerson corresponded about

22  rules that [24]7 recommended.  Ex. 22 at 966-968; Ex. 23 at 374-375 (attaching **ATS 3**, Ex. 23-

23  A).  In another example, Optus sent to both LivePerson and [24]7 a DRD that later became **ATS**

24  **10**.  Ex. 24-A.

25          In 2013, Optus decided to change the chat software provider for its Service website

26  _____

[3] ████████████████████████████████████████████████████
27  ████████████████████████████████████████████████████████
28  ████████████████████████████████████████████████████████

1   (which is separate from the SMB website) from LivePerson to [24]7.  Ex. 25 at 159:2-160:19. ▮

2   ▮

3   ▮

4   ▮

5   ▮

6   ▮

7   ▮

8   ▮

9   ▮

10  ▮

11  ▮

12  ▮ Ex. 35; Ex. 36 at slides 7, 15.

13          2.    **Sears**

14          As with Optus, [24]7 and LivePerson simultaneously provided services to Sears, again

15  through separate and independent contracts with Sears.  [24]7 and Sears began their business

16  relationship in 2007 under a Master Services Agreement.  *See* Ex. 37.  ▮

17  ▮

18  ▮ Ex. 38.  In 2009, [24]7 began providing chat agent services to Sears, which

19  involved [24]7 working with the LivePerson chat software.  Ex. 39.  ▮

20  ▮ Ex. 40 at 176:22–178:13; *see also* Ex. 41 at

21  241:25-242:14.  LivePerson now alleges misappropriation of 3 Alleged Trade Secrets related to

22  Sears: **ATS 9** and **63** (rules), and **49** (XML data).

23          Long before Sears chose [24]7 to provide its chat software, Sears provided [24]7 access

24  to the data and reports broadly described by **ATS 49**, often with LivePerson's knowledge.

25  ▮

26  ▮

27  ▮ Ex. 43 at 31:8–34:24. ▮

28  ▮

1    ███ *See* Ex. 44 at 767-769.

2         Also long before [24]7 provided its chat software to Sears, [24]7 and Sears collaboratively

3    generated the rules contained in **ATS 63.** ████████████████████████████████

4    ██████████████████████████████████████████████████

5    ████████████████████ Ex. 45; *see* Ex. 46 at slide 2; Ex. 47 at 980-981; Ex. 48 (**ATS 63**);

6    *see also* Ex. 39 at 276:25–277:18.

7         Sears later provided the rules contained in **ATS 9** to [24]7 █████████████████

8    ████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████

12   ██████████████████

13        3.    **Capital One**

14        As with Optus and Sears, [24]7 and LivePerson simultaneously provided services to

15   Capital One through separate and independent contracts with Capital One.  [24]7 has provided

16   services to Capital One since at least 2003, when it began providing telephone customer service

17   agents to Capital One.  Ex. 52. ████████████████████████████████

18   ████████████████████████████████ Ex. 53.  That same year, [24]7

19   began providing chat agents and chat optimization services to Capital One, requiring [24]7 to

20   work with the LivePerson chat software.  Ex. 54. ██████████████████████████

21   ██████████████████████████ Ex. 55.  LivePerson alleges misappropriation of 3

22   Alleged Trade Secrets related to customer Capital One: **ATS 1** and **62** (rules) and **48** (XML data).

23        Long before [24]7 provided its chat software to Capital One, Capital One provided [24]7

24   with access to the data and reports broadly described by **ATS 48** so [24]7 could provide improved

25   chat agent services to Capital One. ████████████████████████████████

26   ████████████████████████████████████████████████████

27   ████████████████████████████████████████████████

28   ████████████████████████████████████████████████

[24]7.AI'S MOTION FOR
SUMMARY JUDGMENT
3:17-CV-01268-JST

▮▮▮▮▮▮  *See* Ex. 57.  LivePerson knew [24]7 had this access, and access to LivePerson's "reporting," but imposed no restrictions on [24]7's use of the data.  Ex. 58 at 647-648.

In 2014, Capital One switched from LivePerson to [24]7 for its chat software.  ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Ex. 60 at 670; *see* Ex. 61; Ex. 62.

## III.   LIVEPERSON'S CLAIMS

LivePerson's operative complaint asserts eight claims for relief against [24]7: copyright infringement, breach of contract, trade secret misappropriation, intentional interference with existing business relationships, intentional interference with prospective business relationships, common law unfair competition, Lanham Act unfair competition, and unjust enrichment.  Dkt. 50.  LivePerson recently advised that it will not pursue the copyright claim or either of the intentional interference claims at the trial set for November 26, 2018.  Ex. 63.  Given the undisputed facts, the Court should now grant [24]7 summary judgment on the breach of contract, trade secret misappropriation, Lanham Act unfair competition, and unjust enrichments claims and on certain of LivePerson's damages requests.

