# EXHIBIT 2

REDACTED Version of
Document Sought to be Sealed

ATTORNEYS' EYES ONLY - CONFIDENTIAL

Page 1

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE NORTHERN DISTRICT OF CALIFORNIA

3 -----------------------------x

4 LIVEPERSON, INC.,

5     Plaintiff,

6 vs.     Case No.
         2:17-CV-00220-BRO-KSx

7

 [24]7.AI, INC.,

8

9     Defendant.

10 -----------------------------x

11   **ATTORNEYS' EYES ONLY - CONFIDENTIAL**

12  VIDEOTAPED DEPOSITION OF WILLIAM S. CHOI

13

14

15

16

17 DATE:   Tuesday, June 12, 2018

18 TIME:   9:41 a.m.

19 LOCATION:  O'MELVENY & MYERS LLP
       Two Embarcadero Center, 28th Floor
20       San Francisco, California

21

22

23

24 Reported By: Lynne Ledanois, CSR 6811

25 Job No: 143473

ATTORNEYS' EYES ONLY - CONFIDENTIAL

Page 26

1    suffer lost profits; is that correct?

2         A     So I have put forward an opinion on

3    lost profits and I go through in great detail

4    why I believe that opinion is correct.

5         Q     Does your opinion about lost profits

6    include an opinion that those lost profits

7    allegedly suffered by LivePerson were caused by

8    [24]7's alleged misappropriation of LivePerson

9    trade secrets?

10        A     So --

11            MS. LOTFOLLAHI:  Object to form.

12            THE WITNESS:  I'm not sure -- so help

13        me out here.  I'm not sure what part of my

14        previous answer wasn't clear.

15            So the way that I understand this

16        market, based on my discussions and the

17        documents that I've reviewed and the

18        barriers to entry that existed in this

19        market, the misappropriation of trade

20        secrets by [24]7 allowed it to gain access

21        into the relevant market and the relevant

22        market being for enterprise accounts.  But

23        for the misappropriation, I don't see

24        evidence that [24]7 could have gained access

25        into this marketplace.

ATTORNEYS' EYES ONLY - CONFIDENTIAL

Page 27

1              Then you see other evidence such as

2         [24]7 targeting certain customers in this

3         particular marketplace.

4    BY MR. YOST:

5         Q    Have you heard the term "causation"

6    before?

7         A    I've heard the word "causation."

8         Q    What does that mean to you in a

9    litigation context?

10             MS. LOTFOLLAHI:  Object to form.

11             THE WITNESS:  I'm not a lawyer.  I can

12        speak as an economist.

13   BY MR. YOST:

14        Q    So you assume liability in the case;

15   right?

16        A    That's correct.

17        Q    Have you assumed that [24]7's conduct

18   caused the damages that you calculate in this

19   case?

20             MS. LOTFOLLAHI:  Object to form.

21             THE WITNESS:  As an economist, it does

22        appear that [24]7's conduct did cause

23        LivePerson to lose profits.

24   BY MR. YOST:

25        Q    And that is an opinion you set forth

ATTORNEYS' EYES ONLY - CONFIDENTIAL

Page 71

1    fiscal year '17.  What calendar years does that

2    represent?

3        A    So they -- typically that would be

4    April -- again, this is general range, all

5    right?  So that would be April 2011 through

6    March of 2017.  But again, it's not a hard --

7    these are not hard bookends, because evidence

8    obviously precedes fiscal year 2012.

9             But that's just the general period I

10   have in mind when I was answering your question

11   about could [24]7 have entered into this market

12   around that time and looking at the evidence,

13   and through my discussions with the technical

14   experts, as an economist, I did not see [24]7

15   having the capability of overcoming what I

16   viewed as significant barriers to entry.

