| | |
|---|---|
| LIVEPERSON, INC., <br><br> Plaintiff, <br><br> v. <br><br> [24]7.AI, INC., <br><br> Defendant. | Case No. 17-cv-01268-JST <br><br> **ORDER GRANTING IN PART AND DENYING IN PART SUMMARY JUDGMENT** <br><br> Re: ECF No. 411 |

Before the Court is Defendant [24]7.ai, Inc's ("[24]7") motion for summary judgment. ECF No. 411. For the reasons set forth below, the Court will grant the motion in part and deny it in part.[1]

## I.    BACKGROUND

### A.    Factual Background

LivePerson, Inc. is a company that provides online chat engagement services through a digital platform that it sells to website operators. ECF No. 430-3. In brief, chat engagement allows website operators to initiate real-time text-based communications with website users directly on the website. *See* ECF No. 423-2 at 89. LivePerson's platform attempts to maximize the effectiveness of those chat engagements by identifying when initiating a chat with a particular user is most likely to produce a positive outcome, such as a sale. ECF No. 424-5 at 7-9. The platform uses "rules" that recommend initiating a chat based on variables such as the user's

---

[1] The Court has filed this order under seal because it contains material subject to sealing orders. Within seven days of the filing date of this order, the parties shall provide the Court a stipulated redacted version of this order, redacting only those portions of the order containing or referring to material for which the Court has granted a motion to seal and for which the parties still request the material be sealed. The Court will then issue a redacted version of the order.

United States District Court
Northern District of California

navigation history on the website. *Id.*; ECF No. 424-2 at 4-6. LivePerson develops rules and variables specific to each customer and combined that information into a Design Requirements Document ("DRD"), which it shares with the customer. ECF No. 424-7 at 6-7; ECF No. 424-9 at 8-9. LivePerson's chat platform also collects and analyzes data based on user's visits to the customer's websites. ECF No. 424-2 at 22; ECF No. 430-3 at 80-81. LivePerson makes those data reports accessible to its customers for use in their operations, ECF No. 430-3 at 79, and LivePerson also uses that data to further develop its predictive models, ECF No. 424-2 at 18-19.

[24]7 also operates in the online chat industry. Founded in 2000, [24]7 provides customer service agents to businesses. ECF No. 425-2 at 3, 21. Those agent services include "digital chat agents," meaning customer service agents that participate in the type of online chats initiated through LivePerson's chat platform. ECF No. 410 at 9.

In 2006 and 2007, [24]7 and LivePerson entered into a series of agreements to market and provide services to mutual customers. At the time, [24]7 offered digital chat agents, but did not have its own chat platform. Conversely, LivePerson offered a chat platform, but did not have digital chat agents to staff that platform. The parties entered into a Co-Marketing and Referral Agreement in 2006, which allowed either party to market their combined services. ECF No. 400-5 ("LivePerson-[24]7 CMA") §§ 4.1-4.11. In 2007, the two companies entered into a Master Services Agreement to govern situations where they both provided their respective services to a single customer. ECF No. 400-6 at 1-20 ("LivePerson-[24]7 MSA"), at 2. Pursuant to the LivePerson-[24]7 MSA, the parties entered into individual Statement of Work ("SOW") agreements with two customers, Hoover's and Adobe. ECF No. 400-6 at 21-29; ECF Nos. 400-7, 400-8. The Adobe SOW expired in May 2007. ECF No. 400-7.

On October 3, 2007, [24]7 notified LivePerson that it was terminating the CMA. ECF No. 411-5 at 3. [24]7 specified that it was not terminating any other agreement between the parties, "including, without limitation, the [MSA] or any [SOW] entered thereunder." *Id.* The Hoover's SOW expired in March 2008. ECF No. 400-8 ¶ 7.

Despite the end of [24]7 and LivePerson's direct contractual relationship, the two companies continued to provide their services to mutual customers. Three such arrangements --

1   with Capital One, Sears, and Optus – are relevant here.

2          The parties' dealings with these customers followed the same general framework.  In each

3   case, [24]7 initially provided the customer with telephone customer service agents.  *See* ECF Nos.

4   401-7, 404-1, 406.  Between 2006 and 2010, each customer subsequently signed an agreement

5   with LivePerson to use LivePerson's chat platform.  *See* ECF Nos. 401-8, 404-2, 407.  Shortly

6   after each customer purchased LivePerson's platform, the customer entered into a separate

7   agreement with [24]7 for the use of [24]7's digital chat agents.  *See* ECF No. 403-1 at 622; ECF

8   Nos. 404-3, 407-1.

9          Around 2013, [24]7 introduced its own digital chat platform.  [24]7 touted the features of

10   its platform in a blog post by its CEO, ECF No. 430-2 at 7-8, and a white paper entitled "[24]7

11   Assist: Chat, Made Smarter," *id.* at 11-14.  These posts stated that [24]7's platform was the "first

12   smart chat" platform, describing various predictive capabilities of the product.  *Id.* at 7, 13.  [24]7

13   promoted these same features through a video on its website.  *Id.* at 4.

14          Between 2013 and 2014, all three customers switched to using [24]7's chat platform.  *See*

15   ECF No. 407-7; ECF No. 411-26 at 3: *cf.* ECF Nos. 405-12, 405-14, 405-15.

16          The parties agree that through these arrangements, [24]7 gained access to the rules and

17   data developed for Optus, Capital One, and Sears, which LivePerson claims as trade secrets in this

18   action.  The parties sharply dispute both the factual details of this access and the governing legal

19   obligations.  The Court addresses these disputes as relevant below.  The general thrust of

20   LivePerson's claims is that [24]7 used this trade secret information to develop its own competing

21   chat platform and take LivePerson's customers (including Optus, Capital One, and Sears).

22   LivePerson further alleges that [24]7 continued to make use of LivePerson's protected information

23   while providing chat platform services to those customers.

24          **B.      Procedural History**

25          On March 6, 2014, LivePerson filed suit against [24]/7 in the Southern District of New

26   York, asserting claims of trade secret misappropriation, unfair competition, and breach of contract,

27   among others.  ECF No. 1.  Judge Sweet denied in part and granted in part [24]7's motion to

28   dismiss.  ECF No. 47.  On March 9, 2017, the case was transferred to this Court pursuant to 28

U.S.C. § 1404(a). ECF No. 288. The Court subsequently issued an order relating this case to two

consolidated patent infringement actions brought by [24]7 against LivePerson. *See* ECF No. 292;

Case No. 15-cv-02897, ECF No. 57; Case No. 15-cv-05585.

The parties agreed to conduct an initial bellwether trial covering up to fifteen alleged trade

secrets ("ATSs") and all of LivePerson's non-trade-secret-claims. ECF No. 378, 386. LivePerson

has since stated that it will not pursue its claims for copyright infringement, intentional

interference with existing business relationships, or intentional interference with prospective

business relationships. ECF No. 412-13. On July 13, 2018, [24]7 moved for summary judgment

on the trade secret claims selected for the first trial and LivePerson's remaining claims. ECF No.

410.

## II.     JURISDICTION

The Court has jurisdiction over LivePerson's Lanham Act claims pursuant to 28 U.S.C.

§ 1331 and 15 U.S.C. § 1121(a). The Court has jurisdiction over LivePerson's related state

common-law claims under both 28 U.S.C. § 1332 and 1367.

## III.    LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A dispute is genuine only if there is sufficient evidence for a reasonable trier of fact to resolve the

issue in the nonmovant's favor, and a fact is material only if it might affect the outcome of the

case. *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014)

(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)). The court must draw all

reasonable inferences in the light most favorable to the nonmoving party. *Johnson v. Rancho

Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1018 (9th Cir. 2010).

