United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIVEPERSON, INC.,<br><br>        Plaintiff,<br><br>    v.<br><br>[24]7.AI, INC.,<br><br>        Defendant. | Case No. 17-cv-01268-JST<br><br>**ORDER RE: MOTIONS TO EXCLUDE EXPERT TESTIMONY**<br><br>Re: ECF No. 416, 447, 450 |

The Court now rules as follows on Plaintiff LivePerson's Motion to Exclude Certain Opinions of Defendant [24]7.AI, Inc.'s Experts, ECF No. 450, and Defendant [24]7.AI, Inc.'s Motion to Exclude Certain Testimony of LivePerson's Expert Witness Dr. William Choi, ECF No. 447.

<u>LivePerson's Motion to Exclude Certain Opinions of [24]'s Experts</u>

1. LivePerson's motion to exclude Dr. John Kelly's opinion(s) that [24]7 did not use LivePerson's trade secrets is DENIED. LivePerson's contention that Dr. Kelly disclosed this opinion for the first time at deposition is not supported by the record. Dr. Kelly specifically and repeatedly states in his expert report that "there is substantial evidence and reason to conclude that [24]7's chat platform source code and PxOE decision platform source code were developed independently of LivePerson's Alleged Trade Secrets, and that [24]7's models were developed independently of the Alleged Trade Secret rules." ECF No. 451-4 ("Kelly Report") ¶ 87; *see also id.* ¶ 33 ("There is substantial evidence and reason to conclude that [24]7's chat solution source code was developed independently of LivePerson's Alleged Trade Secrets."), ¶ 34 ("There is substantial evidence and reason to conclude that [24]7's customer specific models were developed independently of LivePerson's Alleged Trade Secret rules, ¶ 62 ("For the reasons explained

1 below, it is my opinion that there is substantial evidence and reason to conclude that [24]7's chat

2 solution source code was developed independently of LivePerson's Alleged Trade Secrets."), ¶ 72

3 ("It is my opinion that there is substantial evidence and reason to conclude that both the [24]7 chat

4 platform source code and the PxOE decision platform source code were developed independently

5 of LivePerson's Alleged Trade Secrets.").

6     2.      The Court also rejects the argument that Dr. Kelly did not disclose that he reviewed

7 [24]7's software to reach his opinions. His rebuttal expert report makes clear that he did review

8 24[7]'s software. *See, e.g.*, 451-4 ¶¶ 73, 74, 77. As LivePerson notes, Dr. Kelly does frequently

9 use the phrase "I am not aware of any evidence or analysis from LivePerson's experts," or variants

10 of that phrase, in responding to LivePerson's contentions. But that does not mean that he relied

11 only on the absence of opposing evidence, or that he did not review 24[7]'s software in reaching

12 his opinions.

13     3.      LivePerson's motion to exclude Ivan Zatkovich's opinion that [24]7 "deactivated

14 many rules, if not all the rules in certain clients" that [24]7 copied from LivePerson into its SQL

15 database, as well as any similar testimony, is GRANTED. Unlike with Dr. Kelly, Mr. Zatkovich's

16 testimony that 24[7] deactivated LivePerson's rules does not follow naturally from the opinion in

17 his declaration that "to the extent that [24]7 used any of the Alleged Trade Secrets, [24]7 used

18 them only temporarily in connection with a migration from the LivePerson chat solution to the

19 [24]7 chat solution, and with that customer's instructions and authorization," before transitioning

20 to [24]7's own models. It was possible for 24[7] to transition away from LivePerson's rules, or

21 even replace them, without deactivating them. Thus, Mr. Zatkovich's deposition testimony cannot

22 accurately be described as "a reasonable synthesis and/or elaboration of the opinions contained in

23 [his] report." Asetek Danmark A/S v. CMI USA, Inc., 2014 WL 6997670, at *1 (N.D. Cal. Dec.

24 9, 2014).

25     4.      The motion to exclude Mr. Zatkovich's opinions regarding advertising and

26 consumer behavior is GRANTED. Mr. Zatkovich was designated as a rebuttal expert, and as such

27 is permitted only to offer opinions that rebut the opinions of LivePerson's experts. Because

28 LivePerson has not offered expert opinion on these topics, there is nothing to rebut. [24]7's

contention that a rebuttal expert may rebut "any evidence" in the case – including evidence consisting entirely of material other than expert opinion – is simply incorrect. In light of this conclusion, the Court need not reach LivePerson's additional argument that Mr. Zatkovich lacks sufficient expertise in this area.

[24]7's Motion to Exclude Certain Testimony of Dr. William Choi

5. [24]/7's motion to exclude any testimony by Dr. William Choi related to or arising from paragraphs 170–217, 263, and 317–18, and Exhibits 5, 7A–12, and 14A in his corrected opening report, and paragraph 5 in his supplemental report, is GRANTED.

6. Dr. Choi's opinion must be excluded because he does not apportion trade secret misappropriation damages among particular alleged trade secrets, and offers no methodology for the jury to calculate trade secret misappropriation damages on fewer than all of the 28 alleged trade secrets in the case. And because the initial trial is a bellwether trial in which only 15 of the 28 alleged trade secrets will be at issue, the jury's verdict will necessarily encompass fewer than all of the alleged trade secrets. *See O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1077 (N.D. Cal. 2005) ("After the jury concluded that [the defendant] did not misappropriate all of [the plaintiff's] trade secrets, [the expert's] testimony regarding damages for misappropriation of all trade secret[s] was useless to the jury.").