## IV.   SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment when the motion shows that there is no genuine dispute concerning any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

When the moving party does not bear the ultimate burden of proof at trial, that party can either "produce evidence which either negates an essential element of the nonmoving party's claims or . . . show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Groupion, LLC v. Groupon, Inc.*, 859 F. Supp. 2d 1067, 1072 (N.D. Cal. 2012).  "The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial."  *Banas v. Volcano Corp.*, 47 F. Supp. 3d 941, 946 (N.D. Cal. 2014).  The moving party may show the absence of evidence by "depos[ing] the non-moving party's witnesses[,] . . . establish[ing] the inadequacy of documentary evidence . . . [or] reviewing for the court the admissions,

[24]7.AI'S MOTION FOR
SUMMARY JUDGMENT
3:17-CV-01268-JST

interrogatories, and other exchanges between the parties that are in the record." *Celotex Corp. v. Catrett*, 477 U.S. 317, 332 (1986) (Brennan, J., concurring in analysis).  If the moving party does so, then "the non-moving party must produce evidence to support its claim." *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1188 (9th Cir. 2016).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Grange Ins. Ass'n v. Lintott*, 77 F. Supp. 3d 926, 932 (N.D. Cal. 2015).  Instead, the non-moving party must identify with reasonable particularity "enough evidence to create a genuine issue of material fact." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000); *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  An issue of fact is "genuine" only where there is sufficient evidence for a reasonable fact finder to find for the nonmoving party.  *Groupion*, 59 F. Supp. 2d at 1072.

## V.     LIVEPERSON'S BREACH OF CONTRACT CLAIM FAILS

[24]7 is entitled to summary judgment on LivePerson's breach of contract claim because LivePerson cannot show that [24]7 breached a contract between LivePerson and [24]7.  *See US Bank Nat'l. Ass'n v. Lieberman*, 950 N.Y.S.2d 127, 129 (N.Y. App. Div. 2012).  Although LivePerson and [24]7 entered into two agreements, the CMA and the MSA, LivePerson will not pursue a claim that [24]7 breached the CMA.  Ex. 63.  [24]7 is entitled to summary judgment on the only remaining aspect of the breach of contract claim because [24]7 did not breach the MSA.

The MSA served a specific, limited purpose.  The CMA allowed the parties to jointly market their services, and the MSA was intended to cover situations where LivePerson, under the MSA, "provide[s] a solution to its clients . . . which include[s] the use of [[24]7]'s customer service representatives."  Ex. 2 at 338.  The MSA governed work only "as . . . set forth in one or more Statements of Work."  *Id.* at 338 § 2.a, 3 § 7.a, 4 § 7.c.  LivePerson and [24]7 entered SOWs for only two customers—Adobe and Hoover's.  *Id.* at 357 (Adobe); Ex. 4 (Hoover's).  The Adobe SOW expired on May 31, 2007, and the Hoover's SOW expired on March 31, 2008.  Ex. 3; Ex. 4 at 392.  [24]7 and LivePerson did not renew either of these SOWs, and they entered no further SOWs.  *See* Ex. 39 at 130:14–22; Ex. 64 at 4-6.  The MSA thus ended by March 31, 2008.  While the MSA includes a "survival" clause for certain provisions, those provisions relate only to

[24]7.AI'S MOTION FOR
SUMMARY JUDGMENT
3:17-CV-01268-JST

1    materials obtained during and in connection with the SOWs.  *See* Ex. 2 at 351 § 23.

2          LivePerson has not alleged that any [24]7 conduct relating to the Adobe or Hoover's

3    SOWs breached the MSA.  Nor has it identified any evidence of [24]7 conduct that would

4    constitute an alleged breach of contract under the MSA, Adobe SOW, or Hoover's SOW.

5    Accordingly, [24]7 is entitled to summary judgment.

6    **VI.    LIVEPERSON'S TRADE SECRET MISAPPROPRIATION CLAIM FAILS**

7          [24]7 is entitled to summary judgment on LivePerson's trade secret misappropriation

8    claims.  To succeed on a claim for misappropriation of trade secrets under New York law,

9    LivePerson must demonstrate that "it possessed a trade secret" and that [24]7 "used that trade

10   secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by

11   improper means."  *Big Vision*, 1 F. Supp. 3d at 257.  [24]7 is entitled to summary judgment as to

12   all of the Alleged Trade Secrets.  *First*, [24]7's customers provided the Alleged Trade Secrets to

13   [24]7 and directed [24]7 to use the information to provide services to those customers.

14   Accordingly, [24]7 did not use the Alleged Trade Secrets as a result of discovery by improper

15   means.  *Second*, [24]7 did not have a contractual agreement with LivePerson relevant to any of

16   the Alleged Trade Secrets, and thus [24]7 did not use any of the Alleged Trade Secrets in breach

17   of an agreement.  *Third*, [24]7 did not have a confidential relationship with LivePerson; rather,

18   [24]7 had separate and direct relationships with its customers Optus, Sears, and Capital One.

19   Accordingly, [24]7 did not use any of the Alleged Trade Secrets in breach of a confidential

20   relationship or duty.