17       Q    In your opinion that -- strike that.

18            It's your opinion that [24]7 could not

19   have entered the predictive chat market for

20   enterprise accounts between April 2011 and March

21   2017, roughly, without misappropriating

22   LivePerson's trade secrets; is that correct?

23       A    So based on the evidence I've seen,

24   and looking for -- to see what [24]7 could have

25   done, also discussing with technical experts,

ATTORNEYS' EYES ONLY - CONFIDENTIAL

Page 72

1     based on the evidence I've seen and looking at

2     the evidence from an economist's perspective, I

3     did not see a credible -- I did not see as

4     credible that [24]7 could have overcome the

5     barriers to entry and enter this market at the

6     speed and the timing at which they did.

7          Q     And you are relying in part on

8     Dr. Wicker's opinions to come to your own

9     opinion on that subject; correct?

10         A     Dr. Wicker has -- yes, I did speak

11    with Dr. Wicker about this.

12         Q     You do not offer in your report any

13    opinions regarding what products are offered in

14    the market you considered; is that correct?

15              MS. LOTFOLLAHI:  Object to form.

16              THE WITNESS:  So help me define what

17         you mean by products?

18    BY MR. YOST:

19         Q     It sounds like the market you

20    considered is the predictive chat market for

21    enterprise accounts; is that fair?

22         A     That's fair.  That's the market I was

23    examining.

24         Q     Did you consider what products are

25    offered in that market beside [24]7 and

ATTORNEYS' EYES ONLY - CONFIDENTIAL

Page 113

1          We are talking about for these

2     companies a product that is not their

▮

▮

▮

▮

7     at the retail level, and that's where their

8     expertise lies.

9          So in terms of predictive chat,

10    certainly they want to behave rationally.

11    They want to make a reasonable purchasing

12    decision.  But to say that they would never

13    make a mistake or to say that they would

14    always be happy with a decision, that's just

15    not consistent with my experience.

16  BY MR. YOST:

17    Q     Is it your opinion -- strike that.

18          Do you express the opinion in your

19  report that [24]7 won any enterprise customer in

20  the predictive chat market by virtue of [24]7's

21  words alone?

22          MS. LOTFOLLAHI:  Form.

23          THE WITNESS:  So I assessed the market

24    and I looked at the barriers to entry.  And

25    I've spoken at length about the types of

ATTORNEYS' EYES ONLY - CONFIDENTIAL

Page 114

1        information that I looked at.

2             And so [24]7 did not have predictive

3        chat, they did not offer predictive chat

4        until fiscal year 2013.

5             And [24]7 also mentioned a number of

6        times how hard it is to get into this

7        market, how much they needed a beachhead

8        account, how much they valued these

9        enterprise accounts to leverage their DCAs.

10            And so I've seen documents that [24]7

11       has in the ways that they've marketed and

12       claimed that they had predictive chat.

13   BY MR. YOST:

14       Q     Was your answer complete?

15       A     Yes.

16       Q     So do you express the opinion in your

17   report that [24]7 won over any enterprise

18   customer in the predictive chat market solely by

19   words alone?

20            MS. LOTFOLLAHI:   Objection, form.

21   BY MR. YOST:

22       Q     Let me rephrase.

23            Do you express the opinion in your

24   report that [24]7 won any enterprise account in

25   the predictive chat market by using words alone?

ATTORNEYS' EYES ONLY - CONFIDENTIAL

Page 154

██

██

██

██

██

6        Q     DCA and voice are separate lines of

7   business from the chat platform, is that your

8   opinion?

9              MS. LOTFOLLAHI:  Object to form.

10              THE WITNESS:  That's not -- that was

11         not -- I guess I don't understand that

12         question in light of the previous question.

13   BY MR. YOST:

14        Q     It stands on its own.

15        A     Okay.  Can you reask the question,

16   please?

17        Q     In your opinion, DCA and voice are

18   separate lines of business at [24]7 from its

19   chat platform business; is that true?

20              MS. LOTFOLLAHI:  Object to form.

21              THE WITNESS:  So the voice appears to

22         be different, but the DCA and the chat have

23         a relationship.