Where the party moving for summary judgment would bear the burden of proof at trial,

that party "has the initial burden of establishing the absence of a genuine issue of fact on each

issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474,

480 (9th Cir. 2000). Where the party moving for summary judgment would not bear the burden of

proof at trial, that party "must either produce evidence negating an essential element of the

1    nonmoving party's claim or defense or show that the nonmoving party does not have enough

2    evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire &*

3    *Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party satisfies

4    its initial burden of production, the nonmoving party must produce admissible evidence to show

5    that a genuine issue of material fact exists. *Id.* at 1102-03. If the nonmoving party fails to make

6    this showing, the moving party is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477

7    U.S. 317, 322-23 (1986).

8    **IV.    DISCUSSION**

9       [24]7 seeks summary judgment on LivePerson's Lanham Act claim and its common-law

10    claims for trade secret misappropriation, breach of contract, and unjust enrichment. In the

11    alternative, [24]7 seeks summary judgment that disgorgement is not an available remedy for

12    LivePerson's trade secret misappropriation or unfair competition claims. The Court addresses

13    each issue in turn.

14       **A.    Lanham Act**

15       The Court first considers LivePerson's Lanham Act claim. A false advertising claim under

16    the Lanham Act[2] requires the plaintiff to prove five elements:

17          (1) a false statement of fact by the defendant in a commercial
advertisement about its own or another's product;

18          (2) the statement actually deceived or has the tendency to deceive a
substantial segment of its audience;

19          (3) the deception is material, in that it is likely to influence the
purchasing decision;

20          (4) the defendant caused its false statement to enter interstate
commerce; and

21          (5) the plaintiff has been or is likely to be injured as a result of the

22

23    [2] A Lanham Act false advertising claim arises under 15 U.S.C. § 1125(a)(1)(B), which renders
liable for damages:

24

25          (1) Any person who, on or in connection with any goods or services,
or any container for goods, uses in commerce any word, term, name,
symbol, or device, or any combination thereof, or any false

26          designation of origin, false or misleading description of fact, or false
or misleading representation of fact, which . . .

27          (B) in commercial advertising or promotion, misrepresents the
nature, characteristics, qualities, or geographic origin of his or her or

28          another person's goods, services, or commercial activities.

false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012).[3] "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

LivePerson's Lanham Act claim is based on three statements in which [24]7 claimed that its product was the "first" chat platform to incorporate real-time "smart" or "predictive" features: (1) a blog post in which its CEO PV Kannan touted [24]7 Assist as "the industry's first smart chat that uses prediction and real-time decisioning with big data to drive customer experience," ECF No. 430-2 at 7; (2) a white paper that stated, "[24]7 Assist is the first predictive, real-time customer assistance solution for chat," *id.* at 13; and (3) an online video that included a voice-over identifying the platform as the "world's first smart chat platform powered by prediction in real-time," ECF No. 411-9 at 5.

[24]7 argues that is entitled to summary judgment for two independent reasons: (1) the statements in question were non-actionable puffery and (2) even if actionable, the statements were not material.

### 1. Puffery

The Court first addresses [24]7's puffery defense. In the Ninth Circuit:

A statement is considered puffery if the claim is extremely unlikely to induce consumer reliance. Ultimately, the difference between a statement of fact and mere puffery rests in the specificity or generality of the claim. The common theme that seems to run through cases concerning puffery in a variety of contexts is that consumer reliance will be induced by specific rather than general assertions. Thus, a statement that is quantifiable, that makes a claim

---

[3] The parties rely on both Second and Ninth Circuit caselaw in their briefing. Because this case was transferred to this Court under 28 U.S.C. § 1404(a), *see* ECF No. 288, Ninth Circuit precedent governs the Lanham Act claim to the extent Circuit precedent differs, *see Newton v. Thomason*, 22 F.3d 1455, 1460 (9th Cir. 1994) ("We therefore hold that, when reviewing federal claims [in an action transferred pursuant to 28 U.S.C. § 1404(a)], a transferee court in this circuit is bound only by our circuit's precedent.").

as to the specific or absolute characteristics of a product, may be an actionable statement of fact while a general, subjective claim about a product is non-actionable puffery.

*Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008) (internal citations and quotation marks omitted) (citing *Cook, Perkiss, & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 245-46 (9th Cir. 1990)). "Puffing is exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely." *Southland Sod Farms*, 108 F. 3d at 1145 (internal quotation marks omitted). Whether a statement constitutes puffery is a legal question that may be resolved even at the motion to dismiss stage. *Newcal Indus.*, 513 F.3d at 1053.

Here, the allegedly false component of the challenged statements is that [24]7's chat platform was the "first" to incorporate smart or predictive technology. In other words, LivePerson does not argue that [24]7's statements were false because [24]7's chat platform lacked this technology. Rather, the implication of [24]7's "first" claims is that LivePerson's competing platform lacks some element of smart or predictive technology, or at the very least, has a newer and less reliable version.

These statements concern "specific or absolute characteristics of [the competing product[s]," *Newcal Indus.*, 513 F.3d at 1053 (citation omitted), namely, whether they possess certain technological features. This case is thus distinguishable from those involving general claims of product superiority or lower prices. *See Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999) (finding nonactionable "[t]he statement that [one company] was 'too small' to handle [a customer's] business, along with the implication or statement that [another company] was large enough to handle that business"); *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 245 (9th Cir. 1990) (concluding that statement implying that debt collection service provided "the same collection services as lawyers at a lower or more competitive price" was puffery).

[24]7 argues that its statements are nonetheless mere puffery because there is no fixed meaning of "smart" or "predictive" within the industry. ECF No. 400-4 at 26 ("'Smart' does not indicate any particular feature or capability of a piece of software, and 'predictive' suggests the use of a range of analytical techniques that could be applied in many different ways to a chat

7

platform."). In other words, even if the statements compared the two products' features, they did so in terms that were not "specific and measurable," *Southland Sod Farms*, 108 F.3d at 1145, or "capable of being proved false," *Coastal Abstract Serv.*, 173 F.3d at 731. LivePerson sharply contests this characterization, arguing that its evidence demonstrates a sufficiently definite meaning of the disputed terms. ECF No. 421-3 at 26-27.

The parties' focus on an abstract inquiry into the meaning of "smart" and "predictive" is misplaced. Neither consumers nor the Court construe [24]7's statements in a vacuum. The appropriate inquiry is whether, in the context of the challenged statements, a reasonable consumer would perceive a message that the advertised product "is objectively and measurably" superior in a specific way. *L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*, 114 F. Supp. 3d 852, 861 (N.D. Cal. 2015); *see also Autodesk, Inc. v. Dassault Systemes SolidWorks Corp.*, 685 F. Supp. 2d 1001, 1017-18 (N.D. Cal. 2009) ("While it may well be true that the phrase 'work easily' is subjective and not measurable in isolation, when viewed as a whole, [the] statement . . . can be viewed as referring to specific and testable characteristics of a product – specifically, that a consumer can work with files produced by 'any version' of AutoCAD."). Here, [24]7's blog post, white paper, and video introduced particular features as "smart" or "predictive." *See, e.g.*, ECF No. 430-2 at 13 (explaining that [24]7 Assist "provides the dynamic ability to predict and guide outcomes that traditional, static rules-based systems simply cannot deliver" and "mines the results of 100% of your customer interactions to make the service smarter over time"). A reasonable consumer could understand [24]7's "first" statements as implying that other products available at the time lacked these features. Properly understood, this claim "is clearly one of fact, able to be proven true or false." *Coastal Abstract Serv.*, 173 F.3d at 732.

Accordingly, the Court concludes that [24]7 is not entitled to summary judgment on this basis.

### 2.    Materiality

The Court next considers whether these statements are material. To satisfy materiality, a plaintiff must show that the challenged statements were "likely to influence purchasing decisions." *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 828 (9th Cir. 2011).