7. LivePerson claims that Dr. Choi provides a way to apportion damages across trade secrets. It cites his written testimony that "[a]s each trade secret was necessary for the acquisition of the respective customer account, at minimum the value assigned to each trade secret claimed for each respective customer could be allocated equal shares." ECF No. 460-5 ¶ 196. Construing this sentence generously to LivePerson, this sentence can be read to opine that the jury can award damages *pro rata* based on the number of trade secrets found to have been misappropriated. For example, if there are five trade secrets at issue, and the jury finds only two were misappropriated, the resulting damages would be 40 percent of the total damages prayed for.

8. So construed, the opinion defies fundamental economics and common sense. It simply does not follow that if [24]7 misappropriated 2/5 percent of the alleged trade secrets for a particular customer, then LivePerson was damaged in the amount of exactly, or even

3

approximately, 40 percent of its lost profits, or 40 percent of [24]7's profits, for that customer. Some trade secrets are more valuable than others. And even if there were evidence that the trade secrets were equally valuable, there would be no way for the jury to evaluate that evidence – because it will not have all the trade secrets before it.

9. But that is not even Dr. Choi's opinion. At deposition, when asked what his opinion would be if the jury found that fewer than all of LivePerson's alleged trade secrets were misappropriated, Dr. Choi said,

> Q: If the jury finds that only one trade secret was misappropriated by [24]7, is LivePerson in your opinion still entitled to disgorgement of [24]7 digital chat agent profits in the same amount that you opine in your report?
>
> A: Again, I would have to speak with Dr. Wicker and Dr. Kursh.
>
> Q: Why?
>
> A: I've been asked to assume regarding the trade secrets at issue. And what assumptions regarding what [24]7 did with the misappropriation from a technical standpoint, if we're changing the assumptions and you're saying only one, it results in me having to speak with Drs. Wicker and Kursh regarding the importance of that one trade secret and what the economic consequences would be.

ECF No. 446-6 (Choi Depo.) at 254:9–255:1. And again:

> Q: And in the event the jury finds that 14 no Optus-related trade secrets were misappropriated by [24]7, how does that impact your damages analysis with respect to disgorgement of chat platform profits?
>
> THE WITNESS: It could change. Again, it's a different kind of factual, so it's not a question that I can readily answer right now. It seems like – there are a number of assumptions with respect to Optus, or a number of documents that I reviewed with respect to Optus that are sort of mixed that are considered in the report. And so by removing – asking me to change the assumptions, and it's a very important assumption, and then to ask me how would the damages change, again, it depends on what the counterfactual looks like. It's not something that I can answer sitting here today.

*Id.* at 263:13-264:8. Dr. Choi further admitted that "[i]f you ask me to change the number of trade secrets, I would have to revisit the issue with Drs. Wicker and Kursh." *Id.* at 255:14-17. And, contrary to the suggestion in Paragraph 196, Dr. Choi testified that he has no opinion about whether the alleged trade secrets are "all of equal value." Id. at 259:4-6.

4

10. LivePerson relies on *Steves & Sons, Inc. v. JELD-WEN, Inc.*, No. 3:16-CV-545, 2018 WL 2172502 (E.D. Va. May 10, 2018), in which the Court allowed an expert to opine on damages in a trade secrets case even after certain of the alleged trade secrets had been removed from the case. *Id.* at *11. In that case, the expert testified that

> there is a "critical mass" to the utility the Trade Secrets provide. While each Trade Secret does provide some value individually, once the user has a sufficient number of Trade Secrets, in aggregate, they provide a significant level of knowledge and know-how to derive meaningful and substantial benefits. In other words, the value of an individual Trade Secret often depends on what the other important variables are, and therefore, awareness of a sufficient number of them provides Steves with that "critical mass" of knowledge and know-how.

*Id.* Thus, the jury could award the total amount of damages calculated by the expert, even if it found that fewer than all trade secrets had been misappropriated.

11. *Steves* is readily distinguishable. In that case, the expert calculated three damages "scenarios." *Id.* at *3. The expert testified that if a sufficiently large group of trade secrets – a "critical mass" – were misappropriated then the damages would be the same as if they all were. He did not purport to opine that any one trade secret would be enough to entitle the plaintiff to 100 percent of its claimed damages. Furthermore, it was clear from the report and the context *which* trade secrets constituted the "critical mass" giving rise to the total damages for each scenario. *Id.* at *11-12. By contrast, LivePerson does not make the argument that any particular group of trade secrets constitutes a "critical mass," much less identify which trade secrets are included in that group. And even if it did, there would be no way for the jury to evaluate the argument, because the jury will not have all the alleged trade secrets before it.

12. Accordingly, [24]7's motion is granted. Because the Court grants the motion on this basis, it need not reach the parties' additional arguments.

**IT IS SO ORDERED.**

Dated: November 30, 2018

_____
JON S. TIGAR
United States District Judge