21          **A.    [24]7's Customers Provided the Alleged Trade Secrets to [24]7, and Thus**
22                  **They Were Not Discovered Through Improper Means**

23          LivePerson has not presented any evidence that [24]7 discovered any Alleged Trade

24   Secret through improper means.  Rather, every Alleged Trade Secret was voluntarily provided to

25   [24]7 by its customers Optus, Sears, and Capital One, often with LivePerson's knowledge.  To

26   show "discovery by improper means," LivePerson must prove that the "trade secret [wa]s

27   acquired through conduct that is itself a tortious or criminal invasion of the trade secret owner's

28   rights."  *Liberty Power Corp., LLC v. Katz*, 2011 WL 256216, at *5 (E.D.N.Y. Jan. 26, 2011)

1   (quoting Restatement (Third) of Unfair Competition § 43 cmt. c (1995)).  In New York, this

2   conduct generally includes "theft, trespass, bribing or otherwise inducing employees or others to

3   reveal the information in breach of duty . . . ."  *Id.*  It is not improper to acquire information from

4   a third party who voluntarily provides the alleged trade secrets.  *Schroeder v. Pinterest Inc.*, 17

5   N.Y.S.3d 678, 691 (N.Y. App. Div. 2015).

6       LivePerson's allegations are similar to those that were dismissed as a matter of law in

7   *Schroeder*.  There, the plaintiffs alleged that a third party (an ex-employee) "voluntarily gave

8   [defendant] the alleged trade secrets."  *Id.*  The court held that plaintiffs "[could not] prevail on

9   their trade secret claims" despite alleging that defendant's "founders knew that the [alleged trade

10  secrets] given to them by [the ex-employee] was not [his] own."  *Id.*  As a matter of law, these

11  circumstances do "not give rise to an inference that [defendant] used improper means to obtain

12  the information."  *Id.*  Likewise, here, LivePerson has presented no evidence that [24]7

13  discovered any of the alleged trade secrets through any misconduct, let alone misconduct rising to

14  the level of a "tortious or criminal invasion" of LivePerson's rights.

15      The evidence shows, instead, that [24]7 acquired all of the Alleged Trade Secrets directly

16  from third parties Optus, Sears, and Capital One, who directed [24]7 to use the Alleged Trade

17  Secrets in providing services to that customer.  *See supra* II.b.  The three companies provided

18  [24]7 with access to data on the LivePerson chat platform to allow [24]7 to provide digital chat

19  agents and chat-related consulting services to all three companies while they were using the

20  LivePerson chat software.  This data encompasses the data-related Alleged Trade Secrets, **ATS**

21  **48, 49,** and **51**.  The rules-related Alleged Trade Secrets are no different.  Optus and [24]7 jointly

22  collaborated in creating **ATS 3** and **10** for Optus's small business website.  █████████████

23  ████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████

25  ███████████████████████████████████████████████████████

26  ██████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████

28  ██████████████████████████████████

**B.     [24]7 Did Not Use the Alleged Trade Secrets in Breach of an Agreement**

[24]7 did not use any of the Alleged Trade Secrets in breach of an agreement. Again, [24]7 did not breach the MSA with LivePerson. Nor did [24]7 breach the CMA. The CMA was terminated no later than November 2, 2007. Section 2.5 of the CMA allowed either party to terminate the CMA "upon thirty (30) days prior written notice to the other party." Ex. 1 at 697 § 2.5. [24]7 notified LivePerson of its intent to terminate the CMA pursuant to Section 2.5 in a letter dated October 3, 2007. Ex. 5 at 974. Thus, the CMA was terminated no later than November 2, 2007—thirty days from the date of [24]7's letter. The CMA does not contain a survival clause. Ex. 1.

LivePerson has not alleged that any [24]7 conduct breached the CMA before it was terminated in November 2007. Only one Alleged Trade Secret arguably overlaps with the CMA's operative time period: █████████████████████████████████ (ATS 48). But LivePerson has identified no evidence that [24]7 used any such information in breach of the CMA. Merely using such information did not breach the CMA. For example, Section 2.4 of the CMA specifically contemplates "[[24]7's] use of its own data analytics algorithms on data that [[24]7] obtains using [LivePerson's] proprietary software." Ex. 1 at 697 § 2.4. LivePerson also never notified [24]7 that it was in breach, despite Section 2.5 requiring that a party provide written notice of any material breaches. *Id.* at 697 § 2.5.

**C.     [24]7 Did Not Use the Alleged Trade Secrets in Breach of a Confidential Relationship or Duty**

There was no confidential relationship between [24]7 and LivePerson relating to any Alleged Trade Secret because the Alleged Trade Secrets were disclosed to [24]7 by [24]7's customers for the benefit of the respective customer, rather than in the context of a relationship between LivePerson and [24]7. In New York, one company may owe a confidential duty to another if there is "an imbalance of economic power, such that the party that disclosed its trade secrets did so because it was in a position of weakness, dependence or vulnerability and the dominant party required the disclosure as a condition of doing business." *Sci. Components Corp. v. Sirenza Microdevices, Inc.*, 2006 WL 6937123, at *17 (E.D.N.Y. July 11, 2006). "A

[24]7.AI'S MOTION FOR
SUMMARY JUDGMENT
3:17-CV-01268-JST

1    confidential relationship is synonymous with fiduciary relationship and exists generally where the

2    parties do not deal on equal terms and one trusts and relies on the other." *Stewart v. World*