24   BY MR. YOST:

25        Q     And that relationship is such that

ATTORNEYS' EYES ONLY - CONFIDENTIAL

Page 169

1       Q       When you refer to the difficulty in

2    breaking into the enterprise market -- well,

3    strike that.

4               You have an opinion that it would have

5    been difficult for [24]7 to break into the

6    enterprise customer market for predictive chat

7    without relying on LivePerson's trade secrets;

8    correct?

9       A       From my review of the documents in

10   evidence in this case and in speaking with

11   experts, there are barriers to entry in that

12   space and it does not appear from an economic

13   basis whether [24]7 -- it's not a reasonable

14   conclusion on an economic basis that [24]7 could

15   have overcome those barriers.

16      Q       Do you still hold that opinion even if

17   it's true that [24]7 served a number of

18   enterprise customers prior to launching its chat

19   platform?

20              MS. LOTFOLLAHI:  Object to form.

21              THE WITNESS:  So they did not have a

22         predictive chat platform.  And one of the

23         barriers -- it's not all the barriers but a

24         barrier to entry that [24]7 even perceived

25         was market credibility in predictive chat.

ATTORNEYS' EYES ONLY - CONFIDENTIAL

Page 250

1    assume that none of the Optus trade secrets were

2    found to be misappropriated by the jury.  Did

3    you understand that?

4        A    So assume a way that -- to assume

5    there is no misappropriation by Optus -- I'm

6    sorry, by [24]7 with respect to the Optus

7    account?

8        Q    Correct.

9        A    Okay.  I'll make that assumption.

10       Q    How does that impact your damages

11   totals?

12       A    So with Optus, one element of lost

13   profits you would have to -- if there is no

14   allegation of misappropriation or if I'm being

15   asked to assume that wasn't true, there is no

16   misappropriation with respect to Optus, then I

17   would have to remove the Optus lost profits from

18   the damages calculation.

19            Also, again, I would have to

20   reconstruct or potentially reconstruct the

21   counterfactual in terms of understanding how

22   [24]7 acquired the Optus account if there was no

23   misappropriation.

24       Q    You assert that LivePerson is entitled

25   to disgorgement of [24]7's profits associated

ATTORNEYS' EYES ONLY - CONFIDENTIAL

Page 253

1              If the methodology had -- I would

2         still use the methodology if it had very

3         little DCA revenue.  It's trying to follow a

4         reasonable methodology for apportionment.

5    BY MR. YOST:

6         Q     So with respect to the DCA profits

7    that in your opinion should be disgorged from

8    [24]7 and given to LivePerson, in the event that

9    the jury finds that no Optus trade secrets were

10   misappropriated by [24]7 such that 54 percent of

11   the asserted trade secrets were not

12   misappropriated, does that have any impact on

13   the amount of DCA profits that should be

14   disgorged in your opinion?

15             MS. LOTFOLLAHI:  Asked and answered.

16             THE WITNESS:  So again, it's trying to

17        follow a methodology of damages.  I don't

18        have an opinion on the trade secrets from a

19        technical standpoint.  I don't have an

20        opinion as to whether -- I've been asked to

21        assume misappropriation has occurred.

22             So the analysis follows the economic

23        events and the consequences of those events

24        with [24]7 gaining access into this

25        marketplace and overcoming barriers to entry

ATTORNEYS' EYES ONLY - CONFIDENTIAL

Page 254

1        and they are making profits from entering

2        into this marketplace.

3              My understanding of the counterfactual

4        is they should not be in this marketplace or

5        they could not have gained the accelerated

6        entry that they -- that we see in the actual

7        world.

8   BY MR. YOST:

9        Q    If the jury finds that only one trade

10  secret was misappropriated by [24]7, is

11  LivePerson in your opinion still entitled to

12  disgorgement of [24]7 digital chat agent profits

13  in the same amount that you opine in your

14  report?