1    First, LivePerson argues that it is entitled to a presumption of materiality because [24]7's

2    statements were literally false. ECF No. 421-3 at 27. The line of Ninth Circuit cases to which

3    LivePerson refers, however, presumed consumer *deception* based on literally false or intentionally

4    misleading statements. *See, e.g.*, *William H. Morris Co. v. Group W, Inc.*, 66 F.3d 255, 258 (9th

5    Cir. 1995) (explaining that if the defendant "intentionally misled consumers, we would presume

6    consumers were in fact deceived and [the defendant] would have the burden of demonstrating

7    otherwise").[4] But as the Ninth Circuit has made clear, consumer deception and materiality are

8    distinct elements of a false advertising claim. *See Rice v. Fox Broadcasting Co.*, 330 F.3d 1170,

9    1181 (9th Cir. 2003) (concluding that "any deception relating to advertisement of the videos" in

10   question was "immaterial"); *accord Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*,

11   299 F.3d 1242, 1250 (11th Cir. 2002) ("The materiality requirement is based on the premise that

12   not all deceptions affect consumer decisions."). Even if the Court were to presume that consumers

13   were deceived into thinking that [24]7 developed the first smart or predictive chat platform, it does

14   not necessarily follow that the Court should presume that the deception was material, i.e.,

15   influenced their decision to purchase [24]7's product.

16   It appears that the majority of circuits, including the Ninth Circuit, require a separate

17   showing of materiality for literally false statements. *See Skydive Arizona*, 673 F.3d at 1111

18   (analyzing plaintiff's evidence of materiality for misleading and false advertisements); *Johnson &*

19   *Johnson Vision Care*, 299 F.3d at 1250 ("[W]e stand with the First and Second Circuits [in]

20   concluding that the plaintiff must establish materiality even when a defendant's advertisement has

21   been found literally false."); *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302,

22   312 (1st Cir. 2002) ("Thus, even when a statement is literally false or has been made with the

23   intent to deceive, materiality must be demonstrated in order to show that the misrepresentation had

24   some influence on consumers."); *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d

---

[4] LivePerson relies on a single unpublished and non-citable Ninth Circuit decision, *Avid
Identification Sys., Inc. v. Schering-Plough Corp.*, 33 F. App'x 854, 856 (9th Cir. 2002); *see* Ninth
Circuit Rule 36-3(c); Civil L.R. 3.4(e). The Court cautions LivePerson against this practice in the
future. Nonetheless, as explained above, neither *Avid* nor the published cases cited therein aid
LivePerson here.

9

1 Cir. 1997); *cf. Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*, 310 F. Supp. 3d 1089,

2 1125 (S.D. Cal. 2018) (acknowledging circuit split and Ninth Circuit's position); *but see Pizza*

3 *Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497 (5th Cir. 2000) (suggesting that the

4 presumption that literally false "statements actually misled consumers" satisfies materiality).[5] The

5 Court therefore declines to apply a presumption of materiality based on literal falsity.

6 Second, LivePerson points to a declaration from its Vice President Mariam Reza as

7 evidence of materiality, in which Reza states that the claim of being "first" to develop a product is

8 likely to influence purchasing decisions because "older technology that has been in the market

9 longer is viewed as having had more time for refinement and development based on data collected

10 over the years." ECF No. 430-2 ¶ 13. Based on her experience, Reza reasons that [24]7's claims

11 that it developed the "first" predictive chat would cause customers to view [24]7's chat platform

12 as likely to "produce better results" and LivePerson's platform as derivative and inferior, thus

13 influencing purchasing decisions. *Id.* LivePerson contends that this declaration at least raises a

14 triable issue of fact.

15 But LivePerson identifies no authority suggesting that untested, generalized assumptions

16 that a statement is likely to influence purchasing decisions are sufficient to demonstrate

17 materiality. As the Ninth Circuit has noted, materiality "is 'typically' proven through consumer

18 surveys," which provide direct evidence of a statement's impact. *Skydive Arizona*, 673 F.3d at

19 1110 (quoting *Southland Sod Farms*, 108 F.3d at 1140). While the *Skydive Arizona* court

20 explained that such surveys are not required in every case, the plaintiff there still presented "direct

21 evidence that [the challenged] statements were likely to influence consumer's purchasing

22 decisions." 673 F.3d at 1111. Specifically, the plaintiff provided a consumer's declaration that he

23 "personally bought" the products at issue "based on [the challenged] representations and

24 advertisements." *Id.* This direct evidence was corroborated by "evidence of numerous

25 consumers" who contacted the plaintiff's business "after having been deceived into believing there

26

27 _____

28 [5] Because the Fifth Circuit takes a different approach to materiality, LivePerson's reliance on a Western District of Texas case, *Kinetic Concepts, Inc. v. Bluesky Med. Grp. Inc.*, No. SA-03-CA-0832-RF, 2005 WL 3068223, at *6 (N.D. Tex. Nov. 1, 2005), is unpersuasive.

1    was an affiliation" with the defendant's business. *Id.* By contrast, LivePerson has produced no

2    evidence demonstrating how consumers reacted to [24]7's statements.

3         To the contrary, the only record evidence suggests that consumers did not simply take

4    [24]7's statements at face value in making purchasing decisions. This makes sense, given that the

5    parties were not selling disposable consumer goods, but rather entering into multi-year contracts

6    between companies to provide a chat platform to service a company's entire website. *See Allen*

7    *Organ Co. v. Galanti Organ Builders, Inc.*, 798 F. Supp. 1162, 1169 (E.D. Pa. 1992), *aff'd*, 995

8    F.2d 215 (3d Cir. 1993) (reasoning that advertisements are less likely to be material where the

9    product is a large financial investment and the decision is made over months of consideration by a

10    multi-person committee). For example, Sears conducted an extensive head-to-head test between

11    [24]7's and LivePerson's chat platforms before switching to [24]7's product. *See* ECF No. 405-

12    14.

13         Finally, the Court declines LivePerson's invitation to infer materiality based on [24]7

14    tracking views of the whitepaper. ECF No. 421-3 at 27-28. Whether [24]7 tracked views of the

15    white paper in general is not probative as to whether the specific alleged falsehood within the

16    white paper was material.

17         The Court concludes that Reza's general observations based on her sales experience,

18    without any evidence specific to any purchasing decisions by [24]7 customers, is insufficient to

19    raise a genuine dispute of fact as to materiality.[6] Accordingly, the Court grants [24]7's motion for

20    summary judgment on the Lanham Act claims.

21    **B.**    **Trade Secret Misappropriation**

22         The parties agree that New York law applies to LivePerson's trade secret misappropriation

23    claim. Under New York law, "[a] plaintiff claiming misappropriation of a trade secret must prove:

24    (1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an

25    agreement, confidence, or duty, or as a result of discovery by improper means." *E.J. Brooks Co.*

26    *v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 452 (2018) (citations omitted). New York courts have

27

28    ――――――――――――――――――
[6] The Court therefore does not reach [24]7's request to strike the Reza declaration. *See* ECF No. 436-4 at 18-19.

adopted the definition of "trade secret" found in the First Restatement of Torts: "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 407 (1993) (quoting Restatement (First) of Torts § 757 cmt. b (Am. Law. Inst. 1939)).

### 1. Possession of a Trade Secret

To determine whether information qualifies as a trade secret, courts consult six factors suggested by the Restatement:

> (1) [T]he extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (quoting Restatement (First) of Torts § 757 cmt. b); *see also Schroeder v. Pinterest Inc.*, 17 N.Y.S.3d 678, 691 (N.Y. App. Div. 2015) (same). The "most important consideration" in this analysis is the secrecy of the information. *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 514 (S.D.N.Y. 2017) (quoting *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir. 1986)). The secrecy of an alleged trade secret generally presents a question of fact. *See Ashland Mgmt.*, 82 N.Y.2d at 407.

[24]7 does not argue that applying these six factors yields a conclusion that LivePerson's ATSs are not trade secrets. Instead, [24]7 argues that certain exceptions apply, such that particular ATSs are categorically exempt from trade secret protection.