3    *Wrestling Fed'n Entm't, Inc.*, 2005 WL 66890, at *4-5 (S.D.N.Y. Jan. 11, 2005) (quotation

4    omitted).  A "conventional business relationship, without more, is insufficient to create a

5    fiduciary relationship" supporting a confidential duty. *Big Vision*, 1 F. Supp. 3d at 273 n.57

6    (quotation omitted).  "Rather, a plaintiff must show special circumstances that transformed the

7    parties' business relationship to a fiduciary one." *Id.*  Thus, one court granted summary judgment

8    after finding that the defendant did not owe a confidential duty because the plaintiff and

9    defendant "were not joint venturers. . . or co-employees." *Id.* at 273.  Another court granted

10   summary judgment after finding no confidential relationship, despite the fact that the defendant

11   "was clearly an important customer" of the plaintiff and represented 40% of the plaintiff's

12   revenues. *Sci. Components*, 2006 WL 6937123, at *17-18.

13          There was no relationship of any kind between [24]7 and LivePerson relevant to the

14   Alleged Trade Secrets, let alone a confidential relationship.  Instead, [24]7 contracted with and

15   provided services to Optus, Sears, and Capital One.  LivePerson ***separately*** contracted with these

16   same three companies.  Optus, Sears, and Capital One willingly provided the Alleged Trade

17   Secrets to [24]7.  *See supra* II.b.  There was no business relationship—conventional or

18   otherwise—between LivePerson and [24]7 relating to these customers or the Alleged Trade

19   Secrets.  And "a conventional business relationship without more" is insufficient to support a

20   confidential relationship. *Big Vision*, 1 F. Supp. 3d at 273 n.57 (quotation omitted).  Accordingly,

21   [24]7 did not and could not have used the Alleged Trade Secrets in breach of a confidential

22   relationship or duty.

23          [24]7 is entitled to summary judgment on LivePerson's trade secret misappropriation

24   claims because as a matter of law [24]7 did not use any alleged trade secret in breach of an

25   agreement, confidential relationship or duty, or as a result of discovery by improper means.

26   **VII.    LIVEPERSON LACKS STANDING TO ASSERT THE OPTUS AND CAPITAL**
             **ONE RELATED TRADE SECRETS.**

27

28   ████████████████████████████████████████████████████

1 ███████████████████████████████████████████████████████████████

2 ███████████████████.[4]  LivePerson can only assert trade secret misappropriation of information

3 LivePerson owns.  In *Pullman Group, LLC v. Prudential Insurance Co.*, for example, the court

4 granted a motion to dismiss 20 causes of action relating to trade secrets because the plaintiff did

5 not own the alleged trade secrets and therefore lacked standing to sue.  733 N.Y.S.2d 1, 1-2 (N.Y.

6 App. Div. 2001).

7 ████████████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████████

10 ██████████████████████████████████████████████████████████████

11 █████████████████████████████████████████████████████████████

12 ██████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████  *Id.* at 358.  If any confidential

14 information was created pursuant to LivePerson's relationship with Optus, it belongs to Optus—

15 not LivePerson.  Optus's employees confirmed that Optus, not LivePerson, owns the Optus-

16 related Alleged Trade Secrets; one testified "I assume the business [*i.e.*, Optus] would own [the

17 rules]."  Ex. 65 at 45:18-23; *see also* Ex. 66 at 31:7-11; 32:10-33:16.

18 █████████████████████████████████████████████████████████

19 ██████████████████████████████████████████████████████████████

20 ██████████████████████████████████████████████████████

21 ██████████████████████████████████████████████████████████████

22 ███████████████████████████████████████████████████████████

23 ██████████████████████████████████████████████████████████████

24 ██████████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████████

26 ██████████████████████████████████████████████████████████████

27 ─────────────────────

28 [4] [24]7 does not concede that LivePerson owns the Sears-related Alleged Trade Secrets but does not raise that issue on summary judgment.

[24]7.AI'S MOTION FOR
SUMMARY JUDGMENT
3:17-CV-01268-JST

1   ███████████████████████████████████ Ex. 68.

2   Because Optus owns **ATS 3-8, 10**, **13** and **51** and Capital One owns **ATS 1, 48** and **62**,

3   [24]7 is entitled to summary judgment on those Alleged Trade Secrets.

4   **VIII.    THE DATA-RELATED ALLEGED TRADE SECRETS ARE NOT TRADE
5            SECRETS**

6        **A.    Alleged Trade Secrets 48, 49, and 51 Are Not Sufficiently Specific**

7        To survive summary judgment, a plaintiff must identify its alleged trade secrets with

8   particularity.  *PaySys Int'l, Inc. v. Atos Se*, 2016 WL 7116132, at *10 (S.D.N.Y. Dec. 5, 2016);

9   *Big Vision*, 1 F. Supp. 3d at 263.  "[S]pecificity is required before the court so that the defendant

10  can defend himself adequately against claims of trade secret misappropriation, and can divine the

11  line between secret and non-secret information, and so that a jury can render a verdict based on a

12  discriminating analysis of the evidence of disclosure and misappropriation."  *Sit-Up Ltd. v.*

13  *IAC/InterActiveCorp.*, 2008 WL 463884, at *11 (S.D.N.Y. Feb. 20, 2008).  LivePerson resisted

14  identifying its alleged trade secrets for years.  Judge Sweet denied a 2016 motion by [24]7 to

15  compel a specific identification, finding that the particularity standard would apply later, at the

16  summary judgment stage.  Dkt. 197 at 7.  We are now at that stage, and LivePerson still fails to

17  meet the particularity requirement in its sweeping identification of **ATS 48**, **49**, and **51**.