15       A    Again, I would have to speak with

16  Dr. Wicker and Dr. Kursh.

17       Q    Why?

18       A    I've been asked to assume regarding

19  the trade secrets at issue.  And what

20  assumptions regarding what [24]7 did with the

21  misappropriation from a technical standpoint, if

22  we're changing the assumptions and you're saying

23  only one, it results in me having to speak with

24  Drs. Wicker and Kursh regarding the importance

25  of that one trade secret and what the economic

ATTORNEYS' EYES ONLY - CONFIDENTIAL

Page 255

1    consequences would be.

2        Q      But in Paragraph 211 in your report --

3        A      I'm sorry, which paragraph?

4        Q      211.  You say in the first sentence in

5    part:  [24]7's gross profit margin need not be

6    allocated based on my understanding of the

7    importance of each trade secret claimed by

8    LivePerson.

9            Should we draw from that opinion that

10   any one trade secret entitles LivePerson to over

███ ████████████████████████████████████████

12           MS. LOTFOLLAHI:  Objection to form.

13           THE WITNESS:  The analysis I performed

14       relies on Drs. Wicker and Kursh.  If you ask

15       me to change the number of trade secrets, I

16       would have to revisit the issue with

17       Drs. Wicker and Kursh.

18   BY MR. YOST:

19       Q      Do you rely on this table on Page 104

20   with the percentage of trade secrets by customer

21   and by type to come to any opinions about

22   damages in this case?

23       A      So this table does not affect my

24   damages conclusion.  As I said, I've been asked

25   to assume misappropriation of trade secrets.

ATTORNEYS' EYES ONLY - CONFIDENTIAL

Page 256

1    I've relied on Drs. Wicker and Kursh, I've

2    constructed a counterfactual analysis, I've

3    conducted a damages study.

4            If you're asking should I change the

5    assumptions on trade secrets, again, that's a

6    technical issue.  I need to revisit the issue

7    with Drs. Wicker and Kursh.

8        Q    Why is this table in your report?

9        A    So I was asked to -- if the damages --

10   after conducting the damages analysis, if there

11   had to be an allocation of the damages, the

12   damages amount doesn't change, but if there has

13   to be an allocation of the damages by trade

14   secret, and again understanding from Dr. Wicker

15   that they are equal weights and it's appropriate

16   to allocate the damages number equally across

17   the trade secrets.

18           It's a demonstration of the number,

19   just a tally of the counts, and conducting the

20   math of allocation is relatively

21   straightforward.

22       Q    So if the jury finds that less than

23   all of the asserted trade secrets were

24   misappropriated by [24]7, you would need to

25   change your assumptions about the trade secrets,

ATTORNEYS' EYES ONLY - CONFIDENTIAL

Page 257

1     which is a technical issue that you would need

2     to revisit with Drs. Wicker and Kursh; is that

3     correct?

4          A     I think you asked --

5               MS. LOTFOLLAHI:  Object to form.

6               THE WITNESS:  I think you asked me

7          about if there is no misappropriation if

8          there's only one trade secret.  It sounded

9          as though that's a change in assumption that

10         I would have to make.  So it's a technical

11         issue.  And so I would need to speak with

12         Drs. Kursh and Wicker.

13    BY MR. YOST:

14         Q     So your report as it stands today does

15    not offer a method for the jury to calculate

16    damages if something less than all 28 trade

17    secrets are found to have been misappropriated

18    by [24]7; is that your testimony?

19         A     No, it's not.

20               MS. LOTFOLLAHI:  Sorry.  Object to

21         form.

22               THE WITNESS:  No, that's not my

23         testimony.

24    BY MR. YOST:

25         Q     I don't understand why you don't --

ATTORNEYS' EYES ONLY - CONFIDENTIAL

Page 258

1    why you can't tell me how your damages analysis

2    changes without talking to Drs. Wicker and Kursh

3    in the event something less than all trade

4    secret are found to have been misappropriated.

5              Is it true in order to come to a

6    revised damages conclusion in the event the jury

7    finds that something less than all 28 trade

8    secrets were misappropriated, you would first

9    have to confer with Drs. Wicker and Kursh?