### a. Ownership of ATSs 3-8, 10, 13, 51

First, [24]7 argues that LivePerson lacks standing to assert a misappropriation claim based on trade secrets that, according to [24]7, are owned by Optus.[7] ATSs 3-8, 10, and 13 are, in

---

[7] Although [24]7's motion argued that Capital One also owned certain trade secrets (ATSs 1, 48, and 62), [24]7 conceded in its reply that there are triable issues of fact as to ownership. *See* ECF No. 436-4 at 15 n.1.

general terms, rules LivePerson developed while providing services to Optus. ECF No. 401-4 at 3. ATS 51 consists of the XML data generated by LivePerson's chat platform. *Id.* at 7. LivePerson disagrees, arguing that it did in fact own those ATSs under its agreements with Optus.[8]

Both parties rely on the Optus-LivePerson MSA. *See* ECF No. 401-8 ("Optus-LivePerson MSA").[9] The agreement's cover page provides that ██████████████████████████████ ████████████ Optus-LivePerson MSA at 2. Rather, the Optus-LivePerson MSA ████████████████████████████ ████████ *Id.* It contemplates that ████████████████████████████████ ████████████████████████████████████████ ██████████ that make up the body of the Optus-LivePerson MSA. *Id.* Clause 2.2, in turn, provides that each such contract will ████████████████████████████ ████████████████████████████████ ████████████████████████████ ██████ *Id.* § 2.2.

[24]7 interprets the Optus-LivePerson MSA as follows. The agreement assigns to Optus all ██████████████████████████████ ████████████████████████████████████ *id.* § 26.1, as well as ████████████████████████████ ██████████████████ *id.* § 23.7. Under the MSA, ████████████████ ████████████ *id.* § 1, which LivePerson does not dispute encompasses the trade

---

The Court also notes that [24]7 does not challenge LivePerson's Article III standing to sue in federal court, but rather argues that New York law authorizes only the owner of a trade secret to assert a misappropriation claim based on that secret. *See TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 824–25 (9th Cir. 2011) (distinguishing between Article III standing and state law requirements).

[8] LivePerson does not contest [24]7's position that ownership is a prerequisite for its trade secret claim.

[9] The parties agree that Engage Pty Limited, a party to the contract, is an entity of LivePerson. *See* ECF No. 400-4 at 13 n.3.

secrets at issue. Further, the Optus-LivePerson MSA defines ███████████████

███████████████████████████████████████████████████

██████████ under a subsequent contract. *Id.* Thus, Optus owns the rules and data-related trade

secrets if they were either (1) █████████████████████████████████████ or (2)

██████████████████████████████████████████████████.

LivePerson offers a contrary interpretation. First, LivePerson urges the Court to look to

the relevant Statement of Work (SOW), which covers ████████████████████████

██████████████████████████████████████

████████████████████ ECF No. 423-2 at 85-105 ("Optus-

LivePerson SOW") § 1.4. The SOW specifies that ████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

██████ *Id.* § 1.8.1(5). LivePerson argues that the ATSs fall within those deliverables and that

the terms of the Optus-LivePerson SOW should prevail. Opp. at 20-21. Furthermore, LivePerson

points to clause 23.2 of the Optus-LivePerson MSA, which provides that LivePerson ████████

████████████████████████████████████████████████

Optus-LivePerson MSA § 23.2. The MSA, in turn, defines ███████████████████

██████████████████████████████████████████████████

███████████████████████████████ *Id.* § 1. Under LivePerson's

interpretation, therefore, LivePerson owns the rules and data-related trade secrets if they are either

(1) ████████ or (2) ████████████████.

The Court cannot grant summary judgment on this issue because there remain ambiguities

as to which category the ATSs belong and therefore as to their ownership.

Under New York law, "[e]xtrinsic evidence of the parties' intent may be considered only if

the agreement is ambiguous, which is an issue of law for the courts to decide." *Greenfield v.*

*Philles Records, Inc.*, 98 N.Y.2d 562, 569-70 (2002) (citation omitted). "A contract is

unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of

misconception in the purport of the [agreement] itself, and concerning which there is no

14

1  reasonable basis for.'" *Id.* (alteration in original) (quoting *Breed v. Ins. Co. of N. Am.,* 46 N.Y.2d

2  351, 355 (1978)). "If the court deems a contract ambiguous, it may consult extrinsic evidence to

3  resolve the ambiguity." *Chen v. Yan,* 971 N.Y.S.2d 519, 522 (N.Y. App. Div. 2013). "However,

4  where 'the determination of the parties' intent depends upon the credibility of extrinsic evidence

5  or a choice among inferences to be drawn from extrinsic evidence, then the issue is one of fact.'"

6  *Id.* at 523 (quoting *Amusement Bus. Underwriters v. Am. Intl. Grp.,* 66 N.Y.2d 878, 880 (1985)).

7      The MSA does not define "material" and neither party offers anything more than

8  conclusory assertions as to whether clauses 23.7 or 26.2 cover the rules and data at issue. But if,

9  as [24]7 contends, ███████████████████████████████████████

10  themselves, ECF No. 436-4 at 15, it seems to create an internal conflict within the Optus-

11  LivePerson MSA. The agreement defines ██████████████████, *see* Optus-LivePerson MSA

12  § 1, and so clause 23.7 could assign Software rights to Optus, while clause 23.2 assigns those

13  same Software rights to LivePerson.

14      Nor does consulting the relevant SOW clarify matters. [24]7 notes that the SOW provides

15  that ████████████████████████████████████████ Optus-

16  LivePerson SOW § 3.10. The SOW also states, however, that ██████████████████

17  ██████████████████████████ *id.* § 1.8.1(5), and thus owned by

18  LivePerson. It is appropriate for the trier of fact to consider the parties' extrinsic evidence to

19  resolve the ambiguity whether the ATSs are materials under the MSA or services provided

20  pursuant to the SOW. Therefore, the Court denies summary judgment on this issue.

21          **b.      Specificity of ATSs 48, 49, and 51**

22      Next, [24]7 argues that LivePerson failed to describe certain ATSs with sufficient

23  particularity. ECF No. 400-4 at 23-25.

24      "[N]either the New York Court of Appeals nor . . . the Second Circuit has expressly

25  required trade secrets to be identified with any particular degree of specificity . . . ." *Broker*

26  *Genius, Inc. v. Zalta,* 280 F. Supp. 3d 495, 515 (S.D.N.Y. 2017). Nonetheless, district courts

27  applying New York law have generally required some degree of specificity, reasoning that "a

28  defendant must know what constitutes a plaintiff's trade secret, so that it does not infringe upon

that trade secret and so that the defendant can defend itself at any trial." *Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 257 (S.D.N.Y. 2014) (collecting cases); *see also Broker Genius*, 280 F. Supp. 3d at 515.

LivePerson describes the disputed ATSs (48, 49, and 51) as "XML data generated by LivePerson's smart chat platform analytics and reporting features" pursuant to LivePerson's provision of services to Capital One, Sears, and Optus, respectively. ECF No. 401-4 at 7. [24]7 contends that this description is insufficient because of the volume of XML data generated over the multi-year service periods. ECF No. 400-4 at 23-24. According to [24]7, LivePerson has not sufficiently demonstrated that all this data constitutes a valuable trade secret, particularly given that LivePerson automatically deletes such data after thirteen months. *Id.* at 24-25. The Court disagrees.

The cases on which [24]7 relies are inapposite. In *PaySys International, Inc. v. Atos Se*, PaySys claimed as a trade secret "millions of lines of source code with diverse functionality" that had been "written more than thirty years ago and licensed widely." No. 14-CV-10105 (KBF), 2016 WL 7116132, at *11 (S.D.N.Y. Dec. 5, 2016). The court concluded that it was beyond dispute that portions of PaySys's code were widely known. *Id.* at 11-12. In this context, the lack of specificity as to which elements of PaySys's code remained secret and valuable impermissibly shifted the burden onto defendants to discern the portions of the code on which PaySys could plausibly base a trade secret claim. *Id.*

In *Big Vision*, the plaintiff asserted as a trade secret a five-element formula for producing recyclable banners. 1 F. Supp. 3d at 230. The plaintiff alleged that this formula had been disclosed to the defendant during a laboratory trial, but neither the defendant nor the court could discern which formula within "70 pages of abstruse laboratory papers" embodied the trade secret because the laboratory trial tested "a wide variety of structures and at-times contradictory ideas," including "varying structure compositions, a variety of different additives in differing concentrations, an enormous range of Entira amounts, and a wide variety of substrates and finishing treatments." *Id.* at 265. The plaintiff exacerbated this difficulty by describing the five elements in "hopelessly vague" terms. *Id.* at 266.