18  Accordingly, the Court should grant [24]7's motion as to these three Alleged Trade Secrets.

19      **ATS 48**, **49**, and **51** cover unspecified information collected over a total of more than 15

20  years and thus fail to provide the required specificity.  █████████████████████████

21  ████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████

28  ██████████████████████████████████ *Id.* at 325:3-14 (emphasis added).  But

1    LivePerson failed to produce the data that forms the basis for the alleged trade secrets, ██████

2    ████████████████████████████████████████████████████████████████████████████████

3    ████████████████████████████████████████   *Id.* at 329:6-330:13.

4    ████████████████   and enormous scope of these Alleged Trade Secrets prevents them from

5    being sufficiently specific to survive summary judgment because they prevent a jury from

6    rendering a verdict "based on a discriminating analysis of the evidence of disclosure and

7    misappropriation." *Sit-Up*, 2008 WL 463884, at *11.  The court in *Big Vision* explained that, by

8    identifying 70 pages of documents as the alleged trade secret, the plaintiff "impermissibly shifts

9    its burden onto [defendant] (and the Court) to sift through 70 pages of abstruse laboratory papers

10   to ascertain [plaintiff's] trade secret." 1 F. Supp. 3d at 263.  These Alleged Trade Secrets are far

11   broader than the "70 pages of abstruse laboratory papers" that were found to be insufficiently

12   specific in *Big Vision*; here, the alleged "data" would likely cover millions of pages—if it had

13   been produced.  Even if it had, LivePerson's broad definitions of **ATS 48**, **49**, and **51** would

14   improperly shift onto [24]7 and the jury the burden of reviewing 15 years' worth of data to

15   ascertain LivePerson's trade secrets.

16        Given the breadth of **ATS 48**, **49**, and **51**, LivePerson also cannot show that all of the

17   information at issue is a trade secret.  In *PaySys*, the plaintiff identified its trade secrets as "the

18   source code" for a number of software applications, which included millions of lines of code

19   originating 30 years earlier.  2016 WL 7116132, at *10-11.  Due to the breadth of the trade secret,

20   the plaintiff was unable to offer a witness "who can swear that all of the lines of code—*i.e.*, all of

21   the thousands of components that comprise CardPac—are not only valuable but truly remain

22   secret," and the court therefore granted summary judgment.  *Id.* at *12.  Here, as well, there is no

23   evidence that ***all*** of the data at issue is valuable.  ████████████████████████████████

24   ████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████

27   ████████████   Ex. 70 at 27 ¶ 72.

28        Despite being put on notice by the Court over two years ago, LivePerson failed to identify

ATS **48**, **49** and **51** with particularity.  Summary judgment is therefore appropriate.

### B.  Alleged Trade Secrets 48, 49, and 51 Are Not Trade Secrets Because They Are Information About Ephemeral Events

Summary judgment is also appropriate as to **ATS 48**, **49**, and **51** because these alleged trade secrets are information relating to ephemeral events.  Under New York law, a trade secret "is a process or device for continuous use in the operation of the business." *Lehman v. Dow Jones & Co.,* 783 F.2d 285, 297-98 (2d Cir. 1986) (quoting § 757, comment b of the Restatement of Torts (1939)).  A trade secret "is not simply information as to single or ephemeral events in the conduct of the business." *Id.*

**ATS 48**, **49**, and **51** comprise data collected about the activities of visitors to the websites of Optus, Capital One, and Sears.  This data is quintessentially "information as to . . . ephemeral events," and trade secret protection is unavailable.  In *Lehman*, the Second Circuit affirmed a finding that the plaintiff's alleged trade secrets were not trade secrets.  *Id.* at 297.  There, plaintiff Lehman's business "was the finding of corporate acquisition deals." *Id.* at 298.  The Second Circuit explained that the alleged trade secrets—information about potential deals for defendant Dow Jones—"was not used to run Lehman's business but was its *product*." *Id.*  Information that might qualify for trade secret protection would be information "used in running the [plaintiff's] business," such as "the formulas or processes used in manufacturing." *Id.*  Summary judgment is appropriate here under *Lehman*.  **ATS 48**, **49**, and **51** are ephemeral products of LivePerson's business, rather than a formula or process used in running LivePerson's business.  ███████████ ███████████████ further demonstrates that the data is simply an ephemeral product, rather than a formula or process necessary for LivePerson's business.  Summary judgment is appropriate.