10             MS. LOTFOLLAHI:  Object to form.

11             THE WITNESS:  So the analysis -- I've

12        been crystal clear about the assumptions

13        that I have had to make.  I've been clear

14        about the fact that I rely on Drs. Wicker

15        and Kursh to inform me on the technical

16        issues.  And I constructed -- I've been very

17        clear about the methodology I constructed

18        and the damages and bases for those damages

19        conclusions.

20             This table does not alter my damages

21        conclusion.  It's simply, I've been asked to

22        assume that if the trade secrets have equal

23        weight and there was -- and how would it be

24        possible to allocate the damages amount

25        across these trade secrets equal weights.

ATTORNEYS' EYES ONLY - CONFIDENTIAL

Page 259

1            From there, it's a simple calculation

2        of allocation.

3  BY MR. YOST:

4        Q    Do you know one way or another whether

5    the trade secrets are all of equal value?

6        A    I don't have an opinion.

7            MS. LOTFOLLAHI:  Outside the scope.

8  BY MR. YOST:

9        Q    Where in your report do you express an

10    opinion regarding how the jury is supposed to

11    calculate damages in the event something less

12    than all of the asserted trade secrets are found

13    to have been misappropriated by [24]7?

14        A    So my damages calculation is from --

15    is very clear.  It is the presumption of -- it

16    is the assumption that the trade secrets have

17    been misappropriated.

18            My technical understanding from

19    Drs. Kursh and Wicker and the examination of the

20    marketplace based on what I know regarding what

21    I've been advised regarding the trade secrets, I

22    come to that conclusion.

23            Now, I've been asked to -- if there is

24    a methodology that exists for allocation, it's

25    that damages number that comes from the stated

ATTORNEYS' EYES ONLY - CONFIDENTIAL

Page 265

1        Q      Yes.  So is it true that your report

2   expresses an opinion regarding how [24]7's

3   alleged misappropriation of trade secrets and

4   other alleged misconduct caused [24]7's digital

5   chat agent revenue to be higher; correct?  Or do

6   you not express such an opinion?

7        A      There's certainly additional lift

8   that's being created on the DCA side as a result

9   of the misappropriation.

10       Q      And your conclusion is based on three

11  things, first, that as stated in Paragraph 201,

22             Those three things are the basis for

23  your opinion that [24]7's conduct in this case

24  resulted in a lift in DCA revenue for [24]7;

25  correct?

ATTORNEYS' EYES ONLY - CONFIDENTIAL

Page 266

1              MS. LOTFOLLAHI:  Object to form.

2              THE WITNESS:  That's incorrect.

3    BY MR. YOST:

4         Q    How is it incorrect?

5         A    So you're limiting my analysis to just

6    these three things when I've written extensively

7    about other issues, other facts, other evidence

8    throughout my report.

9         Q    And I'm referring to these three

10   things as the specific evidence you cite to

11   connect misappropriation of chat platform

12   related trade secrets to [24]7's digital chat

13   agent business.

14             All your other opinions seem to apply

15   to how [24]7's misconduct helped it enter the

16   chat platform market.

17             Am I incorrect?

18        A    Yes.

ATTORNEYS' EYES ONLY - CONFIDENTIAL

Page 267

10        Q     That's not testimony that's cited in

11   your report, is it?

12              MS. LOTFOLLAHI:  Object to form.

13              THE WITNESS:  I have reviewed a number

14        of Sequoia documents.  I testified to the

15        Sequoia documents.  I referenced the Sequoia

16        documents.  I referenced a number of

17        documents with respect to [24]7 and how they

18        viewed the importance of getting into the

19        predictive chat market and the economic

20        benefits that would flow from getting into

21        that market, in particular how it would flow

22        and create lift on the DCA side.

23   BY MR. YOST:

24        Q     It's true, isn't it, that [24]7 was in

25        the digital chat agent business long before it