16

United States District Court
Northern District of California

The key distinction is that in *PaySys* and *Big Vision*, the plaintiff could not plausibly claim the entire set of information described as a trade secret. The *PaySys* plaintiff claimed millions of lines of source code, but substantial portions had already been made public over thirty years of licensing. 2016 WL 7116132, at *11-12. The *Big Vision* court made clear that "the entire field of recyclable banners cannot be Plaintiff's trade secret," and so only some of the numerous formulas described in the laboratory reports could represent the *Big Vision* plaintiff's trade secret. 1 F. Supp. 3d at 265. In both cases, the plaintiff failed to provide the information necessary for the defendant to distinguish the protectable trade secret from the larger subset of information.

This distinction arises from the fact that *PaySys* and *Big Vision* concerned what are essentially formulae. But New York's definition of trade secret also expressly includes a "compilation of information which is used in one's business." *Ashland Mgmt.*, 82 N.Y.2d at 407. ATSs 48, 49, and 51 are compilations of data generated pursuant to LivePerson's rules, i.e., formulae. [24]7 points to no authority suggesting that the breadth of such a compilation is itself disqualifying when the data is produced pursuant to the same processes and subjected to the same treatment. *Cf. Paz Sys., Inc. v. Dakota Grp. Corp.*, 514 F. Supp. 2d 402, 404 (E.D.N.Y. 2007) (holding that database of "data such as customer information, unit pricing, inventories, negotiated prices, vendor information, bid histories and invoices" was a trade secret). Here, LivePerson is claiming the entire set of data, and [24]7 cannot plausibly allege that it is unable to identify that set. Rather, [24]7's argument is premised on its unsupported assumption that only portions of the XML can be protectable.

The Court therefore declines to grant summary judgment on this basis.

### c.    Ephemeral Nature of ATSs 48, 49, and 51

[24]7 contends that ATSs 48, 49, and 51 are not trade secrets as a matter of law because they are merely information regarding ephemeral events. ECF No. 400-4 at 25.

"A trade secret is a process or device for continuous use in the operation of the business." *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir. 1986) (quoting Restatement (First) of Torts § 757 cmt. b). Therefore, "[c]onfidential proprietary data relating to pricing, costs, systems, and methods are protected by trade secret law." *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir.

17

1   2009).  But this protection does not extend to "information as to single or ephemeral events in the

2   conduct of the business, as, for example, the amount or other terms of a secret bid for a contract or

3   the salary of certain employees, or the security investments made or contemplated, or the date

4   fixed for the announcement of a new policy or for bringing out a new model or the like." *Lehman*,

5   783 F.2d at 297-98 (quoting Restatement (First) of Torts § 757 cmt. b).

6       Viewed within the context of LivePerson's chat platform, the XML data constitutes more

7   than single or ephemeral events.  Because the data reflects the application of LivePerson's rules

8   and models to real world situations, it is more akin to "test data," a protectable category of trade

9   secret.  *Next Commc'ns, Inc. v. Viber Media, Inc.*, No. 14-CV-8190 (RJS), 2016 WL 1275659, at

10  *4 (S.D.N.Y. Mar. 30, 2016) (quoting *MedTech Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778,

11  788 (S.D.N.Y. 2008)).  This characterization is further supported by the fact that LivePerson uses

12  this data as part of "a process . . . for continuous use in the operation of [its] business,"

13  Restatement (First) of Torts § 757 cmt. b, by using the data to adjust the parameters of the chat

14  platforms that it provides to its customers.  ECF No. 424-2 at 14-17; *see also Penrose Comput.*

15  *Marketgroup, Inc. v. Camin*, 682 F. Supp. 2d 202, 213 (N.D.N.Y. 2010) (recognizing viable

16  misappropriation claim based on plaintiff's "customized and confidential computer services,

17  solutions or designs for its clients, as well as its cost structure, supply vendors, customer

18  relationships, sales strategies, customer files, customer lists and identities, and other confidential

19  and proprietary information not known to the general public"); *Paz Systems*, 514 F. Supp. 2d at

20  404, 406.  Accordingly, LivePerson has raised a triable issue of fact whether the XML data

21  constitutes "confidential proprietary data relating to [its] systems . . . and methods." *In re Dana*

22  *Corp.*, 574 F.3d at 152.

23      *Lehman*, on which [24]7 relies, is not to the contrary.  In *Lehman*, a "finder" of corporate

24  acquisition deals asserted trade secret protection for information relating to whether a target

25  corporation's officers would be receptive to a merger offer and the finder's recommendation on

26  that opportunity.  783 F.2d at 297-98.  The court concluded that, although information that

27  pertained to general methods of setting up acquisition deals might qualify, this deal-specific

28  information "was not used to run Lehman's business but was its *product*: like the car that rolls off

18

1    the production line, this information was what Lehman had to sell." *Id.* at 298.

2        [24]7's remaining arguments similarly lack merit. [24]7 misapplies *PaySys* in arguing that

3    LivePerson must show that it continuously used every piece of XML data for the data set to

4    qualify as a trade secret. As discussed above, *PaySys* dealt with whether individual lines of code

5    were publicly known, and therefore precluded from trade secret protection on that basis. 2016 WL

6    7116132, at *11-12. No court has indicated that a trade secret plaintiff must affirmatively

7    demonstrate continuous use of each piece of information within a "compilation of information."

8    For instance, a plaintiff need not prove that it will continuously contact or do business with every

9    customer on a customer list to invoke trade secret protection for the whole list. *Cf., e.g., N. Atl.*

10   *Instruments, Inc. v. Haber*, 188 F.3d 38, 44-46 (2d Cir. 1999).

11       Because continuous use of each piece of data is not the standard, LivePerson's periodic

12   deletion of XML data does not defeat trade secret protection. It suffices that LivePerson

13   "continuously" makes use of that data compilation as a whole to refine its products.

14       Finally, LivePerson's cited testimony suggests that, as a general practice, it used data from

15   prior visitor interactions on a particular website to develop its products for that customer. *See*

16   ECF No. 424-2 at 14-17. At summary judgment, the Court finds it is reasonable to infer that

17   LivePerson maintained this practice for the specific customers covered by ATSs 48, 49, and 51.

18       **2.    [24]7's Use of the ATSs**

19       [24]7 also argues that it did not use any "trade secret in breach of an agreement,

20   confidence, or duty, or as a result of discovery by improper means." *E.J. Brooks*, 31 N.Y.3d at

21   452 (citations omitted). The Court addresses each theory in turn.

22       **a.    Breach of an Agreement**

23       As an initial matter, LivePerson agrees that its breach-of-contract claim forms the basis for

24   this theory of misappropriation, and so the two rise and fall together. *See* ECF No. 421-3 at 11

25   n.4, 17-18. Moreover, LivePerson has limited its breach-of-contract theory to the LivePerson-

26   [24]7 MSA. *Id.* at 18-19; ECF No. 412-13 at 2.

27       [24]7 argues that the MSA governed services only "as . . . set forth in one or more

28   Statements of Work," LivePerson-[24]7 MSA §§ 2(a), 7(a), 7(c), and that once all outstanding

19

SOWs expired, the MSA terminated. Consequently, [24]7 reasons, the parties' agreement terminated on March 31, 2008, and no subsequent actions constitute a breach. ECF No. 400-4 at 17-18.