## IX.  LIVEPERSON'S LANHAM ACT CLAIM FAILS

For its Lanham Act false advertising claim, LivePerson must show, in relevant part, that [24]7 made a statement of fact that is both (1) literally false or misleading and (2) material. 15 U.S.C. § 1125 (a)(1); *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 63 (2d Cir. 2016). Puffery, "[s]ubjective claims about products, which cannot be proven either true or false, [is] not

1  actionable under the Lanham Act."  *Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995)

2  (quotation omitted).  LivePerson's Lanham Act claim fails because [24]7's allegedly deceptive

3  statements were (1) puffery and (2) not material.

4         **A.**       **The [24]7 Marketing Statements Are Puffery**

5         LivePerson's Lanham Act claim is based entirely on [24]7 statements that it was first to

6  develop a "predictive" or "smart" chat platform.  Ex. 9 at 53-55.  LivePerson identifies three such

7  statements: (1) a blog post stating that 24/7 Assist is "the industry's first smart chat that uses

8  prediction and real-time decisioning with big data;" (2) a video stating that PxAssist is the

9  "world's first smart chat platform powered by prediction in real-time;" and (3) a white paper

10  stating that "[24]7 Assist is the first predictive, real-time customer assistance solution for chat"

11  and "the industry's first smart chart platform."  *Id.* at 53-55.

12         [24]7's statements claiming the first "predictive" or "smart" chat platform are puffery

13  because they are "subjective claims about products, which cannot be proven true or false."  As

14  [24]7's expert explained, "predictive" or "smart" chat platform has no commonly understood

15  meaning.  Ex. 71 at 224-226 ¶ 693.  "Smart" does not indicate any particular feature or capability

16  of a piece of software, and "predictive" suggests the use of a range of analytical techniques that

17  could be applied in many different ways to a chat platform.  *Id.*  LivePerson's experts do not

18  dispute this opinion.  Indeed, LivePerson's technical expert gave a vague definition of "predictive

19  technology": "technology that uses data sets to predict what a given system will do at a later

20  date." Ex. 12 at 12:15-22. ████████████████████████████████████

21  ██████████████████████████████ Ex. 72 at 405:2-406:11.  In similar circumstances courts have

22  granted dismissal.  One court dismissed a false advertising claim because the claim that a digital

23  personal assistant was "intelligent" was puffery.  *In re Iphone 4S Consumer Litig.*, 2014 WL

24  589388, at *6 (N.D. Cal. Feb. 14, 2014).  Another court dismissed a defamation claim because

25  "whether plaintiff's claim to have invented e-mail is 'fake' depends upon the operative definition

26  of 'e-mail.' Because that definition does not have a single, objectively correct answer, the claim is

27  incapable of being proved true or false."  *Ayyadurai v. Floor64, Inc.*, 270 F. Supp. 3d 343, 358-59

28  (D. Mass. 2017).  Similarly, because "smart" and "predictive" do not have single objectively

1  correct definitions, [24]7's claims cannot be proven true or false and are puffery.

2        In addition, LivePerson's claim is based on sales to large, sophisticated businesses.

3  "Frequently, newness claims are only puffing, especially when they are made in the context of

4  promotional literature" and are unlikely to influence "somewhat sophisticated" purchasers. *Data*

5  *Cash Sys., Inc. v. JS&A Grp., Inc.*, 1984 WL 63623, at *3 (N.D. Mar. 20, Ill. 1984). For these

6  reasons, [24]'s statements are ambiguous and subjective puffery.

7      **B.**      **The [24]7 Marketing Statements Are Not Material**

8        To satisfy the materiality element, LivePerson must show that the "specific

9  representation . . . was likely to influence consumers' purchasing decisions"; generalized

10 evidence of increased sales "stemm[ing] from [defendant's] advertis[ing] efforts" is insufficient.

11 *Apotex*, 823 F.3d at 68.  In the absence of unusual circumstances, false advertising plaintiffs must

12 "introduce some form of evidence—usually, although not necessarily, survey evidence or expert

13 testimony based on it—to raise a factual question" of materiality.  *SourceOne Dental, Inc. v.*

14 *Patterson Cos.*, 2018 WL 3038503, at *7 (E.D.N.Y. June 19, 2018).

15       LivePerson has no evidence that the alleged misrepresentations are material.  LivePerson

16 did not conduct a survey.  LivePerson's damages expert ████████████████████████

17 ████████████████████ but admitted in deposition "you're not going to be able to discern"

18 whether the representation in the whitepaper factored into a purchasing decision.  Ex. 74 at

19 125:12-126:14.  In addition, the products at issue here are customized for each customer, and the

20 customers for which LivePerson seeks damages are sophisticated purchasers who are likely to

21 dismiss marketing statements, particularly puffery, as immaterial.  As one court explained,

22 materiality is less likely in markets "unlike that of a mass market for a consumer item purchased

23 off the shelf, such as dog food or orange juice, where the advertisement alone may sell the

24 product."  *Allen Organ Co. v. Galanti Organ Builders, Inc.*, 798 F. Supp. 1162, 1168 (E.D. Pa.

25 1992).  Moreover, there is little evidence that any company that purchased [24]'s chat platform

26 even saw the statements. ██████████████████████████████████████████████

27 ████████████████████ Ex. 11 at slide 55.  And there is no evidence that the alleged

28 misrepresentations were material to anyone who purchased [24]7's chat software.