[24]7's argument is not supported by the facts. The LivePerson-[24]7 MSA does not state that it will automatically terminate as soon as the parties lack an active SOW. Indeed, it seems doubtful that the parties intended that any lapse in an active SOW, even if only for a few days, would terminate the entire MSA. Certainly, the Court cannot infer that intent simply from the fact that the MSA governed work performed pursuant to SOWs.

Instead, the agreement provides that it will automatically renew for successive one-year terms unless one of the parties gives written notice to the contrary at least sixty days in advance. LivePerson-[24]7 MSA § 10. The agreement also gives each party the right to terminate under certain other conditions, such as an uncured breach. *See id.* § 11. In the absence of any evidence that the parties terminated the MSA in accordance with its provisions, the Court presumes the agreement remains in effect.

Nonetheless, the Court concludes that there is no triable issue of fact whether [24]7 breached the MSA. LivePerson agrees that its breach-of-contract theory is based on conduct and information unrelated to any SOW governed by the MSA, but it argues that the MSA's confidentiality provisions apply to any confidential information [24]7 obtained from LivePerson at any point and in any manner. ECF No. 421-3 at 18-19. LivePerson stresses that various provisions of the MSA refer to "LivePerson Intellectual Property" without explicitly stating that they are limited to information obtained in the course of performing pursuant to a SOW. *See* LivePerson-[24]7 MSA §§ 7(f), 17(a). LivePerson also relies on section 6 of the MSA, which expressly incorporates the confidentiality protections contained in article 5 of the CMA. *Id.* § 6(b). But while LivePerson emphasizes the broad definition of "Confidential Information" in article 5.1, LivePerson overlooks that this definition refers to information that the parties "have received or may receive . . . *in connection with the performance of this Agreement*." LivePerson-[24]7 CMA § 5.1 (emphasis added).

The Court concludes that the contract is not reasonably susceptible to LivePerson's

interpretation. *See Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244 (2014). The Court must "read the document as a whole to ensure that excessive emphasis is not placed upon particular words or phrases." *S. Rd. Assocs., LLC v. Int'l Bus. Machines Corp.*, 4 N.Y.3d 272, 277 (2005). The MSA establishes a framework of terms for work performed under SOWs, LivePerson-[24]7 MSA § 2(a), and its confidentiality and proprietary rights provisions must be read in that context, *see, e.g., id.* § 7(a) (granting [24]/7 a revocable license "for the sole purpose of performing the Services in accordance with the relevant SOW"). Absent any indication within the text of the agreements, it is not reasonable to assume that the parties' agreement to terms for specific service contracts was also intended to execute a universal agreement to safeguard each other's intellectual property rights under all future circumstances.

Accordingly, LivePerson's trade secret misappropriation claim cannot proceed on a breach-of-contract theory.

### b.    Breach of a Confidential Duty

The Court next considers whether [24]7 used LivePerson's trade secrets in the breach of a confidential duty to LivePerson.

"Under New York law, a duty of fidelity can in 'rare instances' arise from a relationship of trust and confidence between two companies." *Sci. Components Corp. v. Sirenza Microdevices, Inc.*, No. 03 CV 1851 NGG RML, 2006 WL 6937123, at \*16 (E.D.N.Y. July 11, 2006) (citation omitted), *report and recommendation adopted*, No. 03-CV-1851(NGG)(RML), 2006 WL 2524187 (E.D.N.Y. Aug. 30, 2006). But "[a] conventional business relationship, without more, is insufficient to create a fiduciary relationship. Rather, a plaintiff must show special circumstances that transformed the parties' business relationship to a fiduciary one." *Big Vision*, 1 F. Supp. 3d at 273 n.57 (S.D.N.Y. 2014) (quoting *Legend Autorama, Ltd. v. Audi of Am., Inc.*, 954 N.Y.S.2d 141, 144 (N.Y. App. Div. 2012)).

An "important element" contributing to a confidential relationship is "an imbalance of economic power, such that the party that disclosed its trade secrets did so because it was in a position of weakness, dependence or vulnerability and the dominant party required the disclosure as a condition of doing business." *Sci. Components*, 2006 WL 6937123, at \*17. In other words,

1    the duty arises from a relationship where "the plaintiff was completely or almost completely

2    dependent on the defendant corporation for its livelihood over a long period of time." *Id.* Such

3    economic dominance may exist in manufacturer-distributor relationships, for instance, where

4    "sales of the [manufactuer's] products constituted the bulk of [the distributor's] revenues."

5    *Abernathy-Thomas Eng'g Co. v. Pall Corp.*, 103 F. Supp. 2d 582, 604 (E.D.N.Y. 2000); *cf. Sci.*

6    *Components*, 2006 WL 6937123, at *18 (explaining that a manufacturer-distributor "designation

7    alone does not create a duty of trust and confidence" (citing *Medinol Ltd. v. Boston Sci. Corp.*, 346

8    F. Supp. 2d 575, 607 (S.D.N.Y. 2004)). Courts have found further evidence of dominance where

9    the manufacturer "dictated the size of [the distributor's] territory, prices and commissions."

10   *Zimmer-Masiello, Inc. v. Zimmer, Inc.*, 552 N.Y.S.2d 935, 937 (N.Y. App. Div. 1990). In these

11   cases, the manufacturer *contractually* required the distributor to disclose the confidential

12   information. *See Abernathy-Thomas Eng'g*, 103 F. Supp. 2d at 603; *A.S. Rampell, Inc. v. Hyster*

13   *Co.*, 3 N.Y.2d 369, 377 (1957); *Zimmer-Masiello*, 552 N.Y.S.2d at 365.

14        Unlike with manufacturers and distributors, LivePerson and [24]7 did not have a direct

15   sales relationship. Nonetheless, LivePerson argues that [24]7 economically dominated LivePerson

16   – albeit indirectly – "given the economics of chat platforms versus revenue-driving [digital chat

17   agents]." ECF No. 421-3 at 16. This claim is difficult to evaluate because LivePerson does not

18   cite any specific evidence regarding the parties' respective positions in the marketplace, relying

19   solely on [24]7's CEO's statement that, in the parties' dealings with Optus, LivePerson was █████

20   ████████████████████████████████████████████████████████████████████████████

21   █████ ECF No. 426-14 at 3. But neither the Court (nor a jury) could reasonably conclude based

22   solely on this evidence that LivePerson's sales to customers who also used [24]7's digital chat

23   agent services constituted "the bulk of [LivePerson's] revenues." *Abernathy-Thomas Eng'g*, 103

24   F. Supp. 2d at 604; *see also Sci. Components*, 2006 WL 6937123, at *18 (holding that evidence

25   that the trade secret plaintiff accounted for forty percent of the defendant's revenues was

26   insufficient, as a matter of law, to establish a confidential relationship).

27        Similarly, LivePerson has not put forth evidence that [24]7's market position prevented

28

1    LivePerson from imposing contractual limitations on [24]7's use of its ATSs.[10]  In other words,

2    LivePerson may have had to give access to [24]7 as a practical matter, but it did not necessarily

3    have to do so without the type of restrictions that would support a breach-of-contract

4    misappropriation theory.  *Cf. Structured Capital Sols., LLC v. Commerzbank AG*, 177 F. Supp. 3d

5    816, 836 (S.D.N.Y. 2016) (holding that where plaintiff voluntarily disclosed trade secret under

6    one-year non-disclosure agreement, trade secret protection expired when agreement did).  Thus,

7    this case further differs from those where a manufacturer leveraged its position to contractually

8    require a distributor to disclose trade secret information.  *See Abernathy-Thomas Eng'g*, 103 F.

9    Supp. 2d at 603; *A.S. Rampell, Inc.*, 3 N.Y.2d at 377; *Zimmer-Masiello*, 552 N.Y.S.2d at 365.

10          *SimplexGrinnell LP v. Integrated Systems & Power, Inc.*, 642 F. Supp. 2d 167 (S.D.N.Y.