## X.   UNJUST ENRICHMENT SHOULD BE DISMISSED AS DUPLICATIVE

"[U]njust enrichment is not a catchall cause of action to be used when others fail. It is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Corsello v. Verizon N.Y. Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012). Thus, New York's highest court dismissed an unjust enrichment claim because it was premised on the plaintiff's other claims:  "To the extent that these claims succeed, the unjust enrichment claim is duplicative; if plaintiffs' other claims are defective, an unjust enrichment claim cannot remedy the defects." *Id.*; *see also Sullivan v. Aventis, Inc.*, 2015 WL 4879112, at *10 (S.D.N.Y. Aug. 13, 2015) ("Plaintiff has alleged actionable wrongs, and the unjust enrichment claim is based on identical facts. The unjust enrichment claim is dismissed.").

LivePerson's unjust enrichment claim should be dismissed because it is premised entirely on LivePerson's other claims for relief. ███████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████ Ex. 73 at 139 ¶ 294.  Because LivePerson does not identify a basis for unjust enrichment separate from its tort claims, this claim should be dismissed.

## XI.   LIVEPERSON CLAIMS DAMAGES NOT AVAILABLE UNDER THE LAW

### A.   LivePerson May Not Seek Disgorgement Damages for Trade Secret Misappropriation or Unfair Competition as a Matter Of Law

LivePerson seeks as recovery on its trade secret misappropriation claim disgorgement of ███████ in [24]7 profits from all of [24]7's chat platform sales[5] and ███████████ in [24]7's

---

███████████████████████████████████████████████████████████
███████████████████

[24]7.AI'S MOTION FOR
SUMMARY JUDGMENT
3:17-CV-01268-JST

profits from supplying digital chat agents, a wholly separate line of business.  *See* Ex. 73 at 97-107.  Under New York law, however, a trade secret plaintiff may not seek amounts "tied to the defendant's gains rather than the plaintiff's losses."  *E.J. Brooks Co. v. Cambridge Sec. Seals*, 2018 WL 2048724, at *6 (N.Y. May 3, 2018).  [24]7 is therefore entitled to summary judgment on LivePerson's request for disgorgement.

Disgorgement of [24]7's profits is simply not a remedy available to LivePerson under New York trade secret or unfair competition law.  It is well-established that a plaintiff alleging trade secret misappropriation or unfair competition can recover as damages only "the amount of loss sustained by it, including opportunities for profit on the accounts diverted from it through defendants' conduct."  *Hertz Corp. v. Avis Inc.*, 485 N.Y.S. 51, 54 (N.Y. App. Div. 1985).  As one court explained, "[t]he measure of damages for unfair competition and the misappropriation and exploitation of confidential information is the loss of profits sustained by reason of the improper conduct limited to lost profits resulting from the defendant's actual diverting of customers."  *Suburban Graphics Supply Corp. v. Nagle*, 774 N.Y.S.2d 160, 16 (N.Y. App. Div. 2004) (internal quotation marks and alterations omitted).  New York's highest court, the Court of Appeals of New York, recently confirmed this rule in *E.J. Brooks,* in which the court held that a plaintiff's losses may not be measured by the costs the defendant avoided.  2018 WL 2048724, at *5 (citing *Hertz*), *7.  Like other types of disgorgement, the "avoided costs" measure of damages is "a measure of the *defendant's* unjust gains, rather than the plaintiff's losses," *id*. at *6, which the plaintiff's expert characterized as "a type of disgorgement."  *Id*. at *2.  Such a damages calculation, however, "does not consider the effect of the misappropriation on the *plaintiff*.  Because this figure is tied to the defendant's gains rather than the plaintiff's losses," the Court of Appeals held, "it is not a permissible measure of damages."  *Id*. at *6.

This blanket rule limits LivePerson's recovery in this case.  LivePerson seeks its calculated lost profit associated with Optus, Sears, and Capital One in the amount of ████.  LivePerson also impermissibly seeks disgorgement of profits from two [24]7 revenue sources that have no bearing on *LivePerson's* alleged losses: all of [24]7's chat platform profits, in the amount of ████ (Ex. 73 at 100-01 ¶ 203, 138-39 ¶ 294; Dkt. 50 ¶¶ 95-101; *see also* Ex. 76 at

1   Exhibit 6B (showing [24]7 chat revenue from customers other than those LivePerson alleges it

2   lost)), and a substantial share of [24]7's digital chat agent profits, in the amount of ███████

3   ███████   Ex. 73 at 107 ¶ 217.  But under *E.J. Brooks*, neither [24]7's chat software profits nor

4   digital chat agent profits are the "actual measure" of LivePerson's losses.  2018 WL 2048724at

5   *13.  LivePerson's lost profit calculation underscores that [24]7's profits are not an actual

6   measure of LivePerson's losses.  LivePerson's damages expert calculated LivePerson's lost

7   profits based on its loss of the three customers at issue in the trade secret claim.  ███████

8   █████████████████████████████████████████████   Ex. 73 at 86-87 ¶ 176, 93 ¶ 188,

9   96 ¶ 194.  LivePerson seeks ███████████ in disgorgement, when it allegedly suffered at most

10  ███████████ in lost profits.  Because the ███████████ "is tied to the defendant's gains rather than

11  the plaintiff's losses, it is not a permissible measure of damages."  *E.J. Brooks*, 2018 WL

12  2048724, at *6.