11   2009), on which LivePerson relies, does not counsel a different result.  *SimplexGrinnell* bears

12   some resemblance to these facts, as one competitor manufactured a product – fire alarm systems –

13   while both competitors provided maintenance services for those systems.  *Id.* at 175.  There,

14   however, the parties had a much closer relationship, where defendant "operated effectively as a

15   branch office of [plaintiff] and served as plaintiff's agent and representative in the New York City

16   area."  *Id.*  Moreover, though defendant gained access to the trade secret through this relationship,

17   a stipulated bankruptcy settlement strictly limited defendant's use.  *Id.* at 176.  Here, LivePerson's

18   evidence, even viewed in its most favorable light, shows a far more attenuated relationship with

19   [24]7 than the agency relationship in *SimplexGrinnell*.  *Cf.* Restatement (First) of Torts § 757 cmt.

20   j ("The chief example of a confidential relationship under this rule is the relationship of principal

21   and agent." (citation omitted)).  And the terms of [24]7's access were not delineated by a

22   stipulation or other contract between the parties.[11]

23

---

24   [10] To the extent that LivePerson premises its misappropriation claim on a breach of a contract
     between LivePerson and [24]7 or a contract between LivePerson and a mutual customer, the Court
25   address those points under the breach-of-contract and improper-means theories.
     [11] LivePerson's other cases are likewise distinguishable.  In *Stewart v. World Wrestling
26   Federation Entertainment, Inc.*, the parties collaborated on the development of a single idea,
     which defendant then used for its sole profit.  No. 03 CV 2468 RLC, 2005 WL 66890, at *4
27   (S.D.N.Y. Jan. 11, 2005).  Though *S.E.C. v. Singer* states that the general proposition that the
     existence of a confidential relationship requires factual findings, 786 F. Supp. 1158, 1169
28   (S.D.N.Y. 1992), it addresses misappropriation under federal securities laws, not New York law.
     Regardless, the factual question of a confidential relationship may be decided at summary

23

Ultimately, the Court concludes that bare assertions regarding the dynamics of the parties' relationships with specific customers and references to general industry standards are insufficient to create a genuine issue of fact that could establish a confidential relationship. Instead, these arguments are more properly considered as a question whether [24]7 used improper means to discover the ATSs.

### c. Improper Means

Improper means are those "which fall below the generally accepted standards of commercial morality and reasonable conduct," *Big Vision*, 1 F. Supp. 3d at 273 (quoting Restatement (First) of Torts § 757 cmt. f), which may include "theft, trespass, bribing or otherwise inducing employees or others to reveal the information in breach of duty, fraudulent misrepresentations," and acts of economic espionage, Restatement (First) of Torts § 759 cmt. c.[12]

LivePerson does not dispute that Optus, Capital One, and Sears voluntarily gave [24]7 access to the ATSs so that [24]7 could provide digital chat agents for LivePerson's chat platform. ECF No. 400-4 at 18; ECF No. 421-3 at 12-13. LivePerson argues, however, that [24]7 improperly exceeded the authorized scope of that access to develop a competing chat platform. ECF No. 421-3 at 12-13. LivePerson points out that its contracts with Optus, Capital One, and Sears designated the ATSs as confidential information. Optus-LivePerson MSA § 19.1; Optus-LivePerson SOW § 1.8.1; ECF No. 412-4 § 13.4; ECF No. 411-36 § 7.2.1. Further, LivePerson contends that its evidence establishes that [24]7 knew of these obligations, or at the very least, was willfully blind to them. ECF No. 421-3 at 13.

LivePerson's argument (and its cited authority) suggest that it is relying on the principle that a defendant may be held liable for trade secret misappropriation if it "learned the secret from a

---

judgment where a plaintiff fails to raise a genuine issue of material fact. *See, e.g.*, *Big Vision*, 1 F. Supp. 3d at 273 n.57; *Sci. Components*, 2006 WL 6937123, at *17.

[12] Contrary to [24]7's characterization, ECF No. 400-4 at 18-19, "conduct that is itself a tortious or criminal invasion of the trade secret owner's rights" is sufficient – but not necessary – to demonstrate improper means. *Liberty Power Corp., LLC v. Katz*, No. 10-CV-1938 NGG CLP, 2011 WL 256216, at *5 (E.D.N.Y. Jan. 26, 2011) ("If a trade secret is acquired through conduct that is itself a tortious or criminal invasion of the trade secret owner's rights, the acquisition ordinarily will be regarded as improper." (quoting Restatement (Third) of Unfair Competition § 43 cmt. c (Am. Law. Inst. 1995))).

24

United States District Court
Northern District of California

third person with notice of the fact that it was a secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other." *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 718 (2d Cir. 1992) (quoting Restatement (First) of Torts § 757(c)); *see also Fabkom, Inc. v. R.W. Smith & Assocs., Inc.*, No. 95 CIV. 4552 (MBM), 1996 WL 531873, at *12 (S.D.N.Y. Sept. 19, 1996) (same). But although LivePerson suggests in passing that [24]7 knew or should have known that "LivePerson's customers were breaching duties of confidentiality to LivePerson to the extent they provided LivePerson's trade secrets to [24]7 for th[e] purpose" of building a competing chat platform, ECF No. 421-3 at 15 n.10, it identifies no such breach by any of its customers. Indeed, in the deposition testimony cited by [24]7, LivePerson witnesses said they were unaware of any instance where LivePerson had concluded that Optus, Sears, or Capital One were in breach or so informed those customers. *See* ECF No. 403-3 at 3 (Optus); ECF No. 405-1 at 3-4 (Sears); ECF No. 407-3 at 3-4 (Capital One). LivePerson does not refute this testimony, and neither its operative complaint, ECF No. 50 ¶¶ 62-67, nor its opposition identify any specific breach.[13]

However, improper means also include those employed against a third person to procure the secret. *See* Restatement (First) of Torts § 757, cmt. h. As relevant here, they encompass "fraudulent misrepresentations to induce disclosure" and the like. *Big Vision*, 1 F. Supp. 3d at 273 (citation omitted); *see also BCG Partners, Inc. v. Avison Young (Canada) Inc*, 160 A.D.3d 407, 408 (N.Y. App. Div. 2018) ("[W]rongful means include fraud or misrepresentation . . . ." (internal quotation marks and citation omitted)). LivePerson raises a triable issue of fact whether [24]7 knew that it was exceeding the scope of its authorized access by developing a competing chat platform and using LivePerson's ATSs to implement that platform for former LivePerson customers. *See, e.g.*, ECF No. 423-1 at 2 ███████████████████████

---

[13] For example, LivePerson does not argue that Optus disclosed its ATSs without ensuring that the receiving personnel from [24]7 had "agreed to maintain the confidentiality of the Confidential Information on terms no less stringent than those imposed by [the Optus MSA]." Optus-LivePerson MSA § 19.1(b)(ii). Nor does LivePerson assert that Optus failed "to take all reasonable precautions to ensure that [LivePerson's] Confidential Information [was] treated as confidential and not disclosed or used other than for the purposes of the Supply Contract or [the Optus MSA]" when it was provided to [24]7. *Id.* § 19.1(c).

25

United States District Court
Northern District of California

1

2          ECF No. 423-2 at 113

3

4          ; *id.* at 225

5

6          ; ECF No. 423-3 at 233-34

7

8

9

10          ; *id.* at 236

11          ; *cf. SimplexGrinnell*, 642 F. Supp.

12 2d at 199 (misappropriation based on exceeding scope of authorization). Similarly, the parties

13 raise a dispute whether the customers providing the ATSs to [24]7 knew that [24]7 was doing so,

14 *see, e.g.*, ECF No. 423-2 at 222

15          *cf.*

16 ECF No. 423-3 at 178

17          If

18 [24]7 misrepresented the nature of its use to those customers, that omission could well be material,

19 as it put customers at risk of liability for a breach without their knowledge. *See Lewis v. Wells*

20 *Fargo Bank, N.A.*, 22 N.Y.S.3d 461, 463 (N.Y. App. Div. 2015) (stating that fraudulent

21 misrepresentations include the "omission of a material fact"). Even if a jury did not find that

22 [24]7's conduct rose to the level of an actionable misrepresentation, it could reasonably conclude

23 that this behavior fell below commercially reasonable standards of conduct.