13      **B.      No Alleged Misconduct Caused [24]7's Digital Chat Agent Profits**

14          LivePerson's request for damages relating to [24]7's digital chat agents fails for an

15  additional reason:  no evidence connects any of [24]7's alleged misconduct to [24]7's digital chat

16  agent sales.  The "well-accepted" element of proximate cause requires "some direct relation

17  between the injury asserted and the injurious conduct alleged." *Laborers Local 17 Health &*

18  *Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 235 (2d Cir. 1999).  In the complete absence of

19  evidence establishing causation, [24]7 is entitled to summary judgment on LivePerson's request

20  for disgorgement of profits and royalties based on [24]7's digital chat agent sales.  *See Am.*

21  *Student Fin. Grp. v. Aequitas Capital Mgmt.*, 2015 WL 11237638, at *11 (S.D. Cal. Feb. 12,

22  2015) (granting summary judgment on trade secret misappropriation claim for damage not arising

23  from misappropriation of trade secrets).

24  ███████████████████████████████████████████

25  █████████████████████████████████████████████

26  █████████████████████████████████████████████████

27  █████████████████████████████████████████████

28  █████████████████████████████████████████████



7                              *Id.*

8         But there is no logical reason to link the separate service of digital chat agents to chat

9 software.  [24]7 was in the digital chat agent business long before it ever offered chat software.

10 Ex. 76 at Exhibit 6A.  [24]7 provided digital chat agents to a number of enterprise customers,

11 including Optus, Sears, and CapOne, before it released its chat software.  *Id.* at Exhibit 6C.  And

12 [24]7's digital chat agents can use any chat software to chat with website visitors, including from

13 LivePerson, [24]7, or one of many third parties.  Ex. 77 at 75:12-77:5.

14         The lack of evidence connecting LivePerson's claims to [24]7's digital chat agent line of

15 business is absolute.

20                 For example,

22                          (*id.* at 21:1-16), but this does not even

23 suggest, much less establish, a causal link between the two services.

24         Dr. Choi does not even try to connect any alleged misconduct to digital chat agent

25 revenue.  Instead, he superficially attempts to connect digital chat agent revenue generally to chat

26 platform revenue, but those efforts fall far short of the evidence necessary to avoid summary

27 judgment.

1

2

3

4                    Ex. 79 at 4 ¶ 5 & n.10; Ex. 80 at 273:23-274:10.  But

5 neither is evidence that any increase in [24]7's digital chat agent sales were the result of [24]7's

6 sales of its chat software, let alone that any of [24]7's digital chat agent sales resulted from the

7 alleged misconduct.  No such evidence is even relevant to the essential issue of causation.

8         As a matter of law, this limited evidence is insufficient to establish that [24]7's alleged

9 misconduct led to increased digital chat agent sales.  In *Alpha Pro Tech, Inc. v. VWR*

10 *International, LLC*, 2016 WL at 5930868, *10 (E.D. Pa. Oct. 12, 2016), the court excluded a

11 damages expert opinion regarding convoyed sales in a trade secret case.  As described in the

12 related field of patent law, damages based on convoyed sales cannot be extended "to include

13 items that have essentially no functional relationship to the patented invention and that may have

14 been sold with an infringing device only as a matter of convenience or business advantage."  *Am.*

15 *Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008) (citing *Rite–Hite Corp. v.*

16 *Kelley Co.,* 56 F.3d 1538, 1550 (Fed. Cir. 1998)).  Evidence that [24]7 may have sometimes sold

17 both services together, even if true, does not establish that [24]7's alleged misconduct caused its

18 digital chat agent revenue to increase.

19         Accordingly, [24]7 is entitled to summary judgment that LivePerson cannot recover any

20 profits from or base any royalty on [24]7's digital chat agent line of business.

21 **XII.   CONCLUSION**

22         The Court should enter summary judgment in [24]7's favor on LivePerson's breach of

23 contract, trade secret misappropriation, Lanham Act unfair competition, and unjust enrichment

24 claims.  And the Court should rule as a matter of law that LivePerson cannot recover [24]7's

25 profits on LivePerson's trade secret misappropriation or unfair competition claims and that

26 LivePerson cannot recover [24]7's profits or receive other damages relating to [24]7's digital chat

27 agents.

28

[24]7.AI'S MOTION FOR
SUMMARY JUDGMENT
3:17-CV-01268-JST

1  Dated:  July 13, 2018

2  O'MELVENY & MYERS LLP

3

4  By:   */s/ Darin W. Snyder*

5  Darin W. Snyder

6  *Attorneys for Defendant [24]7.ai, Inc.*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[24]7.AI'S MOTION FOR
SUMMARY JUDGMENT
3:17-CV-01268-JST