24      Accordingly, the Court denies [24]7's motion for summary judgment on LivePerson's

25 trade secret misappropriation claims. Those claims may proceed, but solely on an improper-

26 means theory.

27      **C.**     **Breach of Contract**

28      As discussed above, LivePerson fails to identify a breach covered by the MSA's

1 unambiguous terms, let alone raise a triable issue of fact. Accordingly, [24]7 is entitled to

2 summary judgment on LivePerson's breach of contract claim.

3 **D.    Unjust Enrichment**

4 [24]7 argues that LivePerson's common-law unjust enrichment claim should be dismissed

5 because it merely duplicates the other claims for relief. ECF No. 400-4 at 28.

6 Under New York law, "[a]n unjust enrichment claim is not available where it simply

7 duplicates, or replaces, a conventional contract or tort claim." *Corsello v. Verizon N.Y., Inc.*, 18

8 N.Y.3d 777, 790 (2012). Rather, an unjust enrichment claim "is available only in unusual

9 situations when, though the defendant has not breached a contract nor committed a recognized

10 tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Id.*

11 "Typical cases are those in which the defendant, though guilty of no wrongdoing, has received

12 money to which he or she is not entitled." *Id.*[14]

13 LivePerson vaguely asserts that its unjust enrichment claim is premised on misconduct

14 independent of its other claims, but the interrogatory response on which LivePerson relies merely

15 incorporates by reference the documents and evidence proffered in support of its other claims. *See*

16 ECF No. 421-3 at 31; ECF No. 423-5 at 109. As best the Court can discern, the unjust enrichment

17 alleged is the benefit that [24]7 purportedly derived from the use of LivePerson's trade secrets and

18 interfering with its business relationships, which are encompassed by LivePerson's other causes of

19 action. LivePerson's unsupported assertion that it may still be entitled to the increase in [24]7's

20 digital chat agent revenue under an unjust enrichment theory, ECF No. 421-3 at 31, fails to

21 remedy this defect.

22 Because LivePerson has not explained how its unjust enrichment claim is not duplicative,

23 the Court grants summary judgment to [24]7 on the claim. *See Cont'l Indus. Grp., Inc. v.*

24 *Altunkilic*, No. 14CIV790ATJLC, 2018 WL 1508566, at *9 (S.D.N.Y. Mar. 27, 2018); *Nelson v.*

25 *MillerCoors, LLC*, 246 F. Supp. 3d 666, 679 (E.D.N.Y. 2017).

26

27 —————————

[14] LivePerson relies on a district court case allowing a duplicative unjust enrichment claim to
proceed along with a trade secret misappropriation claim, *see Member Servs., Inc. v. Sec. Mut. Life*
28 *Ins. Co. of N.Y.*, 2010 WL 3907489, at *12 (N.D.N.Y. 2010), but *Member Services* conflicts with
later precedent from the highest state court and is therefore inapposite.

### E.    Damages

Finally, [24]7 seeks summary judgment on the issue whether LivePerson can seek disgorgement as a remedy for its trade secret misappropriation and unfair competition claims, arguing that disgorgement is unavailable as a matter of law.

The New York Court of Appeals recently addressed the appropriate measure of damages for trade secret misappropriation in *E.J. Brooks*, 31 N.Y.3d 441. The court held "that damages in trade secret actions must be measured by the losses incurred by the plaintiff, and that damages may not be based on the infringer's avoided development costs." *Id.* at 454. Yet the court did not foreclose all reliance on the defendant's profits in calculating damages. In addressing the same question for an unfair competition claim, the court explained that "a defendant's gains may be evidence of a plaintiff's losses," although "they will not be presumed to be the actual measure" of those losses. *Id.* at 452. The court likewise agreed that a trade secret plaintiff is "entitled to recover as damages the amount of loss sustained by it, including opportunities for profit on the accounts diverted from it through defendants' conduct." *Id.* at 453 (quoting *Hertz Corp. v. Avis, Inc.*, 485 N.Y.S.2d 51 (N.Y. App. Div. 1985)). And while the court suggested that "the plaintiff's costs of developing the product may be the best evidence of the (now-depleted) value that the plaintiff placed on the secret," it also acknowledged the possibility that in some instances "the defendant's sales would approximate those of the plaintiff." *Id.* at 454 (citing *Michel Cosmetics, Inc. v. Tsirkas*, 282 N.Y. 195, 202 (1940) (relying on cases where evidence demonstrated "that the plaintiff lost sales of its product to the extent measured by defendant's manufacture of its own")).

*E.J. Brooks* thus establishes that [24]7's profits are a relevant measure of damages only to the extent that they show an "effect of the misappropriation on [LivePerson]" as evidence of LivePerson's lost profits or other damages. *Id.* Given this definitive statement of New York law, LivePerson's reliance on prior federal court cases permitting disgorgement is unavailing. Therefore, Live Person is not entitled to disgorgement of [24]7's profits, but it is not precluded from offering [24]7's profits as evidence to prove *compensatory* damages.

In this case, LivePerson's damages expert, Dr. William Choi, produced his expert report on April 5, 2018. ECF No. 429 ¶ 3. The New York Court of Appeals issued its *E.J. Brooks* decision

on May 3, 2018. 31 N.Y.3d at 441. Prior to *E.J. Brooks*, courts had "deemed an accounting of defendant's profits to be 'an appropriate measure of damages under New York law' for a misappropriation of trade secrets claim." *Shamrock Power Sales, LLC v. Scherer*, No. 12CIV8959KMKJCM, 2016 WL 7647597, at *12 (S.D.N.Y. Dec. 8, 2016), *report and recommendation adopted*, No. 12CV8959KMKJCM, 2017 WL 57855 (S.D.N.Y. Jan. 4, 2017) (quoting *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 969 (2d Cir. 1997)). Dr. Choi reasonably based his expert report on the existing law at the time.[15] The Court will therefore grant LivePerson's request to allow Dr. Choi to supplement his report. ECF No. 421-3 at 29 n.24.[16]

## CONCLUSION

In sum, the Court grants summary judgment to [24]7 on the Lanham Act, breach of contract, and unjust enrichment claims. The Court denies summary judgment on LivePerson's trade secret misappropriation claims. Finally, the Court grants LivePerson's request for Dr. Choi to supplement his report. The parties are ordered to submit a stipulation, or competing proposals, by November 2, 2018 that address the due dates for Dr. Choi's supplemental report and further discovery, if any, concerning that report.

**IT IS SO ORDERED.**

Dated: October 26, 2018



_____
JON S. TIGAR
United States District Judge

---

[15] [24]7's argument at the motion hearing that *Brooks* did not represent a change in the law is flatly contradicted by prior New York cases and by the dissent in *Brooks* itself. *See Brooks*, 31 N.Y.3d at 773 (Wilson, J., dissenting (describing the rule permitting disgorgement in trade secret cases as "ancient, settled law"); *Topps Co. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250, 269 (S.D.N.Y. 2005) ("The most commonly accepted measure of damages for trade secret misappropriation is the defendant's profits . . . .") (quoting Michael A. Rosenhouse, *Proper Measure and Elements of Damage for Misappropriation of Trade Secret*, 11 A.L.R.4th 12 § 2(a) (2004)).

[16] [24]7 also argues that regardless whether its profits may be considered as evidence of LivePerson's loss, [24]7's digital chat agent revenues are not sufficiently related to the alleged misconduct in developing and marketing its chat platform. As just explained, [24]7's digital chat agent revenues provide a basis for damages if, and only if, they measure LivePerson's loss. Consideration of this issue is premature, as Dr. Choi has yet to amend his report.